**FILED**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

Sept 12 2017

U.S. COURT OF
FEDERAL CLAIMS

|  |  |
|---|---|
| HEALTHYCT, INC., <br> IN LIQUIDATION <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No. __17-1233 C__

Judge: _____

## COMPLAINT

Plaintiff HealthyCT, Inc., in Liquidation ("HealthyCT") brings this action against the United States of America and its agencies and instrumentalities ("Defendant" or the "Government"), and alleges the following:

## NATURE OF THE CASE

HealthyCT brings this action seeking damages for the Defendant's violations of the transitional reinsurance and risk corridors provisions of the Patient Protection and Affordable Care Act and implementing regulations, as well as Defendant's breaches of its transitional reinsurance and risk corridors payment obligations under express and implied-in-fact contracts, Defendant's breaches of the covenant of good faith and fair dealing implied in Defendant's contracts with HealthyCT, and Defendant's taking of HealthyCT's property without just compensation in violation of the Fifth Amendment of the U.S. Constitution.

<u>**INTRODUCTION**</u>

1.      This case involves a federal program that Congress established to promote the nearly universal availability of health insurance. The program was established with the Government assuming a portion of the risk of underwriting a previously uninsured population. It did so by providing certain safeguards to prevent runaway claims costs. Hundreds of companies, including HealthyCT, wrote insurance under the new standards relying on these Government safeguards. But instead of honoring its obligations, the Government has reneged on crucial safeguard payments, driving HealthyCT and other similar organizations into bankruptcy.

2.      In March 2010, the Government enacted the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), 124 Stat. 119 and the Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), 124 Stat. 1029 (together, the "ACA"). The ACA significantly altered the health insurance market nationwide. It brought guaranteed availability of health care to most Americans and prohibited health insurers from using factors such as health status, medical history and gender to set premium rates or deny coverage. The ACA also imposed an "individual mandate" requiring individuals to purchase coverage if they are not otherwise insured, and created federal subsidies to offset the cost of coverage for many individuals. It also created the health insurance exchanges ("Exchanges"), which are online marketplaces where individuals and small groups may purchase health insurance.

3.      In order to promote competition within the Exchanges and to provide consumers with greater choices among health plans that meet certain federally-mandated criteria ("Qualified Health Plans" or "QHPs"), the ACA established the Consumer Operated and Oriented Plan ("CO-OP") program. The CO-OP program authorized start-up and surplus note financing for non-profit health insurers. The start-up and solvency loan financing arrangements are effectuated through a loan agreement between the CO-OP and the U.S. Department of Health

and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS"). One of the CO-OP loan agreement provisions requires the CO-OP to offer QHPs to individuals and small groups.

4. The individual mandate, together with the availability of subsidies and the Exchanges, dramatically increased the number of individuals purchasing health insurance. Many of these individuals were previously uninsured. This created significant uncertainty for HealthyCT and other health insurers, which had no previous experience or reliable data to meaningfully assess the needs and medical costs associated with this previously uninsured new population and to set their premiums accordingly.

5. Acknowledging this uncertainty for health insurers, and to encourage participation in the Exchanges, Congress included in the ACA three risk-sharing and premium-stabilization programs, namely transitional reinsurance, temporary risk corridors, and risk adjustment, referred to as the "3R's." These programs were intended to help protect participating health insurers against runaway claims costs resulting from adverse selection by insureds and premium deficiencies as the ACA's market reforms were implemented. This case involves two of those programs: transitional reinsurance and temporary risk corridors.

6. Section 1341 of the ACA provides a reinsurance program for the first three benefit years of the ACA's market reforms: calendar years 2014 ("CY 2014"), 2015 ("CY 2015") and 2016 ("CY 2016"). The reinsurance provides a safeguard against "high risk" individuals (i.e., those with high medical costs). Under the reinsurance program, health insurance issuers are eligible for reinsurance payments when an enrollee's medical costs reach a specified "attachment point." The reinsurance payments stop when the enrollee's medical costs reach a specified "cap." The reinsurance payments are based on a percentage of the medical

costs between the attachment point and the cap, depending on the revenues generated by contributing entities into the program and the medical costs qualifying for reinsurance payments.

7.     The ACA gives states the option to operate their own reinsurance program or to allow HHS to operate one for the state. HHS delegated rulemaking authority for the reinsurance and risk corridors programs to CMS, a division of HHS. 76 FR 53903, 53903-53904 (Aug. 30, 2011). Connecticut elected to run its own reinsurance program for CY 2014 but subsequently elected to have HHS operate the reinsurance program on behalf of Connecticut for part of CY 2015 and all of CY 2016. Bulletin, CMS, "Transitional Reinsurance Program – CMS to Begin Operating on behalf of the State of Connecticut" (Apr. 28, 2017) (*available at*: https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Transitional-Reinsurance-Program-%E2%80%93-CMS-to-Begin-Operating-on-behalf-of-the-State-of-Connecticut.pdf.)

8.     Section 1342 of the ACA established a temporary "risk corridors" program for CY 2014, CY 2015 and CY 2016. The risk corridors program was designed to encourage health insurers to participate in the exchanges and to help mitigate the uncertainty in establishing premium rates by sharing gains and losses between QHPs and the Government. Under the risk corridors program, the Government is legally responsible for making specific payments to a QHP if the QHP's allowable costs are greater than a certain percentage of the target amount of its premium revenues. Conversely, the QHPs must pay the Government certain sums if the QHP's allowable costs are less than a certain percentage of the target amount of its premium revenues. Allowable costs include claims and money spent on quality improvement, and the target amount of premiums equals premiums collected minus the administrative costs of the plan. The ACA

does not contain any financial limits or restraints on the Government's mandatory risk corridors payments to QHPs.

9.      HealthyCT is entitled to a reinsurance payment equal to $10,022 for CY 2015 and $6,345,388 for CY 2016.  In addition, HealthyCT is entitled to a risk corridors payment equal to $1,561,044 for CY 2014, $14,583,148 for CY 2015, and $25,582,824 for CY 2016.

10.      The Defendant has breached its statutory and contractual obligations to make the reinsurance and risk corridors payments in full.  For CY 2014, the Defendant has paid out only 14% of the risk corridors amounts due.  In addition, the Defendant will not pay any of its CY 2015 or CY 2016 risk corridors obligations unless and until it receives sufficient risk corridors payments from QHPs to satisfy its $2.5 billion debt to all QHPs for the CY 2014 risk corridors obligations.  Based on recent financial information published by HHS, it is clear that amounts due to the Government from QHPs do not come close to this amount.

11.      This action seeks the recovery of the $48,082,426 shortfall the Government owes HealthyCT under the reinsurance and risk corridors provisions of the ACA.

**JURISDICTION**

12.      This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491, because HealthyCT brings claims for damages over $10,000 against the Government based on its violations of a money-mandating Act of Congress, money-mandating regulations of an executive department, an express contract and/or an implied-in-fact contract with the Government, and a taking of HealthyCT's property in violation of the Fifth Amendment of the Constitution.

## PARTIES

13.     Plaintiff HealthyCT is a Connecticut-domiciled health insurer having its principal office at 35 Thorpe Ave., Suite 104, Wallingford, CT.  HealthyCT was formed in 2011 as a non-profit entity in Connecticut with the intent to participate in the Connecticut health care market as a CO-OP as identified in Section 1322 of the ACA.

14.     Defendant is the United States of America and its agencies and instrumentalities, including HHS and CMS.

## STATEMENT OF FACTS

### *Congress Enacts the Patient Protection and Affordable Care Act*

15.     Congress enacted the ACA in 2010.  The ACA aimed to increase the number of Americans covered by health insurance and decrease the cost of health care in the United States, and includes a series of interlocking reforms designed to expand coverage in the individual and small employer group health insurance markets.

16.     The ACA provides that "each health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the State that applies for such coverage."  42 U.S.C. § 300gg-1(a).  The ACA generally bars insurers from charging higher premiums on the basis of a person's health.  *See* 42 U.S.C. § 300gg (providing a limited number of factors on which premium may be based).

17.     Section 1311 of the ACA established the framework for statewide marketplaces known as "American Health Benefit Exchanges" or "Exchanges."  42 U.S.C. § 18031.  The Exchanges were intended to facilitate the purchase of QHPs.  HealthyCT participated and offered QHPs in the Exchange established in Connecticut, Access Health CT (the "Connecticut Exchange"), pursuant to Section 1311 of the ACA.

18.     Section 1322 of the ACA established the CO-OP Program.  HealthyCT was formed and operated as a CO-OP under the ACA.    HealthyCT entered into a Loan Agreement with HHS and CMS dated June 7, 2012 (as amended, the "Loan Agreement").  Among other things, the Loan Agreement required HealthyCT to "satisfy and meet all applicable requirements of the Affordable Care Act, and regulations promulgated thereunder, including but not necessarily limited to the regulations codified at 45 CFR Part 156, as well as terms of the CO-OP FOA and any and all additional CO-OP Program guidance as may be issued or released by [HHS and CMS] from time to time…"  Loan Agreement at 23.  In turn, the Government committed to a functional ACA as that law and its implementing regulations were drafted and intended.

### *The ACA's Premium-Stabilization Programs – The "3Rs"*

19.     Sections 1341 to 1343 of the ACA established three risk-sharing and premium-stabilization programs to help protect health insurers against runaway claims costs from adverse risk selection and market uncertainty.  42 U.S.C. §§ 18061–18063; *see also* 76 FR 41929, 41930 (July 15, 2011) ("These programs will mitigate the impact of potential adverse selection and stabilize premiums in the individual and small group markets as insurance reforms and the Affordable Insurance Exchanges ("Exchanges") are implemented, starting in 2014.").  The two temporary programs – reinsurance and risk corridors – were intended to provide stability while the ACA's market reforms were being implemented.  Prior to the implementation of the ACA, insurers protected against runaway claims costs by declining to write unhealthy individuals or to write them at only high premiums.  The ACA eliminated these conventional tools and substituted programs that were intended to protect insurers from the effects of having to take all insureds at the same price regardless of health. The permanent risk adjustment program was designed to provide payments to health insurance issuers that attract high-risk populations (such as

individuals with chronic conditions) and discourage insurers from targeting only healthy people. This action relates to the reinsurance and risk corridors programs.

### *The Risk Corridors Program*

20.    Section 1342 of the ACA requires the Secretary of HHS to establish a temporary risk corridors program that provides for the Government to share in QHPs' gains or losses resulting from inaccurate rate setting annually for CY 2014, CY 2015 and CY 2016 in the individual and small group markets.  42 U.S.C. § 18062.

21.    The risk corridors program was modeled after a similar program implemented as part of the Medicare Part D prescription drug benefit program.  *See* 42 U.S.C. § 18062(a) (requiring that the risk corridors "program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act").  The explicit reference to the Medicare Part D risk corridors program indicates Congress' intent that the ACA risk corridors program, like that in Medicare Part D, provide for annual payments.  *See* 42 U.S.C. § 1395w-115(e)(3)(A) (Medicare Part D provision directing HHS to establish a risk corridor for each prescription drug plan for each plan year); *see also* 42 C.F.R. § 423.336(c) (2009) (Medicare Part D implementing regulations providing for payments on either a lump-sum or adjusted monthly basis in the year following a coverage year).

22.    Congress was aware of HHS' regulations and payment scheme for the Medicare Part D risk corridors program when it enacted the ACA in March 2010.  By expressly directing HHS to model the ACA risk corridors provisions on the Medicare Part D risk corridors program, Congress intended a program of ACA risk corridors payments to be made in full on an annual basis, just as the payments are made under the Medicare Part D risk corridors program.

23.    The risk corridors program under the ACA applies only to issuers of QHPs on the Exchanges.  It was intended to "protect against uncertainty in the Exchange by limiting the

extent of issuer losses (and gains)" during the first three years of the sweeping reforms brought by the ACA." 76 FR 41929, 41930 (July 15, 2011). Congress recognized that without the risk-sharing provided by the risk corridors program, insurers electing to participate in the newly-created Exchanges were likely to be more conservative in setting premium rates, which would cost consumers, and the Government in the form of ACA subsidies, more money. Relying on the risk corridors program, QHPs like HealthyCT set premiums based on the Government's promise to share in losses if costs in this uncertain marketplace were higher than predicted.

### HealthyCT was a QHP Issuer for CY 2014, CY 2015 and CY 2016

24.     In conjunction with its loan agreement with CMS, HealthyCT was required to become a QHP issuer by complying with the statutory requirements of the ACA and participate in the Connecticut Exchange.

25.     On September 30, 2013, HealthyCT was certified by the Connecticut Exchange as a Qualified Health Plan Issuer for CY 2014.

26.     On November 14, 2014, HealthyCT was certified by the Connecticut Exchange as a Qualified Health Plan Issuer for CY 2015.

27.     On October 30, 2015, HealthyCT was certified by the Connecticut Exchange as a Qualified Health Plan Issuer for CY 2016.

28.     Before HealthyCT received QHP certification for its health plans offered on the Connecticut Exchange in CY 2014, CY 2015 and CY 2016, HealthyCT submitted attestations for CMS and the State of Connecticut certifying its compliance with the obligations it was undertaking by agreeing to act as a QHP issuer on the Connecticut Exchange.

29.     Pursuant to its annual attestations to CMS and the State of Connecticut, HealthyCT agreed to many obligations required by the Government to offer QHPs on the Connecticut Exchange. These included requirements as to licensing, employment restrictions,

benefit design standards, cost-sharing limits, dedicated and secure server environments, data standards and timely reporting and participation in financial management programs established under the ACA (including the risk corridors, transitional reinsurance and risk adjustment programs).

30.     HealthyCT attested that "it will adhere to the risk corridor standards and requirements set by HHS as applicable for…risk corridor data standards and annual HHS notice of benefit and payment parameters for the calendar years 2014, 2015, and 2016" and will "remit charges to HHS under the circumstances described in 45 CFR 153.510(c)."   HealthyCT also attested that it will "adhere to risk adjustment standards and requirements set by HHS in the annual HHS notice of benefit and payment parameters (45 CFR Subparagraphs G and H)"; and that it will "adhere to the reinsurance standards and requirements set by HHS in the annual HHS notice of benefit and payment parameters (45 CFR 153.400, 153.405, 153.410, 153.420)."   For all three risk programs, HealthyCT attested that it would remit any charges due to HHS for risk corridors (45 CFR 153.510(c); remit contributions to HHS for transitional reinsurance (under the circumstances described in 45 CFR 153.400); and remit any charges to HHS for risk adjustment payments to other insurers (under the circumstances described in 45 CFR 153.610).

31.     The risk-sharing and premium-stabilization programs were a critical component of HealthyCT's overall financial model and analysis related to initiating health insurance operations to mitigate the financial risk associated with an unknown population and potential runaway claims costs, as well as comply with the strict ACA benefit structure and premium-rate setting requirements.   The successful implementation of the risk-sharing and premium-stabilization programs by CMS was substantially more important for HealthyCT in light of its early stage of development as a risk bearing insurance company.   Unlike its competition,

HealthyCT did not possess any Connecticut market claim-cost history or medical utilization data associated with the population it would insure. Therefore, premium-rate setting risk was greater for HealthyCT, and the need for all three elements of CMS's risk-sharing and premium-stabilization programs, operating collectively as designed in ACA, was critical to its financial viability and success.

32. The Government, through the enactment of the ACA, its implementing regulations, and letters, memoranda and other written and oral communication, offered to provide tax credits, cost-sharing subsidies, risk corridors payments, transitional reinsurance, risk adjustment payments and other reimbursement to QHPs such as HealthyCT. *See, e.g.*, 42 U.S.C. §§ 18061–18063 (establishing the 3Rs); 45 C.F.R. Parts 144, 147, 150, 153-156 (implementing ACA provisions relating to QHPs, the 3Rs, rate setting, and Exchanges); 76 FR 41929, 41931 (July 15, 2011) (proposed rule providing standards for the 3Rs); 78 FR 15410 (May 31, 2013) (final rule providing detail and parameters related to: the risk adjustment, reinsurance, and risk corridors programs; cost-sharing reductions; user fees; advance payments of the premium tax credit; and other Federally-facilitated programs); 79 FR 30240, 30260 (May 17, 2014) (stating that "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers. In [the event of shortfall], HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations."). HealthyCT participated in the Connecticut Exchange offering QHPs and setting premiums in reliance on the availability of the 3Rs, cost sharing reductions and advance payment of premium tax credits. HealthyCT adhered to the standards and requirements set by HHS under the ACA and timely remitted all charges to HHS for these programs in CY 2014, CY 2015 and CY 2016.

33.     These ACA risk programs were meant to work together to mitigate market and premium uncertainties.  Under the 3R programs, high risk adjustment charges, such as the $13.6 million amount HealthyCT experienced for CY 2015, are factored into calculations for risk corridors payments.  In turn, this results in higher risk corridors amounts due those insurers that have high risk adjustment charges.

### *The Risk Corridors Payment Methodology*

34.     At a high level, under the risk corridors program, the Government (i) collects charges from issuers of QHPs if premiums exceed allowable costs by a certain amount and (ii) makes payments to issuers of QHPs if premiums fall short of allowable costs by a certain amount.

35.     Section 1342 of the ACA provides the specific payment methodology and formula for determining the amounts the Government "shall pay" QHPs and the amounts QHPs shall pay to the Government if the risk corridors conditions are met:

> **(b)     Payment Methodology**
> **(1)     Payments out**
> The Secretary shall provide under the program established under subsection (a) that if –
> > (A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and
> > (B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.
> **(2)     Payments in**
> The Secretary shall provide under the program established under subsection (a) that if –
> > (A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the

> Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and
>
> (B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the excess of 92 percent of the target amount over the allowable costs.

42 U.S.C. § 18062(b). "Allowable costs" for a QHP in any year are equal to the total costs (other than administrative costs) of the plan in providing benefits covered by the plan, reduced by any reinsurance and risk adjustment payments received under Sections 1341 and 1343 of the ACA. The "target amount" for a QHP in any year is an amount equal to the total premiums (including any premium subsidies under any governmental program), reduced by the administrative costs of the plan.

36.     Pursuant to the formula prescribed by Section 1342(b) of the ACA, for each of CY 2014, CY 2015 and CY 2016, QHPs with allowable costs that are greater than 103 percent of the QHP's target amount will receive payments from HHS to offset a percentage of those losses, while QHP's with allowable costs less than 97 percent of the QHP's target amount are required to remit charges for a percentage of those cost savings to HHS.

37.     The statute does not state or otherwise require that risk corridors payments by the Government to QHPs are constrained by the amount of risk corridors charges collected by the Government from QHPs, as is the case with the transitional reinsurance and risk adjustment programs.

38.     Section 1342 does not state or otherwise require the risk corridors program to be "budget neutral." Neither that term nor the concept of budget neutrality appear anywhere in Section 1342 or its implementing regulations. HHS and CMS recognized this when they published the following in the Federal Register in their final rulemaking:

The risk corridors program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, HHS will remit payments as required under Section 1342 of the Affordable Care Act.

78 FR 15409, 15473 (Mar. 11, 2013).

39. In CY 2014, CY 2015 and CY 2016, HealthyCT's allowable costs were more than 103 percent of its target amount, making it eligible to receive mandatory risk corridors payments required under Section 1342.

40. Congress did not limit in any way HHS's obligation to make full risk corridor payments owed to QHPs due to appropriations, restrictions on use of funds, or otherwise in Section 1342 or any other section of the ACA.

41. Congress has not amended Section 1342 since the ACA was enacted in 2010. Congress has not repealed Section 1342. HHS thus lacks statutory authority to pay anything less than 100% of the risk corridors payments due HealthyCT for CY 2014, CY 2015 and CY 2016.

42. HealthyCT relied on the Government's offer and commitment to make full risk corridors payments annually as required by Section 1342 of the ACA. Despite the statutory requirement and its repeated assurances to the contrary, the Government has refused to make full and timely risk corridors payments for CY 2014, CY 2015 and CY 2016.

### The Risk Corridors Implementing Regulations

43. Congress authorized and directed HHS to establish and administer the risk corridors program enacted in Section 1342. The Secretary of HHS delegated authority over the risk corridors program to the CMS Administrator on August 30, 2011. 76 FR 53903, 53903-04 (Aug. 30, 2011). Accordingly, CMS issued implementing regulations for the risk corridors program at 45 C.F.R. Part 153.

44. The implementing regulations promulgated by CMS use a risk corridors calculation that is mathematically identical to the statutory formula in Section 1342 of the ACA.

*See* 45 C.F.R. § 153.510 (using the same risk-sharing thresholds and percentages as the ACA). The regulations, like the controlling statute, do not require the program to be "budget neutral." There is no provision limiting the Government's required annual risk corridors payments to QHPs to the amount of charges the Government receives from QHPs. *Id.*

45. 45 C.F.R. § 153.510(b) provides the formula for determining risk corridors payment amounts that QHPs "will receive":

> (b) *HHS payments to health insurance issuers.* QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:
>
> > (1) When a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and
> >
> > (2) When a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

45 C.F.R. § 153.510(b).

46. 45 C.F.R. § 153.510(c) provides the formula for determining risk corridors charges that QHPS "must remit" to HHS:

> (c) *Health insurance issuers' remittance of charges.* QHP issuers must remit charges to HHS in the following amounts, under the following circumstances:
>
> > (1) If a QHP's allowable costs for any benefit year are less than 97 percent but not less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to 50 percent of the difference between 97 percent of the target amount and the allowable costs; and
> >
> > (2) When a QHP's allowable costs for any benefit year are less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the difference between 92 percent of the target amount and the allowable costs.

45 C.F.R. § 153.510(c). The definitions of "allowable costs" and "target amount" are not materially different than those used in Section 1342 of the ACA.

47. The regulation imposes a 30-day deadline for a QHP to fully remit payments to HHS when the QHP's allowable costs in a calendar year are less than 97 percent of the QHP's target amount. 45 C.F.R. § 510(d). The regulation is silent on when HHS must tender full risk corridor payments to QHPs whose allowable costs in a calendar year are greater than 103 percent of the QHP's target amount.

48. During the proposed rulemaking that ultimately resulted in adoption of the 30-day remittance deadline for QHPs, HHS stated that the deadline for the Government to make risk corridor payments should be identical to the deadline for a QHP's remittance of charges to the Government. In July 2011, although HHS did not propose a specific deadline for remittance of risk corridor charges or payments by the Government, it suggested the following in its proposed rule in the Federal Register:

> HHS would make payments to QHP issuers that are owed risk corridor amounts from HHS within a 30-day period after HHS determines that a payment should be made to the QHP Issuer. We believe that QHP issuers who are owed these amounts will want prompt payment, and also believe that the payment deadlines should be the same for HHS and QHP issuers.

76 FR 41929, 419943 (July 15, 2011).

49. In the final rulemaking HHS stated that it "plan[ned] to address the risk corridors payment deadline in the HHS notice of benefit and payment parameters" but it reiterated its prior position:

> While we did not propose deadlines in the proposed rule, we discussed in the preamble timeframes for QHP issuers to remit charges to HHS. We suggested, for example, that a QHP issuer required to make a risk corridors payment may be required to remit charges within 30 days of receiving notice from HHS, and that

> HHS would make payments to QHP issuers that are owed risk corridors amounts within a 30-day period after HHS determines that a payment should be made to the QHP issuer. <u>QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers.</u>

77 FR 17219, 17238-39 (Mar. 23, 2012) (emphasis added).

50.     One year later, CMS published a final rule adopting, among other things, the 30-day deadline for a QHP to remit risk corridors charges to the Government. *See* 78 FR 15409, 15531 (Mar. 11, 2013) (adding a new subsection (d) to 45 C.F.R. § 153.510). Although CMS did not impose a specific deadline for HHS to make its corresponding risk corridors payments to QHPs, the Government never contravened its earlier statements that the deadline for the Government's payment obligations should be identical to that imposed on QHPs.

51.     HealthyCT relied on the statements by HHS and CMS in the Federal Register that full risk corridors payments would be made on an annual basis by the same deadline as payments from QHPs to the Government. Despite its statements to the contrary published in the Federal Register, the Government has refused to make full and timely risk corridors payments for CY 2014 and CY 2015. CMS has stated it will not pay any amounts due for 2016 until amounts paid in to CMS by QHPs can pay amounts owed for 2014 and 2015, which exceed $8 billion . The result of the Government's failure to make these risk corridors payments in a timely fashion is that HealthyCT has gone into receivership, as have nearly all of the other CO-OPs. The delay and uncertainty in payment that the Government belatedly seeks to impose makes the entire CO-OP program unworkable, as the Government reimbursements represented a significant portion of each CO-OP's asset base as a receivable from CMS.

### *HHS' and CMS' Recognition of Risk Corridors Payment Obligations*

52.     Since the enactment of the ACA in 2010, HHS and CMS have publicly acknowledged and reaffirmed their statutory and regulatory obligations to make full and timely

risk corridors payments to QHP issuers. The statements were made or ratified by representatives with authority to bind the Government. HealthyCT relied on these statements to assume and continue its QHP status, including its participation in the Connecticut Exchange during CY 2014, CY 2015 and CY 2016.

53. In July 2011, HHS published a proposed rule in the Federal Register stating that although the proposed regulations did not contain deadlines for QHP issuers to remit charges to HHS or for HHS to make risk corridors payments to QHP issuers, deadlines were under consideration and that "[w]e believe that QHP issuers who are owed [risk corridors] amounts will want prompt payment, and also believe that the payment deadlines should be the same for HHS and QHP issuers." 76 FR 41929, 41943 (July 15, 2011).

54. On March 23, 2012, HHS published its final rule implementing standards for states related to reinsurance and risk adjustment, and for health insurance issuers related to reinsurance, risk corridors, and risk adjustment. 77 FR 17219 (Mar. 23, 2012). While HHS recognized that it did not propose deadlines for making risk corridors payments, it re-stated its prior position that "QHP issuers who are owed [risk corridors] amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers." 77 FR 17219, 17238 (Mar. 23, 2012).

55. In a March 2012 presentation to health insurers regarding its final rule, CMS stated that the risk corridors program is a "Federal program" under the ACA that "[p]rotects against inaccurate rate-setting by sharing risk (gains and losses) on allowable costs between HHS and qualified health plans to help ensure stable health insurance premiums." Presentation, CMS, "Reinsurance, Risk Corridors, and Risk Adjustment Final Rule," at 11 (Mar. 2012) (available at: https://www.cms.gov/CCIIO/Resources/Files/Downloads/3rs-final-rule.pdf).

56.     In proposed rulemaking on December 7, 2012, HHS stated that "[t]he risk corridors program, which is a Federally administered program, will protect against uncertainty in rates for qualified health plans by limiting the extent of issuer losses and gains."  77 FR 73118, 73119 (Dec. 7, 2012).  HHS also reconfirmed that the risk corridors program was designed to share risk between the Government and QHP issuers, stating that "[t]he risk corridors program creates a mechanism for sharing risk for allowable costs <u>between the Federal government and QHP issuers.</u>"  *Id.* at 73200 (emphasis supplied).  HHS also stated its intent that the risk corridors program would be administered on an annual basis: "[i]n this proposed rule, HHS also specified the annual schedule for the risk corridors program, including dates for claims run-out, data submission, and notification of risk corridors payments and charges."  *Id.*

57.     The final rule implemented on March 11, 2013, again confirmed that "[t]he risk corridors program is not statutorily required to be budget neutral.  Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act."  78 FR 15409, 15473 (Mar. 11, 2013).

58.     In February 2014, the Congressional Budget Office ("CBO") published projections of the impact of the risk corridors program on the Government.  The CBO reported that in contrast to the reinsurance and risk adjustment provisions of the ACA, "payments and collections under the risk corridor program will not necessarily equal one another."  CBO, "The Budget and Economic Outlook:  2014 to 2024" at 110 (Feb. 2014).  The CBO projected that in fiscal year 2015, the difference between annual risk corridors payments and collections would net the Government $1 billion in revenue.  *Id.* at 109.  The CBO analysis clearly contemplated that the risk corridors payments would be made annually and in full, rather than at the end of the risk corridors program.  The CBO report stated that "collections and payments for the…risk

corridor programs will occur after the close of a benefit year. Therefore, collections and payments for insurance provided in 2014 will occur in 2015, and so forth." *Id.* at 110 n. 6.

59. On March 11, 2014, HHS published a final rule that again confirmed that risk corridors payments would be made annually. 79 FR 13743 (Mar. 11, 2014). HHS also stated that "we believe that the risk corridors program as a whole will be budget neutral or, will result in net revenue to the Federal government in FY 2015 for the 2014 benefit year." *Id.* at 13829.

60. Citing no statutory authority, HHS – for the first time – reversed is prior position and announced in the March 11, 2014, final rule that it "intends to implement [the risk corridors] program in a budget neutral manner." 70 FR 13743, 13829 (Mar. 11, 2014).

61. On April 11, 2014, CMS issued a bulletin regarding its recent budget neutrality decision. Bulletin, CMS, "Risk Corridors and Budget Neutrality" (April 11, 2014). The bulletin was written in question-and-answer format. In response to the question of "[w]hat risk corridors payments will HHS make if risk corridors collections for a year are insufficient to fund risk corridors payments for the year, as calculated under the risk corridors formula?," CMS answered that "[w]e anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments. However, if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall." Bulletin, CMS, "Risk Corridors and Budget Neutrality," at 1 (April 11, 2014).

62. In a final rule of May 27, 2014, HHS summarized its statements from the April 11, 2014, bulletin, stating that "we intend to administer risk corridors in a budget neutral way over the three-year life of the program, rather than annually," but confirmed that payments would be made on an annual basis by stating that "if risk corridors collections in the first or second year are insufficient to make risk corridors payments as prescribed by the regulations, risk corridors

collections received for the next year will first be used to pay off the payment reduction issuers experience in the previous year….." 79 FR 30239, 30260 (May 27, 2014).

63.     The May 27, 2014, final rule also repeated HHS's belief that "risk corridors collections will be sufficient to pay for all risk corridors payments." *Id.* HHS, however, also affirmed that should a shortfall occur, "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers. In that event, HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations." *Id.* HHS reaffirmed its position in proposed rulemaking on November 26, 2014, again stating that "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers." 79 FR 70673, 70700 (Nov. 26, 2014).

64.     HHS finalized its proposed policy to administer the risk corridors program in a "budget neutral" manner in a final rule published on February 27, 2015. 80 FR 10749, 10779 (Feb. 27, 2015). But HHS also again reaffirmed its position with respect to potential shortfalls in collections:

> HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers. In the unlikely event that risk corridors collections, including any potential carryover from the prior years, are insufficient to make risk corridors payments for the 2016 program year, HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations.

*Id.*

65.     On or about July 31, 2015, HealthyCT submitted its CY 2014 risk corridors data to CMS pursuant to 45 C.F.R. § 153.530(d).

66.     On October 1, 2015, HHS and CMS announced a significant shortfall in the CY 2014 risk corridors program. CMS announced in a bulletin that based on current data from QHP

issuers, the Government would collect $362 million in risk corridors charges from QHPs but owe $2.87 billion in risk corridors payments for CY 2014 – a shortfall of over $2.5 billion. Bulletin, CMS, "Risk Corridors Payment Proration Rate for 2014" (Oct. 1, 2015). As a result of the shortfall, risk corridors payments to QHPs would be prorated to 12.6% for CY 2014. *Id.*

67. On November 19, 2015, CMS issued a public announcement confirming that even in light of the severe shortfall in the risk corridors program, "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers." Bulletin, CMS, "Risk Corridors Payments for 2014 Benefit Year" (Nov. 19, 2015). CMS stated that it was recording the unpaid amounts following the 12.6% prorated payment as "fiscal year 2015 obligation[s] of the United States Government for which full payment is required." *Id.*

68. On September 9, 2016, after several actions had been filed by QHP issuers in this Court seeking monetary relief for breaches of the Government's risk corridors payment obligations, CMS again confirmed that "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers," and that "HHS will record risk corridors payments due as an obligation of the United States Government for which full payment is required." Bulletin, CMS, "Risk Corridors Payments for 2015" (Sept. 9, 2016).

69. On November 18, 2016, CMS announced that as a result of the severe shortfall in the CY 2014 risk corridors program, all CY 2015 risk corridors collections would be used to pay a portion of balances on CY 2014 risk corridors payments. Bulletin, CMS, "Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year" (Nov. 18, 2016).

### *The Defendant's Failure to Make Full Risk Corridors Payments*

70. Despite HHS's and CMS's repeated and correct acknowledgments that the ACA requires full payment of risk corridors amounts to QHP issuers, the risk corridors program has

been the subject of subsequent congressional actions intended to undermine the administration of the risk corridors program as contemplated by the ACA and its implementing regulations.

71.     Neither the ACA nor its implementing regulations, however, limit the Government's obligation to make risk corridors payments to the amount of risk corridors charges it collects from QHP issuers.  Indeed, in its final rule proposed on March 11, 2013, HHS stated that "[t]he risk corridors program is not statutorily required to be budget neutral.  Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act."  78 FR 15410, 15473 (Mar. 11, 2013).  This was consistent with Congress' stated intent when the ACA was enacted:  that the risk corridors program be modeled after the Medicare Part D risk mitigation program, which is not budget neutral.  *See* U.S. Gov't Accountability Office, GAO Report GAO-15-447 at 14 (April 2013) (*available at*: http://www.gao.gov/assets/680/670161.pdf)  ("For the Medicare Advantage and Medicare Part D risk mitigation programs, the payments that CMS makes to issuers are not limited to issuer contributions.").

72.     One year later, HHS declared – with no statutory basis – that it would "implement" the program in a budget neutral manner.  70 FR 13743, 13829 (Mar. 11, 2014).

73.     On December 16, 2014, Congress enacted the omnibus appropriations bill for fiscal year 2015, the "Consolidated and Further Continuing Appropriations Act, 2015," Pub. L. 113-235 (the "2015 Appropriations Act").  A provision in the 2015 Appropriations Act targeted the risk corridors program, prohibiting the use of certain specific appropriated CMS funds for payments under the risk corridors program.  Section 227 of the 2015 Appropriations Act provides as follows:

> None of the funds made available by this Act from the Federal
> Hospital Insurance Trust Fund or the Federal Supplemental

> Medical Insurance Trust Fund, or transferred from other accounts
> funded by this Act to the "Centers for Medicare and Medicaid
> Services–Program Management" account, may be used for
> payments under section 1342(b)(1) of Public Law 111-148
> (relating to risk corridors).

128 Stat. 2491.

74. Congress' preclusion of certain funds appropriated for CMS from being used for the risk corridors program did not amend or otherwise modify Section 1342 of the ACA, and did not abrogate the Government's statutory or contractual obligation to make full and timely risk corridors payments to QHPs. The 2015 Appropriations Act did not expressly or by clear implication amend or repeal Section 1342 of the ACA, nor did it prohibit "any or all" governmental appropriations from being used, nor did it modify the government's substantive obligations under Section 1342 of the ACA. The legislative history of the appropriations act similarly does not contain clear and uncontradicted language doing so.

75. On December 18, 2015, Congress enacted the omnibus appropriations bill for fiscal year 2016, the "Consolidated Appropriations Act, 2016," Pub. L. 114-113 (the "2016 Appropriations Act"). The 2016 Appropriations Act Congress contained language identical to Section 224 of the 2015 Appropriations Act, again targeting the risk corridors program by prohibiting the use of certain appropriated funds for payments under the risk corridors program. 2016 Appropriations Act, 129 Stat. 2624. The 2016 Appropriations Act also contained an additional funding restriction:

> In addition to the amounts otherwise available for ''Centers for
> Medicare and Medicaid Services, Program Management'', the
> Secretary of Health and Human Services may transfer up to
> $305,000,000 to such account from the Federal Hospital Insurance
> Trust Fund and the Federal Supplementary Medical Insurance
> Trust Fund to support program management activity related to the
> Medicare Program: *Provided*, That except for the foregoing
> purpose, such funds may not be used to support any provision of

24

> Public Law 111–148 or Public Law 111–152 (or any amendment made by either such Public Law) or to supplant any other amounts within such account.

129 Stat. 2625.

76.     Congress' preclusion of certain funds appropriated for CMS from being used for the risk corridors program did not amend or otherwise modify Section 1342 of the ACA, and did not abrogate the Government's statutory or contractual obligation to make full and timely risk corridors payments to QHPs.  The 2016 Appropriations Act did not expressly or by clear implication amend or repeal Section 1342 of the ACA, nor did it prohibit "any or all" governmental appropriations from being used, nor did it modify the government's substantive obligations under Section 1342 of the ACA.  The legislative history of the appropriations act similarly does not contain clear and uncontradicted language doing so.

77.     On May 5, 2017, Congress enacted the omnibus appropriations bill for the remainder of fiscal year 2017, the "Consolidated Appropriations Act, 2017," Pub. L. 115-31 (the "2017 Appropriations Act").  The 2017 Appropriations Act contains language identical to the 2016 Appropriations Act, again attempting to target the risk corridors program by prohibiting the use of certain funds appropriated under the act for CMS for payments under the risk corridors program.  2017 Appropriations Act, Pub. L. 115-31 at Sections 223-24.

78.     Congress' preclusion of certain funds appropriated for CMS from being used for the risk corridors program did not amend or otherwise modify Section 1342 of the ACA, and did not abrogate the Government's statutory or contractual obligation to make full and timely risk corridors payments to QHPs.  The 2017 Appropriations Act did not expressly or by clear implication amend or repeal Section 1342 of the ACA, nor did it prohibit "any or all" governmental appropriations from being used, nor did it modify the government's substantive

obligations under Section 1342 of the ACA.  The legislative history of the appropriations act similarly does not contain clear and uncontradicted language doing so

79.     On September 9, 2016, HHS announced that it "recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers," and that "HHS will record risk corridors payments due as an obligation of the United States Government for which full payment is required."  Bulletin, CMS, "Risk Corridors Payments for 2015" (Sept. 9, 2016).  This bulletin was followed by testimony of CMS Acting Administrator Andrew Slavitt before the House Energy and Commerce Committee on September 14, 2016.  During the joint hearing, U.S. Rep. Morgan Griffith asked Mr. Slavitt if CMS takes the position that insurance plans are entitled to be made whole on risk corridors payments, even if there is no congressional appropriation to do so.  Mr. Slavitt responded under oath: "Yes, it is an obligation of the federal government." Energy and Commerce Committee, The Affordable Care Act on Shaky Ground:  Outlook and Oversight, September 14, 2016 (*available at*:   https://energycommerce.house.gov/hearings-and-votes/hearings/affordable-care-act-shaky-ground-outlook-and-oversight).

80.     The Government has repeatedly acknowledged in writing and in sworn testimony that the full amount of risk corridors payments owed to QHP issuers are obligations of the Government.  It simply refuses to honor those legal obligations.

### *The Reinsurance Program*

81.     Section 1341 of the ACA authorizes and directs the Secretary of HHS to establish a reinsurance program intended to stabilize individual market premiums during the first three years of the ACA's new market reforms.  42 U.S.C. § 18061; 76 FR 41929, 41930 (July 15, 2011).  The Secretary of HHS delegated authority over the reinsurance program to the CMS Administrator on August 30, 2011.  76 FR 53903, 53903-04 (Aug. 30, 2011).

82.     Under the reinsurance program, HHS collects reinsurance contributions from contributing entities based on enrollment, and eligible issuers receive reinsurance payments when the costs for an enrollee reaches a specific "attachment point." An eligible issuer receives from HHS a portion of the costs above the attachment point, until a specified "cap" is reached. Once the cap is reached, the issuer is no longer eligible to receive reinsurance payments on claim amounts above the cap. 42 U.S.C. § 18061; 45 C.F.R. § Part 153.230.

83.     Unlike the risk corridors program, the reinsurance program was designed to be budget neutral. The amount of reinsurance payments to eligible issuers is limited to the amount of reinsurance contributions from the contributing entities. *See* 45 C.F.R. § 153.230 ("[t]he national reinsurance payment parameters for each benefit year commencing in 2014 and ending in 2016 set forth in the annual HHS notice of benefit and payment parameters for each applicable benefit year will apply with respect to reinsurance payments made from contributions received under the national contribution rate."). HHS, or a state if it elects to operate its own reinsurance program, must notify issuers of the total amount of reinsurance payments that will be made no later than June 30 of the year following the applicable benefit year. 45 C.F.R. § 153.240.

84.     In a final rule published on March 23, 2012, HHS provided that reinsurance payments to eligible issuers will be made for a portion of an enrollee's claims costs paid by the issuer that exceeds an attachment point, subject to a cap. 77 FR 17219, 17228 (Mar. 23, 2012). HHS would publish the specific payment parameters for each of the three years of the reinsurance program in the Federal Register.

85.     On March 11, 2013, HHS published its Notice of Benefit and Payment Parameters for CY 2014. 78 FR 15409 (Mar. 11, 2013). On March 11, 2014, HHS published its Notice of Benefit and Payment Parameters for CY 2015. 90 FR 13744 (Mar. 11, 2014). On February 27,

2015, HHS published its Notice of Benefit and Payment Parameters for CY 2016. 80 FR 10749 (Feb. 27, 2015).

86.     HealthyCT made reinsurance contributions in the amount of $187,758 for CY 2014 and $1,321,838 for CY 2015. Based on the claim costs of its enrollees, HealthyCT received $1,944,236 in reinsurance payments for CY 2014 and $11,499,231 for CY 2015. HealthyCT received the entire amount of its reinsurance for CY 2014. The Government failed to pay HealthyCT $10,022 of its CY 2015 reinsurance and has made no CY 2016 reinsurance payment to HealthyCT.

***HealthyCT is Placed Into Rehabilitation and Then Liquidation Pursuant to Connecticut Law***

87.     Relying on the functioning of the 3R programs as designed and intended under the ACA, HealthyCT paid all amounts owed HHS for CY 2014 and CY 2015, including the $13.6 million risk adjustment charge it owed for 2015. The Defendant failed to make the $14.6 million risk corridors payment for CY 2015 owed to HealthyCT, effectively forcing HealthyCT into rehabilitation.[1] But for the Defendant reneging on its obligation to pay promised risk corridors payments, HealthyCT could, and should, still be operating as a financially healthy insurer.

88.     Largely as a result of the Government's failure to make the payments to which HealthyCT was entitled under the ACA, HealthyCT became financially distressed and on November 1, 2016, the Connecticut Superior Court, Judicial District of Hartford, entered an Order of Rehabilitation placing HealthyCT into rehabilitation and appointing Katherine L. Wade, Insurance Commissioner of the State of Connecticut, as Rehabilitator of HealthyCT. Order of Rehabilitation of HealthyCT (Nov. 1, 2016) (attached hereto as Exhibit A). The Court entered

---

[1] HealthyCT also paid all amounts owed for CY 2016, but the Government has not paid and will not pay HealthyCT over $40 million in risk corridors payments for CY 2014, CY 2015 and CY 2016.

the Order of Rehabilitation because HealthyCT's financial condition was such that its further transaction of business would have been hazardous financially to its policyholders, creditors, or the public. HealthyCT consented to the entry of the Order of Rehabilitation.

89.     Despite the best efforts of the Rehabilitator and her appointed Special Deputy Rehabilitator, Daniel L. Watkins, to restore HealthyCT to financial stability, HealthyCT's financial condition continued to deteriorate and it became insolvent. Accordingly, on December 7, 2016, the Rehabilitator sought an order from the Connecticut Superior Court to liquidate HealthyCT pursuant to Sections 38a-918(a) and 38a-919 of The Insurers Rehabilitation and Liquidation Act, Conn. Gen. Stat. §§ 38a-903 to 38a-961 (inclusive) (the "Connecticut Insurance Receivership Act").

90.     On December 9, 2016, the Connecticut Superior Court entered an Order of Liquidation of HealthyCT, effective 11:59 p.m. on December 31, 2016, pursuant to the Connecticut Insurance Receivership Act. Order of Liquidation of HealthyCT (Dec. 9, 2016) (attached hereto as Exhibit B) (the "Liquidation Order"). The Liquidation Order appointed Katherine L. Wade, Insurance Commissioner of the State of Connecticut, and her successors in office, as Liquidator, and Daniel L. Watkins as Special Deputy Liquidator.

91.     The Connecticut Insurance Receivership Act provides a comprehensive scheme for the rehabilitation and liquidation of insurance companies as part of the regulation of the business of insurance in the State of Connecticut. Conn. Gen. Stat. § 38a-903(7). As stated in the Connecticut Insurance Receivership Act, "[p]roceedings in cases of insurer insolvency and delinquency are deemed an integral aspect of the business of insurance and are of vital public interest and concern." *Id.*

92.     Nothing in the ACA altered the primacy of state law governing the liquidation of an insolvent insurer.  Rather, the ACA and its implementing regulations reflect Congress' intent to preserve state regulation of health insurer solvency and proceedings relating to financially distressed or insolvent insurers.  Under a clause titled "No interference with State regulatory authority," the ACA states that "[n]othing in this title shall be construed to preempt any State law that does not prevent the application of the provisions of this title."  42 U.S.C. § 18041(d).  The ACA contains no provisions that even attempt to regulate the rehabilitation or liquidation of insurance companies.

### The Set-Off Effectuated in Connecticut Superior Court

93.     Upon entry of the Liquidation Order, the Liquidator was directed to "immediately take possession of the assets of HealthyCT and to administer them under the general supervision of the Court."  Liquidation Order at para. 5.  The Liquidation Order also vests the Liquidator with all powers and authority expressed or implied under the Connecticut Insurance Receivership Act, and all powers and authority set forth in the Liquidation Order.  *Id.* at 4.

94.     The Connecticut Insurance Receivership Act gives the Liquidator the power to "collect all debts and moneys due and claims belonging to the insurer, wherever located, and for this purpose…to do such other acts as are necessary or expedient to collect, conserve or protect its assets or property…"  Conn. Gen. Stat. § 38a-923(a)(6).  Thus, the Liquidator is charged with gathering and administering the assets of HealthyCT and collecting the debts, monies and claims due and belonging to HealthyCT.  The amounts owed by the Defendant under the ACA are debts due to HealthyCT and are an asset of the estate.  It is the Liquidator's duty to collect those amounts.

95.     The Connecticut Insurance Receivership Act also provides the Liquidator with the authority to set off mutual debts or mutual credits between the insurer and another person.  Conn.

Gen. Stat. § 38a-932(a). In addition, the Connecticut Insurance Receivership Act gives the Liquidator the power to do such other acts as are necessary or expedient to collect, conserve or protect the insurer's assets, and to pursue any creditor's remedies, which include common law rights of set off. Conn. Gen. Stat. § 38a-932(a)(6).

96. Pursuant to the power and authority vested in the Liquidator under the Liquidation Order, including those under Connecticut statute and common law, the Liquidator set off amounts owing by HealthyCT to the Government under the ACA against amounts owed by the Government to HealthyCT under the risk corridors program. In effectuating the set off HealthyCT (i) calculated owing the Government $9,939,377 in the aggregate, consisting of risk adjustment payments pursuant to Section 1343 of the ACA, advanced premium tax credit and cost-sharing reduction and reconciliations amounts, reinsurance contributions, Patient-Centered Outcomes Research Institute fees, and other fees imposed on QHP issuers under the ACA; and (ii) calculated the Government owing HealthyCT $44,805,981, in the aggregate, consisting of all risk corridors and reinsurance payments under Sections 1341 and 1342 of the ACA for CY 2014, CY 2015 and CY 2016. As a result of the set off, there was a net payable by the Government as of February 14, 2017, consisting of risk corridors and reinsurance payments under Section 1341 and 1342 of the ACA including $16,165,020 for CY 2014 and CY 2015 Risk Corridors due and payable in December 2016.[2] Notice of the actions taken by the Liquidator was provided to the Government by letter dated February 14, 2017 (the "Set Off Notice," attached hereto as Exhibit C).

---

[2] While the inputs for calculating amounts for CY 2016 were reasonably estimable (e.g., enrollment, claims and premium revenue), the calculations for amounts related to CY 2016 depended in part on data submitted by other QHP issuers through July 2017. Thus, well-informed calculations were used at the time of set off. As noted above, at the time the set-off was effectuated, amounts due and payable to HealthyCT by the Government for CY 2015 and CY 2015 Risk Corridors ($16,165,020) exceeded all amounts owed or projected to be owed to the Government by HealthyCT. The amount payable by the Government to HealthyCT is $48,082,426 as of September 1, 2017.

97. The Liquidator provided detail regarding the set off to the Connecticut Superior Court in the First Accounting and Status Report of Daniel L. Watkins, Special Deputy Liquidator, filed on February 17, 2017. Contemporaneously, the Liquidator filed with the Court a Motion to Approve the First Accounting and Status Report. The Liquidator also filed a Brief in Support of the Motion to Approve the First Accounting and Status Report on March 3, 2017. Notice and a copy of the First Accounting and Status Report, the Motion to Approve same, and Brief in Support thereof were provided to the Government on March 7, 2017. A detailed summary of the notice and documents provided to the Government is contained in an Affidavit of Daniel L. Watkins, Special Deputy Liquidator, which was filed with the Connecticut Superior Court on March 7, 2017, and is attached hereto as Exhibit D.

98. The Connecticut Superior Court authorized, approved and ratified the set off effectuated by the Liquidator by Order dated May 17, 2017 (attached hereto as Exhibit E).

99. The Defendant did not respond to the Set Off Notice or object or otherwise appear before the Connecticut Superior Court in connection with the Motion to Approve the First Accounting and Status Report and Acts Reported Therein.

### HealthyCT's Risk Corridors Amounts Due for CY 2014 – CY 2016

100. In a report released on November 19, 2015, HHS and CMS publicly announced QHPs' risk corridors payments and charges for CY 2014. Bulletin, CMS, "Risk Corridors Payment and Charge Amounts for Benefit Year 2014" (Nov. 19, 2015).

101. HealthyCT's losses for CY 2014 resulted in the Government being required to pay HealthyCT a risk corridors payment of $1,833,886. The Government announced, however, that it would pay HealthyCT a prorated amount of $231,397 for CY 2014.

102. On September 9, 2016, HHS published guidance on risk corridors payments for CY 2015, stating that it anticipated that all CY 2015 risk corridors collections would be used

toward the 87.4% of CY 2014 risk corridors payments that remain due and owing to QHPs as a result of the Government's failure to provide full and timely CY 2014 risk corridors payments. Bulletin, CMS, "Risk Corridors Payments for 2015" (Sept. 9, 2016).

103.    On November 9, 2016, HHS and CMS confirmed that all CY 2015 risk corridors collections would be used to pay a portion of balances on the CY 2014 risk corridors payments. Bulletin, CMS, "Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year" (Nov. 18, 2016).

104.    HealthyCT's losses in CY 2015 resulted in the Government being required to pay HealthyCT a risk corridors payment of $14,583,148.  The Government announced, however, that it would not pay any portion of the risk corridors payments owed for CY 2015.    Aggregate payments of $272,842 have been made towards satisfying the outstanding balance owed to HealthyCT for CY 2014 risk corridors payments.

105.    As a result of the set off effectuated by the Liquidator, as detailed above, HealthyCT is owed aggregate risk corridors payments for CY 2014, CY 2015 and CY 2016 equal to $41,727,016.  The Government lacks the authority, under statute, regulation or contract, to unilaterally withhold the full and timely payment of such amount.

### HealthyCT's Reinsurance Amounts Due for CY 2015 and CY 2016

106.    HealthyCT's claims costs in CY 2015 resulted in the Government being required to pay HealthyCT a reinsurance payment of $11,509,253.    The Government has paid $11,499,231 towards HealthyCT's CY 2015 reinsurance.  The Government is required to pay the balance of $10,022.

107.    HHS lacks the authority, under statute, regulation or contract, to unilaterally withhold, set-off or net the remaining CY 2015 reinsurance payments from HealthyCT when it owes HealthyCT more than HealthyCT owes HHS.

108.     HealthyCT's claims costs in CY 2016 resulted in the Government being required to pay HealthyCT a reinsurance payment of $6,345,388.  The Government has failed to make the required payment.

109.     HHS lacks the authority, under statute, regulation or contract, to unilaterally withhold set-off or net the CY 2016 reinsurance payments from HealthyCT when it owes HealthyCT more than HealthyCT owes HHS.

## COUNT I

### Violation of Reinsurance Statute and Regulation

110.     HealthyCT re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

111.     Section 1341 of the ACA is money mandating, and authorizes and directs the Secretary of HHS to establish a reinsurance program.

112.     On March 11, 2014, HHS published its Notice of Benefit and Payment Parameters for CY 2015.  90 FR 13744 (Mar. 11, 2014).  On February 27, 2015, HHS published its Notice of Benefit and Payment Parameters for CY 2016.  80 FR 10749 (Feb. 27, 2015).

113.     HealthyCT satisfied all statutory and regulatory requirements for participation in and payments under the reinsurance program for CY 2015 and CY 2016 until it entered liquidation on January 1, 2017.

114.     The Government failed to provide full payment of reinsurance amounts owed to HealthyCT for CY2015, in violation of Section 1341 and 45 C.F.R. § 153.240.  By paying only $11,499,231 of the total $11,509,253 to which HealthyCT is entitled, the Government owes HealthyCT an additional $10,022 in reinsurance payments for CY 2015.

115. The Government has failed to provide payment of reinsurance amounts owed to HealthyCT for CY2016, in violation of Section 1341 and 45 C.F.R. § 153.240. The Government owes HealthyCT $6,345,388 in reinsurance payments for CY 2016.

116. As a result of the Government's violation of Section 1341 of the ACA and 45 C.F.R. § 153.240, HealthyCT has been damaged in the amount of at least $6,355,410, together with interest, costs of suit and such other relief as this Court deems just and proper.

**COUNT II**

**Violation of Risk Corridors Statute and Regulation**

117. HealthyCT re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

118. Section 1342 of the ACA and 45 C.F.R. § 153.510 are money mandating, and require the Government to pay qualified issuers statutorily defined amounts as part of the risk corridors program.

119. HealthyCT satisfied all statutory and regulatory requirements for participation in and payments under the risk corridors program for CY 2014, CY 2015 and CY 2016.

120. The Government failed to provide the risk corridors payments owed to HealthyCT for CY 2014, in violation of 1342 and 45 C.F.R. § 153.510. The government paid only $272,842 of the total $1,833,886 to which HealthyCT is entitled. The Government owes HealthyCT an additional $1,561,044 in risk corridors payments for CY 2014.

121. The Government announced that it will not pay any of the $40,165,972 in risk corridors payments owed to HealthyCT for CY 2015 and CY 2016, in violation of Section 1342 of the ACA and 45 C.F.R. § 153.510, unless and until the Government receives sufficient risk corridors collections to pay the entire $2.5 billion it still owes for CY 2014 risk corridors obligations. The Government has also announced that it will not pay the entirety of the

$40,165,972 in risk corridors payments owed to HealthyCT for CY 2015 and CY 2016, unless and until the Government receives sufficient risk corridors collections from issuers to cover all of its CY 2015 and CY 2016 risk corridors obligations to all issuers. There is virtually no possibility that these events will occur.

122. The mere determination by Congress to make certain appropriated funds unavailable, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not defeat a Government obligation created by statute. The Government is obligated to make full payment to QHP issuers, such as HealthyCT.

123. The Government's failure to make full and timely risk corridor payments to HealthyCT constitutes a violation and breach of the Government's mandatory payment obligations under Section 1342 of the ACA and 45 C.F.R. § 153.510.

124. As a result of the Government's violation of Section 1342 of the ACA and 45 C.F.R. § 153.510, HealthyCT has been damaged in the amount of at least $41,727,016, together with interest, costs of suit and such other relief as this Court deems just and proper.

**COUNT III**

**Breach of Express Contract**

125. HealthyCT re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

126. The Loan Agreement is a valid written agreement between HealthyCT, as borrower, and HHS and CMS, as lender.

127. The Loan Agreement was executed or ratified by representatives of the Government who had express or implied actual authority to bind the Government, and were entered into with mutual assent and consideration by both parties.

128.     The Loan Agreement obligated HHS and CMS to support a functioning ACA as that law and its implementing regulations were drafted and intended, and not to frustrate HealthyCT's performance of its obligations thereunder.

129.     HealthyCT satisfied and complied with its obligations under the Loan Agreement until it entered liquidation on January 1, 2017.

130.     The Government's failure to make full and timely reinsurance and risk corridors payments to HealthyCT, as required by Sections 1341-1342 of the ACA and 45 C.F.R. §§ 153.240 and 153.510, is a material breach of the Loan Agreement.

131.     As a result of the Government's material breaches of the Loan Agreement, HealthyCT has been damaged in the aggregate amount of $48,082,426, together with interest, costs of suit and such other relief as this Court deems just and proper.

<u>COUNT IV</u>

**Breach of Implied-In-Fact Contract**

132.      HealthyCT re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

133.     The circumstances alleged above establish mutuality of intent to contract, consideration, lack of ambiguity in offer and acceptance, and actual authority upon the part of Government actors to bind the Government, with respect to reinsurance and risk corridor payments.

134.     The Government knowingly and voluntarily entered into a valid implied-in-fact contract with HealthyCT pursuant to which HealthyCT agreed to become a QHP and participate in the Connecticut Exchange in exchange for full and timely payment by the Government of reinsurance and risk corridors amounts, as well as other cost-sharing subsidies created by the ACA.

135.    The ACA and HHS' and CMS' implementing regulations, and HHS' and CMS' repeated admissions regarding their obligation to make reinsurance and risk corridors payments, were made or ratified by representatives of the Government who had express or implied actual authority to bind the Government.    They constituted a clear and unambiguous offer by the Government to make full and timely reinsurance and risk corridors payments to health insurers, including HealthyCT, that agreed to participate as QHPs in the Exchanges and were approved as certified QHPs by the Government at its discretion.    This offer evidences a clear intent by the Government to contract with HealthyCT.

136.    HealthyCT accepted the Government's offer by agreeing to become a QHP issuer and to participate in and accept the uncertain risks imposed by the Exchanges, risks the Government agreed to mitigate with full and timely reinsurance and risk corridors payments.

137.    The implied-in-fact contract was authorized and ratified by representatives of the Government who had express or implied actual authority to bind the Government, including, but not limited to, the Secretary of HHS, Kevin Counihan, Director of CCIIO and CEO of the Health Insurance Marketplaces, and Andrew Slavitt, Administrator of CMS, and their predecessors. The contract was founded upon a meeting of the minds between the parties and entered into with mutual assent, and was supported by consideration.    The contract is further confirmed by the statements, actions and performance of the parties.

138.    HealthyCT satisfied its contractual obligation by selling and providing QHPs on the Connecticut Exchange in each of CT 2014, CY 2015 and CY 2016.

139.    The Government breached its contractual duty to HealthyCT by failing to pay $41,727,016 of the CY 2014, CY 2015 and CY 2016 risk corridors payments to which HealthyCT is entitled.

140.     The Government also breached its contractual duty to HealthyCT by failing to pay $6,355,410 of the CY 2015 and CY 2016 reinsurance payments to which HealthyCT is entitled.

141.     As a result of the Government's material breaches of its contractual obligations, HealthyCT has been damaged in the aggregate amount of $48,082,426, together with interest, costs of suit and such other relief as this Court deems just and proper.

## COUNT V

### Breach of Implied Covenant of Good Faith and Fair Dealing

142.     HealthyCT re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

143.     A covenant of good faith and fair dealing is implied in every contract, including those with the Government, and imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.

144.     The contracts entered into between HealthyCT and the Government created reasonable expectations for HealthyCT that the risk corridors and reinsurance payments, which HealthyCT regarded as an important part of the contract consideration, would be paid by the Government.

145.     By failing to make full and timely reinsurance and risk corridors payments, the Government has destroyed HealthyCT's reasonable expectations regarding the fruits of the contracts between HealthyCT and the Government, in breach of an implied covenant of good faith and fair dealing existing therein.

146.     Congress granted HHS rulemaking authority regarding the reinsurance and risk corridors programs in Sections 1341 and 1342 of the ACA.  HHS and CMS had an obligation to

exercise the discretion afforded to them in good faith, and not arbitrarily, capriciously or in bad faith.

147. The Government breached the implied covenant of good faith and fair dealing by, among other things:

(a) inserting in HHS and CMS regulations a 30-day deadline for a QHP issuer's full remittance of risk corridors charges to the Government, but failing to create a similar deadline for the Government's full payment of risk corridors payments to QHP issuers, despite stating that QHP issuers and the Government should be subject to the same payment deadline;

(b) requiring QHP issuers to fully remit risk corridors charges to the Government, but unilaterally deciding that the Government may make prorated risk corridors payments to QHP issuers, despite earlier stating that QHP issuers and the Government should be subject to the same payment deadline;

(c) in Section 227 of the 2015 Appropriations Act, targeting legislatively the Government's risk corridors payment obligations by limiting funding sources for CY 2014 risk corridors payments, after HealthyCT had undertaken significant expenses in performing its obligations as a QHP in the Connecticut Exchange based on its reasonable expectations that the Government would make full and timely risk corridors payments if HealthyCT experienced sufficient losses in CY 2014;

(d) in Section 225 of the 2016 Appropriations Act, targeting legislatively the Government's risk corridors payment obligations by limiting funding sources

for CY 2014 and CY 2015 risk corridors payments, after HealthyCT had undertaken significant expenses in performing its obligations as a QHP in the Connecticut Exchange based on its reasonable expectations that the Government would make full and timely risk corridors payments if HealthyCT experienced sufficient losses in CY 2014 and CY 2015;

(e) in Section 223 of the 2017 Appropriations Act, targeting legislatively the Government's risk corridors payment obligations by limiting funding sources for CY 2014, CY 2015 and CY 2016 risk corridors payments, after HealthyCT had undertaken significant expenses in performing its obligations as a QHP in the Connecticut Exchange based on its reasonable expectations that the Government would make full and timely risk corridors payments if HealthyCT experienced sufficient losses in CY 2014, CY 2015 and CY 2016;

(f) making statements regarding risk corridors payments upon which HealthyCT relied to become a QHP and participate in the Connecticut Exchange (*see, e.g.*, 78 FR 15409, 15473 (Mar. 11, 2013 ("The risk corridors program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act."), then failing to make full and timely risk corridors payments after unilaterally determining to "implement [the risk corridors] program in a budget neutral manner." 79 FR 13743, 13829 (Mar. 11, 2014);

(g) repeatedly acknowledging in writing and testimony before Congress that the Government is obligated to make full risk corridors payments to QHP

issuers, including HealthyCT, then taking a contrary position in actions pending in this Court asserting that the Government has no obligation to pay any risk corridors amounts unless it has sufficient risk corridors collections or unless Congress makes new specific appropriations for such purposes; and

(h) failing to make the full amount of required reinsurance payments to HealthyCT for CY 2015 and CY 2016 despite HealthyCT's qualification for such payments under HHS' published Notices of Benefit and Payment Parameters for CY 2015 and CY 2016.

148.    As a direct and proximate result of the aforementioned breaches of the covenant of good faith and fair dealing, HealthyCT has been damaged in the amount of at least $48,082,426, together with interest, costs of suit and such other relief as this Court deems just and proper.

## COUNT VI

### Taking Without Just Compensation

149.    HealthyCT re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

150.    The government's actions complained of herein constitute a deprivation and taking of HealthyCT's property for public use without just compensation in violation of the Fifth Amendment to the U.S. Constitution.

151.    HealthyCT has a vested property interest in its contractual, statutory and regulatory rights to receive statutorily-mandated reinsurance and risk corridors payments. HealthyCT had a reasonable investment-backed expectation of receiving full and timely payment of reinsurance and risk corridors payable to QHP issuers under the ACA and implementing regulations, and based on the Loan Agreement and HHS' and CMS' direct public statements.

152.    The Government expressly and deliberately interfered with and has deprived HealthyCT of property interests and its reasonable investment-back expectation to receive full and timely payment of reinsurance and risk corridors amounts required under the ACA and implementing regulations.

153.    HealthyCT is entitled to just compensation for the Government's taking of its property in the amount of at least $48,082,426, together with interest, costs of suit and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

Wherefore, HealthyCT respectfully requests that this Court award the following relief:

a.  That the Court award monetary relief in the amount HealthyCT is entitled to under Section 1341 of the ACA and 45 C.F.R. § 153.240 regarding CY 2015 and CY 2016 reinsurance payments;

b.  That the Court award monetary relief in the amount HealthyCT is entitled to under Section 1342 of the ACA and 45 C.F.R. § 153.510 regarding CY 2014, CY 2015 and CY2016 risk corridors payments;

c.  That the Court award damages in the amount of $48,082,426 sustained by HealthyCT as a result of the Government's breach of the Loan Agreement;

d.  That the Court award damages in the amount of $48,082,426 sustained by HealthyCT as a result of the Government's breach of the implied covenant of good faith and fair dealing contained in the Loan Agreement;

e.  That the Court award just compensation for the Government's taking of HealthyCT's property in the amount of at least $48,082,426;

f. That the Court award HealthyCT such additional damages and other monetary relief as is available under applicable law;

g. That the Court award all available interest, including, but not limited to, post-judgment interest, to HealthyCT;

h. That the Court award attorney's fees and costs to HealthyCT; and

i. That the Court award such other relief as the Court may deem just and proper.


Dated: September 12, 2017


Respectfully submitted,

/s/ Brad Fagg
Brad Fagg
(Counsel of Record)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5191
(202) 739-3001 (fax)
brad.fagg@morganlewis.com

*Attorneys for HealthyCT, Inc., in Liquidation*

Of Counsel:

Harold S. Horwich
Benjamin J. Cordiano
MORGAN, LEWIS & BOCKIUS LLP
One State Street
Hartford, CT 06103

# EXHIBIT A

## Order of Rehabilitation

CV16-6072516

KATHARINE L. WADE, INSURANCE      :     SUPERIOR COURT
COMMISSIONER OF THE STATE         :
OF CONNECTICUT                    :     JUDICIAL DISTRICT OF
                                  :     HARTFORD
VS                                :
                                  :
HEALTHYCT, INC.                   :     NOVEMBER 1, 2016

## ORDER OF REHABILITATION

The Court enters this Order by consent of the parties, Katharine L. Wade,

Insurance Commissioner of the State of Connecticut (the "Commissioner") and

HealthyCT, Inc. ("HealthyCT") as provided in Conn. Gen. Stat. § 38a-914(1).

IT IS HEREBY ORDERED:

1.     This Order of Rehabilitation is entered into pursuant to the provisions of

The Insurers Rehabilitation and Liquidation Act (the "Act"), Conn. Gen. Stat. §§ 38a-

903 to 38a-961 and more particularly Conn. Gen. Stat. 38a-914(1). The consent of

the board of directors of HealthyCT to the entry of this Order of Rehabilitation is

attached hereto as Exhibit A.

2.     Sufficient cause exists for the rehabilitation of HealthyCT pursuant to

the Act. Accordingly, HealthyCT is placed in rehabilitation under the Act, and as of

3:25 o'clock AM/PM of this ___1^st___ day of November, 2016, HealthyCT shall in its

existing form cease all operations and "HealthyCT, Inc. in Rehabilitation" shall

continue as successor of HealthyCT, consistent with the terms of this and all

subsequent Orders of this Court. The title of this case shall hereafter be "In the

matter of HealthyCT, Inc." but the case number shall remain the same.

105.00

3.      The Commissioner and her successors in office (collectively, the "Rehabilitator") are hereby appointed Rehabilitator of HealthyCT and are vested, in addition to the powers and authority set forth in this Order, with all powers and authority expressed or implied under the Act.

4.      Pursuant to Conn. Gen. Stat. § 38a-915(a), the Rehabilitator is granted and directed to take forthwith possession and control of and title to the assets and property of HealthyCT and to administer them under the general supervision of the Court. The filing or recording of this Order with the Clerk of the Superior Court or with the recorder of deeds of the judicial district in which the principal business of HealthyCT is conducted or in which HealthyCT's principal office or place of business is located, shall impart the same notice as a deed, bill of sale or other evidence of title duly filed or recorded with the recorder of deeds would have imparted. Title to all assets and property of HealthyCT, wherever located, is vested by operation of law in the Rehabilitator.

5.      The Rehabilitator shall have all the powers and duties set forth in Conn. Gen. Stat. § 38a-916, including, without limitation, the authority to appoint one or more special deputies who shall have all of the powers and responsibilities of the Rehabilitator under said section, and the Rehabilitator may employ such counsel, consultants, clerks, and assistants as deemed necessary. The compensation of any such special deputies, counsel, consultant, clerks or assistants and all expenses of taking possession of HealthyCT and of conducting the proceedings and activities under the Act shall be fixed by the Rehabilitator, with the approval of the Court, and shall be paid out of the funds or assets of HealthyCT.

2

6. The Rehabilitator may take such actions as she deems necessary or appropriate to reform, revitalize, rehabilitate or run-off HealthyCT, or if the Receiver determines that further efforts to rehabilitate HealthyCT would substantially increase the risk of loss to creditors, policyholders or the public, or would be futile, he may apply to this Court for an Order of Liquidation pursuant to Conn. Gen. Stat. § 38a-918. The Rehabilitator shall have all the powers of the directors, officers and managers, whose authority shall be suspended, except as they are redelegated by the Rehabilitator. The Rehabilitator shall have full power to direct and manage, to hire and discharge employees subject to any contract rights they may have and to deal with the property and business of HealthyCT. Pursuant to Conn. Gen. Stat. § 38a-916(f), the Rehabilitator may exercise any of the powers under Conn. Gen. Stat. § 38a-923, as necessary or appropriate.

7. Subject to applicable law, upon the entry of this Order all pre-rehabilitation employment contracts of HealthyCT's officers, managers, and employees are terminated. Notwithstanding the termination of their pre-rehabilitation employment contracts, the officers, managers, and employees of HealthyCT shall remain employed as at-will employees until such times as they are notified by the Rehabilitator that they have been discharged. Within her sole discretion, the Rehabilitator may re-contract with any officers, managers, or employees of HealthyCT whose pre-rehabilitation employment contracts are terminated pursuant to this paragraph 7 upon terms agreeable to the parties.

8.　The Rehabilitator may, in her discretion, pay expenses incurred in the ordinary course of HealthyCT's business in rehabilitation and may, in her discretion, pay the actual, reasonable and necessary costs of preserving or recovering the assets of HealthyCT and the costs of goods and services provided to HealthyCT's estate. Such costs shall include but not be limited to: (a) reasonable professional fees for accountants, actuaries, attorneys and consultants retained by the Rehabilitator; (b) compensation and other costs related to representatives and employees of HealthyCT; and (c) a reasonable allocation of costs and expenses associated with time spent by Connecticut Insurance Department personnel in connection with the rehabilitation of HealthyCT.

9.　In the event that the property of HealthyCT does not contain sufficient cash or liquid assets to defray the costs incurred, the Commissioner may advance costs so incurred out of any appropriation for the maintenance of the Insurance Department. Any amounts so advanced for expenses of administration shall be repaid to the Commissioner for the use of the Insurance Department out of the first available money of HealthyCT.

10.　The Rehabilitator shall have the authority to pursue all appropriate legal remedies on behalf of HealthyCT, including without limitation, the powers granted pursuant to Conn. Gen. Stat. §§ 38a-916(f), 38a-928, and 38a-929 to avoid fraudulent transfers, and the powers pursuant to Conn. Gen. Stat. §§ 38a-916(d) with regard to any criminal or tortious conduct or breach of any contractual or fiduciary obligation detrimental to HealthyCT by any officer, manager, agent, producer, employee or other person, or entity.

4

11. Pursuant to Conn. Gen. Stat. § 38a-916(e), if the Rehabilitator determines that reorganization, consolidation, conversion, reinsurance, merger or other transformation of HealthyCT is appropriate, she shall prepare a plan to effect such changes. Upon application of the Rehabilitator for approval of the plan, and after such notice and hearing as the Court may prescribe, the Court may either approve or disapprove the proposed plan or may modify the plan and approve it as modified.

12. Pursuant to Conn. Gen. Stat. § 38a-918(a), if the Rehabilitator believes that further attempts to rehabilitate HealthyCT would be futile or would substantially increase the risk of loss to creditors, policyholders, or the public, she may petition the Court for an order of liquidation.

13. Except as provided in this paragraph 13, the Rehabilitator shall not pay any creditor claims for goods or services provided prior to the date of this Order until further order of this Court. In order to ensure the continuity of insurance coverage to HealthyCT's policyholders, and to minimize disruptions to HealthyCT's business operations, the Rehabilitator shall pay: (a) all creditor claims for covered goods and services provided to HealthyCT's policyholders/insureds prior to the date of this Order, according to the company's normal claim processing procedures; and (b) all creditor claims for wages of HealthyCT's officers, managers, and employees that were earned but unpaid as of the date of this Order.

14.     Pursuant to Conn. Gen. Stat. § 38a-939(a), claims made under pre-rehabilitation employment contracts by HealthyCT's directors, officers, or persons in fact performing similar functions or having similar powers are statutorily limited to the payment of earned but unpaid wages for services they rendered prior to the date of this Order. Accordingly, the provision in paragraph 13 requiring payment of pre-rehabilitation wages does not apply to, and at no time shall the Rehabilitator pay, any claims for severance, post-termination benefits, or other non-wage payments that might otherwise be payable to a HealthyCT director or officer upon the termination of his or her employment contract entered into prior to the date of this Order.

15.     Pursuant to Conn. Gen. Stat. § 38a-915(a), the entry of this Order shall not constitute an anticipatory breach of any contracts of HealthyCT nor shall it be grounds for retroactive revocation or retroactive cancellation of any contracts of HealthyCT unless such revocation or cancellation is done by the Rehabilitator pursuant to Conn. Gen. Stat. § 38a-916. Except for employment contracts terminated under paragraph 7 of this Order, and pursuant to Conn. Gen.Stat. § 38a-907(a)(1)(K), during the pendency of this rehabilitation, all persons or entities other than HealthyCT policyholders that have contractual or other relationships with HealthyCT as of the date of this Order are hereby ENJOINED AND RESTRAINED from terminating existing contracts or relationships on the basis of the entry of this Order or HealthyCT's financial condition. This injunction against terminating existing contracts or relationships applies, without limitation, to any contracts or relationships between HealthyCT and health care providers, provider networks, third party administrators, financial reporting vendors, and utilization review vendors.

Notwithstanding the foregoing, the Rehabilitator shall review the necessity of any contracts subject to this paragraph 15 during the pendency of this rehabilitation and, upon determining that any such contract is unnecessary to HealthyCT's rehabilitation, the Rehabilitator is authorized to terminate the contract either in accordance with the contract's notice and other applicable provisions or under such varying terms and conditions as the Rehabilitator deems necessary and appropriate.

16.     All officers, managers, directors, trustees, owners, employees or agents of HealthyCT, or any other persons with authority over or in charge of any segment of HealthyCT's affairs, including, but not limited to, banks, savings and loan associations, financial or lending institutions, brokers, stock or mutual associations, shall, in accordance with Conn. Gen. Stat. § 38a-908, fully cooperate with the Rehabilitator in the performance of her duties.  The definition of "to cooperate" shall include, but not be limited to, a duty to do the following:

(a) Reply promptly to any inquiry from the Rehabilitator, including a written reply when requested;

(b) Provide the Rehabilitator with immediate, full and complete possession, control, access to, and use of all books, accounts, documents, and other records, information, or property of or pertaining to HealthyCT in his, her or its possession, custody, or control as may be necessary to enable the Rehabilitator to operate the business and to maintain the continuity of insurance coverage for all policyholders;

(c) Provide the Rehabilitator with full and complete access to and control of all assets, documents, data, computer systems, security systems, buildings, leaseholds, and property of or pertaining to HealthyCT; and

(d) Disclose verbally or in writing, in the transmission requested by the Rehabilitator, the exact whereabouts of such items and information referenced in paragraphs (b) and (c) above, if not in possession, custody or control of the officers, directors, trustees, employees or agents of HealthyCT, or any other person, firm, association, partnership, corporation or other entity in charge of any aspect of HealthyCT's affairs.

In addition, pursuant to Conn. Gen. Stat. § 38a-908(b), no person shall obstruct or interfere with the Rehabilitator in the conduct of this rehabilitation proceeding.

17.    All officers, managers, directors, trustees, owners, employees, attorneys, agents, creditors, and policyholders of HealthyCT and all other persons or entities of any nature are hereby ENJOINED AND RESTRAINED, pursuant to Conn. Gen. Stat. § 38a-907, from:

(a)    the transaction of further business of HealthyCT unless so authorized by the Rehabilitator;

(b)    transferring, selling, concealing, terminating, canceling, destroying, disposing or assigning any assets, funds or other property of any nature of HealthyCT;

(c)    any interference, in any manner, with the Rehabilitator in her possession of or title to the property and assets of HealthyCT or in the discharge of her duties as Rehabilitator;

(d) any waste of HealthyCT's assets or property;

(e) dissipation and transfer of bank accounts and negotiable instruments;

(f) the institution or further prosecution of any actions or proceedings in which HealthyCT is a party;

(g) the obtaining of preferences, judgments, attachments, garnishments or liens against HealthyCT, its assets, or its policyholders;

(h) the levying of execution against HealthyCT, its assets, or its policyholders;

(i) the making of any sale or deed for nonpayment of taxes or assessments that would lessen the value of the assets of HealthyCT;

(j) the withholding from the Rehabilitator or her designees of books, accounts, documents, or other records relating to the business of HealthyCT; or

(k) any other threatened or contemplated action that might lessen the value of HealthyCT's assets or prejudice the rights of policyholders/insureds, creditors, or shareholders, or the administration of the receivership proceeding.

18. All persons who have in their possession, custody or control, assets, documents, data, accounts, moneys, books, records, information, or property of or pertaining to HealthyCT, shall immediately:

(a) provide the Rehabilitator with notice that such assets, documents, data, accounts, moneys, books, records, information, or property are in his, her, or its possession, custody, or control, together with a description of

9

the assets, documents, data, accounts, moneys, books, records, information, or property in his, her, or its possession, custody, or control;

(b) tender possession, custody, and control of such assets, documents, data, accounts, moneys, books, records, information or property to the Rehabilitator; and

(c) take all necessary steps to safeguard, preserve, and retain the assets, documents, data, accounts, moneys, books, records, information, or property.

19. Pursuant to Conn. Gen. Stat. 38a-907(a)(G) and (K), all non-contracted and contracted health care providers are hereby specifically ENJOINED AND RESTRAINED from pursuing collection against, obtaining judgments against, and/or balance billing of HealthyCT's policyholders, insureds, or members for health care goods provided or services rendered prior to the date of this Order. All non-contracted and contracted health care providers that provided such goods or rendered such services prior to the date of this Order shall seek payment solely from HealthyCT as a HealthyCT creditor. The foregoing prohibition does not apply to any applicable co-payments, deductibles, cost sharing, or fees for health care goods or services that are not covered by and remain the policyholder's, insured's, or member's responsibility under his or her HealthyCT insurance policy.

20. All creditor claims against HealthyCT are within the exclusive jurisdiction of this Court and will be determined, resolved, paid, and/or discharged, in whole or in part, according to the terms and conditions approved by the Court.

21. Any and all claims by creditors against HealthyCT must be raised or asserted within the rehabilitation proceeding before this Court and are subject to this Court's orders regarding the submission and determination of claims.

22. At the appropriate time and if necessary, the Rehabilitator shall develop a method for submission, evaluation, and resolution of any unpaid creditor claims for goods and services provided to HealthyCT prior to the date of this Order.

23. Any bank, savings and loan association, other financial institution, including any other entity or person, which has on deposit or in its possession, custody or control any funds, accounts and any other assets of HealthyCT shall immediately transfer title, custody and control of all such funds, accounts or assets to the Rehabilitator and is instructed that the Rehabilitator has absolute control over such funds, accounts and other assets, and that the Rehabilitator may change the name of such accounts and other assets, withdraw them from such bank, savings and loan association or other financial institution, or take any lesser action necessary for the proper conduct of the receivership.

24. No bank, savings and loan association, reinsurer, other financial institution, or any other person or entity shall exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever or refuse to transfer any funds or assets to the Rehabilitator's control without the permission of this Court.

11

25.    All insurance agents, brokers or other persons having sold policies of insurance and/or collected premiums on behalf of HealthyCT shall account for all earned premiums and commissions and shall account for and pay all premiums and commissions unearned due to policies canceled in the normal course of business, directly to the Rehabilitator at the offices of HealthyCT within 30 days of this Order, or the date of receipt, whichever is later, or appear before this Court to show good cause as to why they should not be required to account to the Rehabilitator.  No insurance agent, broker or other person shall use premium monies owed to HealthyCT for refund of unearned premiums or for any purpose other than payment to the Rehabilitator.

26.    The provisions of Conn. Gen. Stat. § 38a-917 concerning legal actions in which HealthyCT is a party or obligated to defend shall apply to these proceedings, including a stay of the action or proceeding, upon request by the Rehabilitator, for ninety days and such additional time as is necessary for the Rehabilitator to obtain proper representation and prepare for further proceedings.

27.    Any person who violates an injunction issued in this matter shall be liable to the Rehabilitator, the policyholder/insured, or both, for the reasonable costs and attorney fees incurred in enforcing the injunction or any court orders related thereto and any reasonably foreseeable damages.

28.     Pursuant to Conn. Gen. Stat. § 38a-915(b), if HealthyCT remains in rehabilitation, the Rehabilitator shall make an accounting to the Court of HealthyCT's financial condition and progress toward rehabilitation on or before ~~May~~ TBD _____, 2017, and thereafter at six-month intervals. Each accounting shall also include a report concerning the Rehabilitator's opinion as to the likelihood that a plan, as discussed in paragraph 11, above, will be prepared by the Rehabilitator and the timetable for doing so.

29.     This Court shall retain jurisdiction over this matter for all purposes necessary to effectuate and enforce this Order. The Rehabilitator may at any time make further application for any such further relief, including, without limitation, any restraining order, preliminary or permanent injunctions, and other orders as he deems necessary.

30.     A copy of this Order of Rehabilitation shall be served forthwith upon HealthyCT.

APPROVED AND SO ORDERED this 1st day of November, 2016.

$\underline{(Robaina, J)}$   $11/1/16$
Judge
ABLevikan

A   Hearing is ordered on 11/14/16 at 9.30 am at 95 Washington St., Hartford, CT.

13

**EXHIBIT B**

# Order of Liquidation

DOCKET NO. HHD-CV16-6072516-S        :        SUPERIOR COURT

                                     :
IN THE MATTER OF HEALTHYCT, INC.,    :        JUDICIAL DISTRICT OF
IN REHABILITATION                    :        HARTFORD
                                     :                    9
                                     :        DECEMBER 7, 2016

## ORDER OF LIQUIDATION

Upon the Petition of Katharine L. Wade, Insurance Commissioner of the State of

Connecticut (the "Commissioner"), and pursuant to The Insurers Rehabilitation and

Liquidation Act, Conn. Gen. Stat. §§ 38a-903 to 38a-961, inclusive (the "Act"), and upon

the Order of Rehabilitation (the "Rehabilitation Order") entered in respect of HealthyCT,

Inc. ("HealthyCT") dated November 1, 2016, and the Affidavit of Daniel L. Watkins, it is

hereby **ORDERED**:

## Commencement/Termination of Proceedings;
## Appointment of Liquidator, Special Deputy; Fixing of Rights and Liabilities

1.      HealthyCT is placed into liquidation under the Act, effective 11:59 p.m.,

Eastern Standard Time, on December 31, 2016 (herein, the "Effective Time"). HealthyCT .

shall, in its existing form, cease all operations as of the Effective Time, and "HealthyCT in

Liquidation", shall continue as successor of HealthyCT in Rehabilitation, consistent with

the terms of this and all subsequent Orders of the Court.  Rehabilitation proceedings in

respect of HealthyCT shall be deemed terminated as of the Effective Time; provided,

however; termination of rehabilitation proceedings hereunder in respect of HealthyCT

shall not impair the right of any person to compensation or expense reimbursement

pursuant to paragraph 5 of the Rehabilitation Order, or the privilege of the Commissioner

to advance the same pursuant to paragraph 8 of the Rehabilitation Order.  The title of this

1



case shall hereafter be "IN RE LIQUIDATION OF HEALTHYCT," but the case number shall remain the same.

2.      The Commissioner, and her successors in office (collectively, the "Liquidator") are hereby appointed as Liquidator of HealthyCT pursuant to Conn. Gen.Stat. § 38a-920 and, as further delineated in paragraph 35 hereof, Daniel L Watkins is appointed as Special Deputy Liquidator with such authority, powers, duties and responsibilities as set forth in Conn. Gen. Stat. § 38a-923. Moreover, all reasonable fees and expenses of the Special Deputy associated with the proceedings shall be paid out of the assets of HealthyCT's estate. Hereafter, the Liquidator and the Special Deputy Liquidator shall be referred to as the "Liquidator".

3.      Except as otherwise provided herein and in Conn. Gen. Stat. § 38a-921 and Conn. Gen. Stat. § 38a-939, the rights and liabilities of HealthyCT and of its creditors, policyholders, and all other persons interested in its estate are fixed as of the Effective Time of this Order, as defined above. Unless another effectiveness time is specifically stated herein, each and every action, authorization, appointment, prohibition, vesting and other stipulation or provision set forth below in this Order shall become effective, according to their terms and without further action on the part of the Court, as of the Effective Time.

### General Powers and Duties of Liquidator; Immunity

4.      The Liquidator is hereby vested, in addition to the powers and authority set forth in this Order, with all powers and authority expressed or implied under the Act.

5.      In addition to the powers and authority described in Paragraph 4 above, and not in derogation thereof, pursuant to Conn. Gen. Stat. § 38a-920, (a) the Liquidator

is hereby vested with the title to all of the property, contracts, and rights of action and all of the books and records of HealthyCT, wherever located and (b) the Liquidator is hereby directed immediately to take possession of the assets of HealthyCT and to administer them under the general supervision of the Court. The filing or recording of this Order with the clerk of the Superior Court and with the recorder of deeds of the town in which HealthyCT's principal office or place of business is located, or, in the case of real estate with the recorder of deeds of the town where the property is located, shall impart the same notice as a deed, bill of sale, or other evidence of title duly filed or recorded with that recorder of deeds would have imparted.

6.    The Liquidator shall have all the powers and duties set forth in Conn. Gen. Stat. § 38a-923, including (without limitation and in addition to the appointment of Daniel L. Watkins as described in Paragraphs 2 and 35 hereof), the power to appoint one or more special deputies who shall have all of the powers and responsibilities of the Liquidator under such section, and the power to employ or continue the employment of such employees and agents, legal counsel, actuaries, accountants, appraisers, consultants and such other personnel as he may deem necessary to assist in the liquidation, together with the power to fix the reasonable compensation of such persons (which compensation shall be paid out of the funds or assets of HealthyCT). The Liquidator is hereby authorized, in her sole discretion, to pay reasonable severance benefits and retention incentives to HealthyCTs' current or former employees. The Liquidator is hereby authorized to pay, from the funds or assets of HealthyCT, the reasonable compensation of the foregoing, with all such payments to be reported to the Court in the Liquidator's periodic reports of receipts and disbursements filed pursuant to

3

paragraph 37 of this Order. The Liquidator is hereby authorized to pay the expenses of administration of the liquidation in the ordinary course, and to pay the expenses of the Rehabilitator incurred during the period of rehabilitation but which have not yet been paid.

7.     The Liquidator is hereby authorized, in her sole discretion, to maintain the existing bank accounts of HealthyCT. The Liquidator is also authorized to deposit funds in banks and other institutions in accounts which are insured by the Federal Deposit Insurance Corporation and to invest funds which are not immediately necessary for the administration of the case in the Short Term Investment Fund managed by the Treasurer of the State of Connecticut or obligations of the United States government or agencies and instrumentalities thereof, or in other investments which a health insurance company could own under Connecticut law.

8.     In the event that the estate of HealthyCT does not contain sufficient cash or liquid assets to defray the costs incurred, the Commissioner may (but shall not be obligated to) advance the costs so incurred out of any appropriation for the maintenance of the Insurance Department. Any amounts so advanced for expenses of administration shall be repaid to the Commissioner for the use of the Insurance Department out of the first available monies of HealthyCT.

9.     The Liquidator is hereby authorized to abandon without further order of the Court, property of HealthyCT which, in her discretion, she deems burdensome or of insubstantial value. The Liquidator is further authorized and empowered to sell, transfer, and convey her right, title, and interest and the right, title, and interest of HealthyCT in and to any real property, personal property (tangible and intangible), licenses or any other

4

assets of HealthyCT, for such sums of money and on such terms as appears reasonable, at public or private sales.

10.    Except as otherwise expressly provided herein, the entry of this Order shall not constitute an anticipatory breach or repudiation of any contracts of HealthyCT, which contracts may be affirmed or disavowed by the Liquidator at any time during the pendency of this case pursuant to the Act with the approval of this Court, said approval to be sought by motion to this Court on no less than ten (10) days written notice to the other party or parties to any contract proposed to be affirmed or disavowed, and to any other person or entity who or which has filed or will hereafter file an appearance in these proceedings or in the prior rehabilitation proceedings (the "Notice Parties").

11.    The Liquidator may sue, defend and continue to prosecute suits or actions already pending in the courts and tribunals, agency or arbitration panels in this state and other states, and may settle controversies in respect of debts and claims owing to HealthyCT, and claims against the estate in these proceedings, on such terms as appear reasonable to the Liquidator.

12.    The actions of the Commissioner, as Rehabilitator of HealthyCT, set forth in the Petition are hereby authorized and approved.

13.    To the fullest extent provided by law including, but not limited to, Conn. Gen. Stat. § 38a-909, the Liquidator, her employees, and other personnel retained by the Liquidator pursuant to this Order and/or the Rehabilitation Order, including without limitation any person who acts or has acted as Special Deputy Receiver or Special Liquidator and his or her associates and employees, shall have official immunity and shall be immune from suit and liability, both personally and in their official capacity, for

5

any claim or other civil liability in respect of any alleged act, error or omission of the Liquidator, her employees and retained personnel arising out of or by reason of their duties, employment or retention with respect to these liquidation proceedings or the prior rehabilitation proceedings.

## Injunctions

14.     The following injunctions set forth in Sections 15 through 25 hereof shall apply to entities and persons no matter where they are located, and shall apply to all actions commenced or pending in any jurisdiction, whether in or outside of Connecticut.

15.     All officers, managers, directors, trustees, owners, employees or agents of HealthyCT, or any other persons with authority over or in charge of any segment of HealthyCT's affairs, including, but not limited to, banks, savings and loan associations, financial or lending institutions, brokers, stock or mutual associations, shall, in accordance with Conn. Gen. Stat. § 38a-908, fully cooperate with the Liquidator in the performance of her duties. The definition of "to cooperate" shall include, but not be limited to, a duty to do the following:

(a)  Reply promptly to any inquiry from the Liquidator, including a written reply when requested;

(b)  Provide the Liquidator with immediate, full and complete possession, control, access to, and use of all books, accounts, documents, and other records, information, or property of or pertaining to HealthyCT in his, her or its possession, custody, or control as may be necessary to enable the Liquidator to operate the business and to maintain the continuity of insurance coverage for all policyholders;

(c)  Provide the Liquidator with full and complete access to and control of all assets, documents, data, computer systems, security systems, buildings, leaseholds, and property of or pertaining to HealthyCT; and

(d)  Disclose verbally or in writing, in the transmission requested by the Liquidator, the exact whereabouts of such items and information referenced in paragraphs (b) and (c) above, if not in possession, custody or control of the officers, directors, trustees, employees or agents of HealthyCT, or any other person, firm, association, partnership, corporation or other entity in charge of any aspect of HealthyCT's affairs.

In addition, pursuant to Conn. Gen. Stat. § 38a-908(b), no person shall obstruct or interfere with the Liquidator in the conduct of this liquidation proceeding.

16.    All officers, managers, directors, trustees, owners, employees, agents, creditors, and policyholders of HealthyCT and all other persons or entities of any nature are hereby stayed, enjoined and restrained, pursuant to Conn. Gen. Stat. § 38a-907, from:

(a)    the transaction of further business of HealthyCT;

(b)    transferring, selling, concealing, terminating, canceling, destroying, disposing or assigning any assets, funds or other property of any nature of HealthyCT;

(c)    any interference, in any manner, with the Liquidator in her possession of or title to the property and assets of HealthyCT or in the discharge of her duties as Liquidator;

(d)    any waste of HealthyCT's assets or property;

7

(e)     dissipation and transfer of bank accounts and negotiable instruments;

(f)     the institution or further prosecution of any actions or proceedings in which HealthyCT is a party;

(g)     the obtaining of preferences, judgments, attachments, garnishments, or liens against HealthyCT, its assets or its policyholders;

(h)     the levying of execution against HealthyCT, its assets, or its policyholders;

(i)     the making of any sale or deed for nonpayment of taxes or assessments that would lessen the value of the assets of HealthyCT;

(j)     the withholding from the Liquidator or her designees of books, accounts, documents, or other records relating to the business of HealthyCT, or

(k)     any other threatened or contemplated action that might lessen the value of HealthyCT's assets or prejudice the rights of the policyholders/insureds, creditors, or shareholders, or the administration of this receivership proceeding.

17.     All persons who have in their possession, custody or control, assets, documents, data, accounts, moneys, books, records, information, or property of or pertaining to HealthyCT, shall immediately:

(a)     provide the Liquidator with notice that such assets, documents, data, accounts, moneys, books, records, information, or property are in his, her, or its possession, custody, or control, together with a description of the assets, documents, data, accounts, moneys, books, records, information, or property in his, her, or its possession, custody, or control;

8

(b)    tender possession, custody, and control of such assets, documents, data, accounts, moneys, books, records, information or property to the Liquidator; and

(c)    take all necessary steps to safeguard, preserve, and retain the assets, documents, data, accounts, moneys, books, records, information, or property.

18.    Pursuant to Conn. Gen. Stat. 38a-907(a)(1)(G) and (K), all non-contracted and contracted health care providers are hereby specifically ENJOINED AND RESTRAINED from pursuing collection against, obtaining judgments against, and/or balance billing of HealthyCT's policyholders, insureds, or members for health care goods provided or services rendered prior to the effective date of this Order. All non-contracted and contracted health care providers that provided such goods or rendered such services prior to the effective date of this Order shall seek payment solely from HealthyCT as a HealthyCT creditor. The foregoing prohibition does not apply to any applicable co-payments, deductibles, cost sharing, or fees for health care goods or services that are not covered by and remain the policyholder's, insured's, or member's responsibility under his or her HealthyCT insurance policy.

19.    Any company that shall have acquired any assets or business of HealthyCT at any time shall make their books, data processing information, and records (collectively, "documents") available for inspection and copying by the Liquidator, and shall relinquish possession of the originals of any of HealthyCT's records that may be in their possession to the Liquidator. Any documents sought by the Liquidator which are claimed in good faith by the party in possession of such documents to be privileged or outside the scope

9

of the preceding sentence shall immediately be presented to the Court by such party for a determination of the Liquidator's entitlement to access to such documents.

20. HealthyCT, its officers, directors, trustees, employees, agents, owners and attorneys shall deliver to the Liquidator keys or access codes to the premises where HealthyCT conducts its business and to any safe deposit boxes, and to advise the Liquidator of the combinations or access codes of any safes or safe keeping devises of HealthyCT.

21. HealthyCT, its officers, directors, trustees, employees, agents and attorneys shall identify for the Liquidator all of the assets, books, records, files, credit cards, or other property of HealthyCT, to tender or make readily available to the Liquidator, in the Liquidator's discretion, all of the foregoing, and to otherwise advise and cooperate with the Liquidator in identifying and locating any of HealthyCT's assets.

22. Any bank, savings and loan association, other financial institution, including any other entity or person, which has on deposit or in its possession, custody or control any funds, accounts and any other assets of HealthyCT shall immediately transfer title, custody and control of all such funds, accounts or assets to the Liquidator and is instructed that the Liquidator has absolute control over such funds, accounts and other assets, and that the Liquidator may change the name of such accounts and other assets, withdraw them from such bank, savings and loan association or other financial institution, or take any lesser action necessary for the proper conduct of the liquidation.

23. No bank, savings and loan association, reinsurer, other financial institution, or any other person or entity shall exercise any form of set-off, alleged set-off, lien, or any

form of self-help whatsoever or refuse to transfer any funds or assets to the Liquidator's control without the permission of this Court.

24.    All agents, brokers, producers, premium finance companies and any other persons having sold insurance policies of HealthyCT are enjoined from returning any unearned premiums or any money in their possession collected for premiums or enrollment contributions to policyholders of HealthyCT. All agents, brokers, producers, premium finance companies and any other persons (other than the insured) responsible for the payment of a premium, shall pay to the Liquidator any unpaid collected premium including any amount representing commissions held by such person at the time of the Liquidation Order. Insureds are responsible only for the payment of any earned but unpaid premium for any policy that is due HealthyCT for coverage through the termination thereof either before or after the entry of the Liquidation Order.

25.    Pursuant to Conn. Gen. Stat. § 38a-926(a), upon entry of this Order of Liquidation, no action at law or equity shall be brought against HealthyCT, the Liquidator, or the Special Deputy Liquidator, whether in this State or elsewhere, nor shall any such existing actions be maintained or further proceedings presented after entry of this Liquidation Order. Accordingly, pursuant to Conn. Gen. Stat. § 38a-926(a) and § 38a-907(a)(1), and effective immediately, all persons and entities are expressly ENJOINED from filing an action at law or equity or maintaining or further presenting any such existing action against HealthyCT, the Liquidator, or Special Deputy Liquidator, whether in this State or elsewhere.

26.    Pursuant to Conn. Gen. Stat. § 38a-959, during the pendency of this Liquidation proceeding, no action or proceeding in the nature of an attachment,

garnishment, or levy of execution shall be commenced or maintained in this State against HealthyCT or its assets.

27.     Any person who violates an injunction issued in this matter shall be liable to the Liquidator, the policyholder/insured, or both, for the reasonable costs and attorney fees incurred in enforcing the injunction or any court orders related thereto and any reasonably foreseeable damages.

### Notices; Termination of Coverage; Claim Filing Deadline

28.     The Liquidator shall give or cause to be given notice of this Order in the form attached to the Petition as soon as possible:

(a)     by first-class mail and electronic communication to the Connecticut Life and Health Insurance Guaranty Association ("the Guaranty Association");

(b)     by first-class mail to all insurance agents, brokers and producers of HealthyCT of records, with recent appointments and recent licenses to represent HealthyCT, at their last known address;

(c)     by first-class mail to all persons known or reasonably expected to have claims against HealthyCT, including policyholders and healthcare providers, by mailing a notice to their last known addresses indicated by the records of HealthyCT;

(d)     by first-class mail and electronic communication to the U.S. Department of Health & Human Services, Centers for Medicare & Medicaid Services.

(e)     by publication in The Hartford Courant and in other newspapers, if any, as the Liquidator deems appropriate.

29.     Pursuant to Conn. Gen. Stat. § 38a-921 and Conn. Gen. Stat. § 38a-865, all policies and/or certificates of insurance heretofore issued by HealthyCT are terminated as of the earliest of the following dates:

(a) for group policies or contracts, the earlier of the next renewal date under the policy or contract, or 45 days, but not less than 30 days, after the date this Liquidation Order is entered;

(b) all individual policies terminate by their own terms on December 31, 2016;

(c) the date that the insured replaces the policy's insurance coverage with insurance in another insurer or otherwise terminates the policy; or

(d) the date that the Liquidator effects a transfer of the policy obligation to a solvent assuming insurer pursuant to Conn. Gen. Stat. § 38a-923(a)(8).

30.     The form of notice attached to the Petition and the procedures set forth therein for the filing of proofs of claim are hereby approved. Proofs of claim shall be filed with the Liquidator in the form required by Conn. Gen. Stat. § 38a-938 at the address and the manner specified in the Notice. Any and all claims against HealthyCT not presented to the Liquidator on or before July 31, 2017, shall be forever barred from sharing in distributions of the assets of HealthyCT except as provided in Conn. Gen. Stat. § 38a-937.     If notice is given in accordance with this Order, the distribution of assets of HealthyCT in these proceedings shall be conclusive with respect to all claimants whether or not they receive notice.

31.     All creditor claims for healthcare goods and services provided to a HealthyCT policyholder or insured pursuant to a HealthyCT insurance policy, whether made by a contracted or non-contracted healthcare provider or the policyholder/insured,

13

shall not file proofs of claims against the HealthyCT estate but rather shall continue submitting claims for payment to HealthyCT (or any third-party administrator) in the normal course of business. The deadline for those third-party healthcare providers to submit any and all claims to HealthyCT shall be July 31, 2017.

32.     The liquidator shall provide brokers and agents of HealthyCT notice of the amount of any commission claim they may have against HealthyCT as reflected on the books and records of HealthyCT. Brokers and agents at HealthyCT are not required to submit a proof of claim against HealthyCT unless they dispute the amount of their claim as reflected on the books and records of HealthyCT or they did not receive notice from the Liquidator of any such claim. The deadline for any brokers and agents to submit any such proof of claim shall be July 31, 2017.

33.     The Liquidator may seek Court approval for payment of hardship claims. The manner and method by which hardship claims will be handled shall be addressed in any such future motion.

34.     Unless otherwise provided in paragraphs 29 through 33 of this Order, all claims by creditors against the assets of HealthyCT must be made by filing a Proof of Claim in this liquidation proceeding. All creditor claims against HealthyCT are within the exclusive jurisdiction of this Court and will be determined, resolved, paid, and/or discharged, in whole or in part, according to the terms and conditions approved by the Court.

## Special Deputy Liquidator; List of Assets; Reports

35.     As authorized by Conn. Gen. Stat. § 38a-923(a)(1), the Liquidator appoints Daniel L. Watkins as Special Deputy Liquidator of HealthyCT with such authority, powers

and duties and responsibilities as set forth in Conn. Gen. Stat. § 38a-923. Mr. Watkins shall serve at the pleasure of the Liquidator. Moreover, all reasonable fees and expenses of the Special Deputy associated with the proceedings shall be paid out of the assets of HealthyCT's estate.

36.    As soon as practical, but in no event later than one hundred twenty (120) days from the date of the Effective Time, the Liquidator shall prepare in duplicate, pursuant to Conn. Gen. Stat. § 38a-927, a list of HealthyCT's assets and file one copy in the office of the clerk of the Superior Court and one copy shall be retained for the Liquidator's files.

37.    The Liquidator shall file the financial reports required by Conn. Gen. Stat. § 38a-920(e). Such reports shall be filed within one year of the date of this Order, and at least annually thereafter, and shall report the assets and liabilities of HealthyCT and all funds received or disbursed by the Liquidator during the current period and such other matters as the Liquidator shall, in her discretion, deem appropriate. The foregoing requirement supersedes the requirement of paragraph 28 of the Rehabilitation Order.

### Finding of Insolvency; Early Access

38.    Respondent is insolvent within the meaning of Conn. Gen. Stat. §§ 38a-1 and 38a-905(14), and for the purposes of Conn. Gen. Stat. § 38a-919(b).

39.    The Liquidator shall be authorized to disburse to the Guaranty Association from time to time, funds from the marshaled assets of HealthyCT which the Liquidator determines in good faith will not be necessary to pay claims with class 1 or class 2 priority under Conn. Gen. Stat. § 38a-944 or which are secured claims or which are claims which have other status which is senior and prior to class 3 claims under Conn. Gen. Stat. §

38a-944. Disbursement of such funds to the Guaranty Association shall be conditioned on that Association's entering into an agreement in form and substance satisfactory to the Liquidator which shall include the provisions contemplated by Conn. Gen. Stat. § 38a-936(b). The amount of such disbursements shall not exceed the amounts that such Association has paid or expects to pay with respect to claims against HealthyCT.

### **Continuing Jurisdiction**

40.    This Court shall retain jurisdiction over this matter for all purposes necessary to effectuate and enforce this Order. The Liquidator may at any time make further application for any such further relief, including, without limitation, any restraining order, preliminary or permanent injunctions, and other orders as she deems necessary.

**APPROVED AND SO ORDERED**  this  9th  day of December, 2016.

JUDGE:  *Robert B. Shapiro, J.*
ROBERT B. SHAPIRO

**EXHIBIT C**

**Set Off Notice**



February 14, 2017

The Honorable Tom Price
Secretary of U.S. Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC

Re: Recent Action in the Liquidation of HealthyCT, Inc.

Dear Secretary Price:

I am the Special Deputy Liquidator of HealthyCT, Inc., in Liquidation ("HCT"), and by this letter I advise you of action the Liquidator has taken on behalf of HCT with respect to obligations owing by and to the United States and its agencies. These obligations are set forth below.

1. Risk Corridors payments are owing to HCT for the 2014 and 2015 plan years in the aggregate amount $16,165,020. Exhibit A attached hereto contains correspondence and materials from the U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS") confirming this amount, toward which CMS has made minimal payments.[1]

2. A Risk Corridors payment is owing to HCT for the 2016 plan year in an amount calculated to be $22,367,329. This amount was determined using 2016 data and an actuarial model developed by a third party pursuant to parameters established by CMS. The model and HCT's methodology for calculating these amounts have been subject to third party review and audit. Exhibit B attached hereto provides a breakdown of this Risk Corridors amount by line of business.

3. A final Transitional Reinsurance payment is owing to HCT for the 2015 plan year in the amount of $655,234. Exhibit C attached hereto contains a payment summary received from CMS in January 2017 confirming this receivable amount.

4. A Transitional Reinsurance payment is owing to HCT for the 2016 plan year in an amount calculated to be $5,618,398. This amount was determined using 2016 incurred, paid and pended claim data as of January 24, 2017, based on the 2016 benefit-year parameters established by CMS.

5. A Risk Adjustment payment is owing by HCT for the 2016 plan year in an amount calculated to be $7,256,549. This amount was determined using an actuarial model developed by a third party pursuant to parameters established by CMS based on paid claims through October 2016. The Risk Adjustment amount will be adjusted as paid claims

---

[1] 12.6% and 1.9% of the Risk Corridors amount for 2014 have been paid by CMS in 2015 and 2016. These partial *payments were deducted from the total Risk Corridors amounts in the CMS reports attached as Exhibit A.*



through December 2016 are submitted to the CMS EDGE server by HCT and other Connecticut certified health plan carriers.

6. Transitional Reinsurance Fees, Risk Adjustment User Fees and Patient-Centered Outcomes Research Institute fees are owing by HCT for the 2016 plan year in an amount calculated to be $1,167,728. These calculations are based on HCT's enrollment and the per-covered life rates and methodologies established by CMS and the IRS.

7. Advanced Premium Tax Credits ("APTC") and Cost Share Reduction ("CSR") reconciliation amounts are owing by HCT for the 2016 plan year in the amount of $1,515,100. The APTC amount is based on APTC subsidy reports supplied by Access Health CT, inclusive of retroactive adjustments, compared to cumulative amounts funded by CMS. The CSR Reconciliation amount represents CSR advance payments for the months of October, November, and December 2016 pending final reconciliation of the difference between the 2016 advance payments and actual 2016 claim experience.

By this letter, you are hereby advised that the Liquidator has set off items 5, 6 and 7 against items 1 and 2. These setoffs have been effectuated pursuant to the Liquidator's authority under Conn. Gen. Stat. §§ 38a-923(a)(6), 38a-923(b), 38a-932(a), paragraphs 4 through 6 of the Order of Liquidation entered December 9, 2016, and Connecticut common law and equity.

The United States may contend that the amounts set forth in item 1 are not currently due. HCT *disagrees with this position, but such amounts, at a minimum, are undoubtedly owed by the United* States' own admissions. In addition, the U.S. Court of Federal Claims has held in two recent cases that Risk Corridors payments are due and payable by the United States on an annual basis. *See Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757, 776 (Fed. Cl. 2017) (holding that Risk Corridors claims were ripe for adjudication because the United States is required to make annual Risk Corridors payments to eligible qualified health plans); *see also Moda Health Plan, Inc. v. United States*, No. 16-649C, 2017 WL 527588, *1 (Fed. Cl. February 9, 2017) ("The Court finds that the ACA requires annual payments to insurers, and that Congress did not design the risk corridors program to be budget-neutral."). Under Connecticut law, where one of the parties to mutual debts is insolvent, set off may be effectuated even though one or more of the obligations is not yet due. *Sullivan v. Merchants Nat'l Bank*, 144 A. 34 (Conn. 1928). Therefore, items 5, 6 and 7 are considered paid in full, and I have adjusted HCT's records accordingly. Items 3 and 4 should be paid in full by the United States as and when due, based on the balance of the mutual debts of the United States and HCT.[2]

---

[2] The proceeds of the Series A (Start-up) and Series B (Solvency) Loans, issued pursuant to the Loan Agreement dated June 7, 2012, between CMS and HCT (as amended, the "Loan Agreement"), are structured as surplus notes pursuant to the National Association of Insurance Commissioners Statement of Statutory Accounting Principles 41. Given their structure as surplus notes, amounts are not owing by HCT other than with the prior approval of the



February 14, 2017
Page 3

The Liquidation Court will be notified of the mutual obligations discussed herein and the set offs effectuated in my next accounting and status report.
Please let me know if you have any questions.

Respectfully yours,

Dan Watkins
Special Deputy Liquidator for
HealthyCT, Inc.

Email ccs:  Tom Donahue, CMS Consumer Information and Insurance Oversight (CCIIO),
Thomas.donahue@cms.hhs.gov

Jeff Wu, Acting Director & Acting Marketplace CEO (CMS/CCIIO),
jeff.wu@cms.hhs.gov

Jeff Grant, Director, Payment Policy and Financial Management Group
(CMS/CCIIO), jeff.grant@cms.hhs.gov

Matt Lynch, Director, State Marketplace and Insurance Programs Group
(CMS/CCIIO), matthew.lynch@cms.hhs.gov

Serena Orloff, United States Department of Justice, Civil Division, Commercial
Litigation Branch, serena.m.orloff@usdoj.org

---

Connecticut Insurance Commissioner. *See* Series A and B Promissory Notes, attached to the Loan Agreement as Appendices ("Notwithstanding any conflicting provisions contained in the Loan Agreement, payment shall be on the terms and subject to the conditions set forth in this Surplus Note....This Surplus Note shall be repaid only out of the surplus earnings of Borrower and, as to each payment, only with the prior approval of the Connecticut Insurance Commissioner or his designee."). The surplus notes therefore are not subject to set off as a mutual debt owing by HCT to CMS. CMS's waiver of set off in the Promissory Notes confirms this treatment: "[t]he obligation of Borrower under this Promissory Note may not be offset or be subject to recoupment with respect to any liability or obligation owed to Borrower."

EXHIBIT A

# Department of Health & Human Services

Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201



**Date:** November 19, 2015

**Subject:** Risk Corridors Payment and Charge Amounts for Benefit Year 2014

## Background:

Section 1342 of the Affordable Care Act directs the Secretary of the Department of Health and Human Services (HHS) to establish a temporary risk corridors program that provides issuers of qualified health plans (QHPs) in the individual and small group markets additional protection against uncertainty in claims costs during the first three years of the Marketplace. The program, which was modeled after a similar program implemented as part of the Medicare Part D prescription drug benefit program, encourages issuers to keep their rates stable as they adjust to the new health insurance reforms in the early years of the Marketplaces.

HHS has previously stated that if risk corridors collections for a particular year are insufficient to make full risk corridors payments for that year, risk corridors payments for the year will be reduced pro rata to the extent of any shortfall.[1] On October 1, 2015, HHS announced the payment proration rate for 2014 will be approximately 12.6 percent, reflecting risk corridors charges of $362 million and payments of $2.87 billion requested by issuers.[2] This proration rate was based on the most current risk corridors data submitted by issuers and assumes full collection of charges from issuers.

Today, HHS is releasing issuer-level risk corridors payments and charges based on the most current risk corridors data submitted by issuers and assuming full collection of charges from issuers, by market and state, for the 2014 benefit year. The tables below include the risk corridors payment or charge amounts for the individual and small group markets, respectively, and the prorated risk corridors payment, if applicable. **Risk corridors charges payable to HHS are not prorated, and the full risk corridors charge amounts are noted in the chart below. Only risk corridors payment amounts are prorated.** HHS will begin collection of risk corridors charges in November 2015 and will begin remitting risk corridors payments to issuers starting in December 2015.[3]

---

[1] "Risk Corridors and Budget Neutrality", published April 11, 2014 and posted at
https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf

[2] The exact proration rate for 2014 is 12.6178665287897%.

[3] We note that the risk corridor payment and charge amounts published in this bulletin do not reflect any payment or charge adjustments due to resubmissions after September 15, 2015 or any amount held back for appeals.

Table 1 – Alabama

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | | PRORATED AMOUNT (INDIVIDUAL MARKET) | | PRORATED AMOUNT (SMALL GROUP MARKET) | |
|---|---|---|---|---|---|---|---|---|---|---|
| AL | 44580 | Humana Insurance Company | $ | 947,116.86 | $ | - | $ | 119,505.94 | $ | - |
| AL | 46944 | Blue Cross and Blue Shield of Alabama | $ | 354,762.84 | $ | - | $ | 44,763.50 | $ | - |
| AL | 59809 | UnitedHealthcare Life Insurance Company | $ | - | $ | (4,761.86) | $ | - | $ | (4,761.86) |

Table 2 – Alaska

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | | PRORATED AMOUNT (INDIVIDUAL MARKET) | | PRORATED AMOUNT (SMALL GROUP MARKET) | |
|---|---|---|---|---|---|---|---|---|---|---|
| AK | 38344 | Premera Blue Cross Blue Shield of Alaska | $ | 8,126,435.92 | $ | 122,178.45 | $ | 1,025,382.84 | $ | 15,416.31 |
| AK | 73836 | Moda Health Plan, Inc. | $ | 1,237,418.79 | $ | 448,597.16 | $ | 156,135.85 | $ | 56,603.39 |

Table 3 – Arizona

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | | PRORATED AMOUNT (INDIVIDUAL MARKET) | | PRORATED AMOUNT (SMALL GROUP MARKET) | |
|---|---|---|---|---|---|---|---|---|---|---|
| AZ | 23307 | Humana Health Plan, Inc. | $ | 1,851,728.19 | $ | - | $ | 233,648.59 | $ | - |
| AZ | 51485 | Health Net Life Insurance Company | $ | 38,309,878.15 | $ | 6,528,368.90 | $ | 4,833,889.29 | $ | 823,740.87 |
| AZ | 53901 | Blue Cross Blue Shield of Arizona, Inc. | $ | 11,688,096.55 | $ | (216,623.22) | $ | 1,474,788.42 | $ | (216,623.22) |
| AZ | 60761 | Meritus Health Partners | $ | 3,401,552.97 | $ | 88,126.95 | $ | 429,203.41 | $ | 11,119.74 |

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | | PRORATED AMOUNT (INDIVIDUAL MARKET) | | PRORATED AMOUNT (SMALL GROUP MARKET) | |
|---|---|---|---|---|---|---|---|---|---|---|
| CO | 21032 | Kaiser Foundation Health Plan of Colorado | $ | 14,160,790.95 | $ | - | $ | 1,786,789.70 | $ | - |
| CO | 49375 | Cigna Health and Life Insurance Company | $ | (632,444.16) | $ | - | $ | (632,444.16) | $ | - |
| CO | 63312 | Colorado Choice Health Plans | $ | 5,893,514.24 | $ | 114,299.01 | $ | 743,635.76 | $ | 14,422.10 |
| CO | 66699 | Denver Health Medical Plan, Inc. | $ | 287,542.11 | $ | - | $ | 36,281.68 | $ | - |
| CO | 74320 | Humana Health Plan | $ | 3,183,617.97 | $ | - | $ | 401,704.67 | $ | - |
| CO | 76680 | HMO Colorado, Inc., dba HMO Nevada | $ | 1,479,675.14 | $ | (21,811.05) | $ | 186,703.43 | $ | (21,811.05) |
| CO | 80208 | Rocky Mountain Health Care Options | $ | - | $ | 440,553.54 | $ | - | $ | 55,588.46 |
| CO | 92137 | All Savers Insurance Company | $ | (107,467.82) | $ | - | $ | (107,467.82) | $ | - |
| CO | 97879 | Rocky Mountain HMO | $ | 1,470,136.36 | $ | 578,003.29 | $ | 185,499.84 | $ | 72,931.68 |

**Table 7 – Connecticut**

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | | PRORATED AMOUNT (INDIVIDUAL MARKET) | | PRORATED AMOUNT (SMALL GROUP MARKET) | |
|---|---|---|---|---|---|---|---|---|---|---|
| CT | 49650 | UnitedHealthcare Insurance Company | $ | - | $ | 11,299.51 | $ | - | $ | 1,425.76 |
| CT | 76962 | ConnectiCare Benefits, Inc. | $ | (717,037.34) | $ | - | $ | (717,037.34) | $ | - |
| CT | 86545 | Anthem Health Plans, Inc. (Anthem BCBS) | $ | (863,733.24) | $ | (26,699.38) | $ | (863,733.24) | $ | (26,699.38) |
| CT | 91069 | HealthyCT, Inc. | $ | 1,561,247.18 | $ | 272,638.90 | $ | 196,996.09 | $ | 34,401.21 |

**Department of Health & Human Services**

Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight 200
Independence Avenue SW
Washington, DC 20201



**CMS**
CENTERS FOR MEDICARE & MEDICAID SERVICES
CENTER FOR CONSUMER INFORMATION
& INSURANCE OVERSIGHT

**Date:** November 18, 2016

**Subject:** Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year

**Background:**

Section 1342 of the Affordable Care Act directs the Secretary of the Department of Health and Human Services (HHS) to establish a temporary risk corridors program that provides issuers of qualified health plans (QHPs) in the individual and small group markets additional protection against uncertainty in claims costs during the first three years of the Marketplace.

HHS established a three-year payment framework for the risk corridors program and outlined the details of this payment framework in our April 11, 2014 guidance on *Risk Corridors and Budget Neutrality*.[1] As set forth in that guidance, if risk corridors collections for a particular year are insufficient to make full risk corridors payments for that year, risk corridors payments for the year will be reduced pro rata to the extent of any shortfall. Because risk corridors payments for the 2014 benefit year exceeded risk corridors collections for that benefit year, risk corridors collections for the 2015 benefit year will be used first towards remaining balances on 2014 benefit year risk corridors payments.

On September 9, 2016, HHS published guidance on *Risk Corridors Payments for 2015*, stating that we anticipated that all 2015 benefit year collections would be used toward remaining 2014 benefit year risk corridors payments, and that no funds would be available at this time for 2015 benefit year risk corridors payments.[2] Today, we are confirming that all 2015 benefit year risk corridors collections will be used to pay a portion of balances on 2014 benefit year risk corridors payments.

We are also announcing issuer-level risk corridors payments and charges for the 2015 benefit year. The tables below show risk corridors payments and charges calculated for the 2015 benefit year, by State and issuer, and the additional amount based on anticipated 2015 risk corridors collections that HHS expects to pay towards the calculated 2014 benefit year payments.[3] Pursuant to 45 CFR

---

[1] *Risk Corridors and Budget Neutrality*, available at: https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf

[2] *Risk Corridors Payments for 2015*, available at:
https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/Risk-Corridors-for-2015-FINAL.PDF

[3] Risk corridor payment and charge amounts published in this bulletin do not reflect any payment or charge adjustments due to resubmissions after September 30, 2016 or any amount held back for appeals.

153.510(g), the 2015 benefit year risk corridors amounts listed in this report include the direct adjustment for issuers that reported certified estimates of the cost-sharing reduction portion of advance payments that were lower than the actual CSRs provided for the 2014 benefit year (as calculated under CSR reconciliation for the 2014 benefit year). On November 17, 2016, HHS notified issuers subject to the direct adjustment to 2015 benefit year risk corridors amounts of the calculated adjustment amount, consistent with guidance issued on September 15, 2016.[4]

Risk corridors payments are reduced pro rata based on risk corridors collections received. HHS intends to collect the full 2015 risk corridors charge amounts indicated in the tables below. HHS is collecting 2015 risk corridor charges in November 2016, and will begin remitting risk corridors payments to issuers in December 2016, as collections are received.

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS 2015 RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS 2015 RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | EXPECTED PAYMENT TOWARD 2014 AMOUNTS |
|---|---|---|---|---|---|
| AK | 38344 | Premera Blue Cross Blue Shield of Alaska | $7,479,997.83 | $716,228.92 | $274,005.10 |
| AK | 73836 | Moda Health Plan, Inc. | $28,630,662.11 | $2,900,481.02 | $56,006.61 |
| AL | 44580 | Humana Insurance Company | $2,935,440.73 | $0.00 | $31,461.63 |
| AL | 46944 | Blue Cross and Blue Shield of Alabama | $79,476,154.29 | $10,341,860.76 | $11,784.62 |
| AL | 59809 | UnitedHealthcare Life Insurance Company | $0.00 | $6,577.07 | $0.00 |
| AL | 68259 | UnitedHealthcare of Alabama, Inc. | $8,688,275.81 | $0.00 | N/A |
| AR | 62141 | Celtic Insurance Company | $1,812,823.37 | $0.00 | $0.00 |
| AR | 70525 | QCA Health Plan, Inc. | $476,592.83 | $0.00 | $138,891.20 |
| AR | 75293 | USAble Mutual Insurance Company | $15,919,592.28 | -$7,883.38 | $0.00 |
| AR | 37903 | QualChoice Life & Health Insurance Company, Inc. | $4,524,487.98 | $0.00 | N/A |
| AZ | 23307 | Humana Health Plan, Inc. | $202,481.41 | $0.00 | $61,511.29 |
| AZ | 51485 | Health Net Life Insurance Company | $95,219,226.99 | $17,249,722.49 | $1,489,451.17 |
| AZ | 53901 | Blue Cross and Blue Shield of Arizona, Inc. | $51,990,665.22 | $0.00 | $388,258.91 |
| AZ | 60761 | Meritus Health Partners | $54,694,644.83 | $702,732.99 | $115,921.29 |
| AZ | 70239 | Health Choice Insurance Co. | $4,444,184.06 | $0.00 | $41,795.92 |
| AZ | 84251 | Aetna Life Insurance Company | -$389,753.48 | $0.00 | $1,995.46 |
| AZ | 86830 | Cigna Health and Life Insurance Company | $1,023,204.62 | $0.00 | $5,758.61 |
| AZ | 88925 | University of Arizona Health Plans-University Healthcare, Inc. | $1,213,077.74 | $0.00 | $21,429.04 |
| AZ | 91450 | Health Net of Arizona, Inc. | $38,681,654.46 | $5,438,853.29 | $1,523,528.06 |
| AZ | 92045 | Meritus Mutual Health Partners | $11,438,590.03 | $1,437,229.12 | $62,237.55 |

[4] *Reporting of Risk Corridors Amounts Reflecting Certified Estimates of 2014 Cost-Sharing Reduction Amounts in Part 3, Line 1.7 of the Medical Loss Ratio Annual Reporting Form for the 2015 Benefit Year,* available at: https://www.regtap.info/uploads/library/RC_CSRandMLR_091516_v1_5CR_091516.pdf

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS 2015 RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS 2015 RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | EXPECTED PAYMENT TOWARD 2014 AMOUNTS |
|---|---|---|---|---|---|
| AZ | 65441 | Phoenix Health Plans, Inc. | $34,931.14 | $0.00 | N/A |
| AZ | 80863 | Time Insurance Company | $7,624,448.10 | $0.00 | N/A |
| AZ | 98971 | All Savers Insurance Company | $7,002,813.66 | $0.00 | N/A |
| CA | 18126 | MOLINA HEALTHCARE OF CALIFORNIA | $1,784,227.07 | $0.00 | $0.00 |
| CA | 27603 | Blue Cross of California(Anthem BC) | -$808,605.43 | $0.00 | $0.00 |
| CA | 40513 | Kaiser Foundation Health Plan, Inc. | $39,758,493.83 | $47,233,593.74 | $1,226,858.64 |
| CA | 47579 | Chinese Community Health Plan | -$25,303.31 | $0.00 | $23,677.66 |
| CA | 67138 | Health Net of California, Inc | $24,828,036.37 | $0.00 | $0.00 |
| CA | 70285 | CA Physician's Service dba Blue Shield of CA | $29,839,109.20 | -$217,494.36 | $0.00 |
| CA | 84014 | County of Santa Clara | $151,037.85 | $0.00 | $0.00 |
| CA | 92499 | Sharp Health Plan | $0.00 | $31,033.86 | $258.29 |
| CA | 92815 | Local Initiative Health Authority for Los Angeles County | $8,255,198.64 | $0.00 | $450,495.26 |
| CA | 93689 | Western Health Advantage | $0.00 | $171,678.94 | $193.15 |
| CA | 99110 | Health Net Life Insurance Company | $130,379,454.51 | $10,868,970.44 | $168,047.08 |
| CA | 99483 | CONTRA COSTA HEALTH PLAN | $0.00 | $0.00 | $0.00 |
| CO | 11555 | New Health Ventures Inc | $88,645.17 | $0.00 | $3,538.44 |
| CO | 20472 | Colorado Health Insurance Cooperative, Inc. | $97,136,652.48 | $1,558,715.85 | $475,035.47 |
| CO | 21032 | Kaiser Foundation Health Plan of Colo. | $52,928,909.77 | $0.00 | $470,397.66 |
| CO | 49375 | Cigna Health and Life Insurance Company | $2,017,361.36 | $0.00 | $0.00 |
| CO | 63312 | Colorado Choice Health Plans | $1,597,077.24 | $60,789.09 | $199,569.45 |
| CO | 66699 | Denver Health Medical Plan, Inc | $141,372.24 | $0.00 | $9,551.66 |
| CO | 74320 | Humana Health Plan | $2,856,524.81 | $0.00 | $105,754.43 |
| CO | 76680 | HMO Colorado, Inc., dba HMO Nevada | $3,002,631.67 | $38,482.92 | $49,152.32 |
| CO | 80208 | Rocky Mountain Health Care Options | $0.00 | $0.00 | $14,634.44 |
| CO | 92137 | All Savers Insurance Company | $184,407.92 | $0.00 | $0.00 |
| CO | 97879 | Rocky Mountain HMO | $32,345,160.48 | $780,733.56 | $68,035.75 |
| CT | 49650 | UnitedHealthcare Insurance Company | $222,890.06 | $265,020.43 | $375.35 |
| CT | 76962 | ConnectiCare Benefits, Inc. | $0.00 | $0.00 | $0.00 |
| CT | 86545 | Anthem Health Plans Inc(Anthem BCBS) | -$691,198.86 | $0.00 | $0.00 |
| CT | 91069 | HealthyCT, Inc. | $12,859,364.54 | $1,723,783.09 | $60,918.61 |
| DC | 41842 | UnitedHealthcare Insurance Company | $0.00 | $0.00 | $0.00 |
| DC | 73987 | Aetna Health Inc. (a PA corp.) | $0.00 | $220,036.68 | $0.00 |
| DC | 75753 | Optimum Choice, Inc. | $0.00 | -$240,089.45 | $0.00 |
| DC | 77422 | Aetna Life Insurance Company | $42,898.21 | $112,048.45 | $0.00 |

EXHIBIT B

**HEALTHYCT**
**2016 BENEFIT YEAR RISK CORRIDOR CALCULATION**

| Risk Corridor Development | IND | SG | LG | IND+SG |
|---|---|---|---|---|
| Premium | $79,080,600 | $55,763,791 | $60,942,815 | $134,844,391 |
| Paid Claims - Less CSR | $0 | $0 | $0 | $0 |
| Reinsurance Recoveries | -$7,865,812 | $0 | -$2,564,627 | -$7,865,812 |
| Reserves | $101,142,988 | $51,910,980 | $64,629,263 | $153,053,968 |
| Total Claims - Less CSR | $93,277,176 | $51,910,980 | $62,064,636 | $145,188,156 |
| Admin Expenses | $16,863,037 | $14,454,572 | $12,450,134 | $31,317,609 |
| Taxes and Fees | $1,993,501 | $1,351,106 | $1,801,038 | $3,344,607 |
| After-tax Premium | $77,087,099 | $54,412,685 | $59,141,777 | $131,499,784 |
| Risk-corridor Profit | $3,854,355 | $2,720,634 | $2,957,089 | $6,574,989 |
| Allowable Admin Expenses | $18,952,663 | $13,321,897 | $14,812,229 | $32,274,559 |
| Target Amount | $60,127,937 | $42,441,894 | $46,130,586 | $102,569,832 |
| Risk Corridor Ratio | 155.13% | 122.31% | 134.54% | 141.55% |

**Risk Corridors**

| Factor | Low | High | | | | | |
|---|---|---|---|---|---|---|---|
| -80% | 0% | | 92% | $0 | $0 | $0 | $0 |
| -50% | 92% | | 97% | $0 | $0 | $0 | $0 |
| 0% | 97% | | 100% | $0 | $0 | $0 | $0 |
| 0% | 100% | | 103% | $0 | $0 | $0 | $0 |
| 50% | 103% | | 108% | $1,503,198 | $1,061,047 | $1,153,265 | $2,564,246 |
| 80% | 108% | | 999% | $22,671,203 | $4,858,987 | $9,794,882 | $27,530,190 |

| | | |
|---|---|---|
| Total Receivable (Payment) | $24,174,401 | $5,920,035 |
| Estimated QHP % | 85.0% | 25.0% |
| | $20,548,241 | $1,480,009 |

| Risk Corridor Formula Full Year Estimate | | |
|---|---|---|
| | **Individual** | **Small Group** |
| Premium Earned including Premium Tax Credits | $79,080,600 | $55,763,791 |
| - Taxes and Regulatory Fees | $1,993,501 | $1,351,106 |
| After Tax Premiums Earned | $77,087,099 | $54,412,685 |
| Administration Costs (less taxes and regulatory fees) | $14,869,537 | $13,103,466 |
| + Profits Earned | -$31,059,614 | -$10,601,761 |
| Profit (minimum of 3% of after tax premium) | $2,312,613 | $1,632,381 |
| Admin Costs (2016: 22%) | $16,959,162 | $11,970,791 |
| + Taxes and Regulatory Fees | $1,993,501 | $1,351,106 |
| Allowable Administrative Costs | $18,952,663 | $13,321,897 |
| Claims (less CSR payments) | $0 | $0 |
| + Claim-Related Retention (QI/Health IT) | $0 | $0 |
| + Risk Adjustment Charges | $0 | $0 |
| - Risk Adjustment Receivables | $0 | $0 |
| - Reinsurance Receivables | -$7,865,812 | $0 |
| +Change in reserves | $101,142,988 | $51,910,980 |
| Allowable Costs | $93,277,176 | $51,910,980 |
| Target Amount | $60,127,937 | $42,441,894 |
| Risk Corridor Ratio | 1.55 | 1.22 |
| Risk Corridor Receivable / (Payment) | $24,174,401 | $5,920,035 |
| Risk Corridor Receivable / (Payment) - % QHP + Margin | $ 20,548,241 | $ 1,480,009 |
| % QHP + Margin | 85% | 25% |
| 108% | 0.4020 | 0.1395 |
| 103%-108% | 0.0000 | 0.0000 |
| 92%-97% | 0.0000 | 0.0000 |
| 92% | 0.0000 | 0.0000 |

5.0%
22%

EXHIBIT C

## 2015 CT. Reisurance Payment #3 Summary Report

| Issuer ID | Issuer Legal Name | EDGE RI Payment Calculation | Projected Proration Factor | Projected RI Payment Amount | Previous RI Remaining Balance | Prorated Payment Amount 1/23/2017 | New RI Remaining Balance |
|---|---|---|---|---|---|---|---|
| 91089 | Healthy CT, Inc. | $20,743,824.90 | 55.06168% | $ 11,421,888.53 | $1,228,201.27 | $572,966.82 | $655,234.45 |

# EXHIBIT D

## Affidavit of Daniel L. Watkins, Special Deputy Liquidator

| DOCKET NO. HHD-CV16-6072516-S | : | SUPERIOR COURT |
| --- | --- | --- |
| | : | |
| IN THE MATTER OF HEALTHYCT, INC., | : | JUDICIAL DISTRICT OF |
| IN REHABILITATION | : | HARTFORD |
| | : | |
| | : | March 7, 2017 |

## **AFFIDAVIT OF DANIEL L. WATKINS**

I, Daniel L. Watkins, being duly sworn, hereby depose and say:

1.    I am over eighteen years of age and believe in the obligations of an oath.

2.    I make this affidavit upon my own knowledge, information and belief.

3.    On December 7, 2016, Katharine L. Wade, Insurance Commissioner of the State

of Connecticut (the "Commissioner") acting in her capacity as the Rehabilitator of HealthyCT,

Inc. ("HealthyCT"), filed a petition for liquidation of HealthyCT pursuant to The Insurers

Rehabilitation and Liquidation Act, Conn. Gen. Stat. §§ 38a-903 to 38a-961, inclusive, which

was granted by order of the Court dated December 9, 2016 (the "Liquidation Order").

4.    The Liquidation Order appointed the Commissioner, and her successors in office,

as Liquidator of HealthyCT and appointed me as Special Deputy Liquidator, with such authority,

powers, duties and responsibilities as set forth in Conn. Gen. Stat. § 38a-923.

5.    On February 15, 2017, I provided the United States Department of Health &

Human Services ("HHS"), via Federal Express, notice of certain actions taken by the Liquidator

on behalf of HealthyCT with respect to obligations owing by and to the United States and its

agencies (the "Set Off Notice"). A copy of the Set Off Notice is attached hereto as Exhibit A; a

copy of the delivery confirmation is attached hereto as Exhibit B.

6.    On February 16, 2017, I sent, via email, a copy of the Set Off Notice to the

following individuals at the Centers for Medicare & Medicaid Services ("CMS") and the United

States Department of Justice ("DOJ"): Tom Donohue (thomas.donohue@cms.hhs.gov); Jeff Wu (jeff.wu@cms.hhs.gov); Jeff Grant (jeff.grant@cms.hhs.gov); Matt Lynch (matthew.lynch@cms.hhs.gov); and Serena Orloff (serena.m.orloff@usdoj.org).

7.     On March 7, 2017, I provided HHS, CMS and DOJ, via U.S. Mail to the addresses listed below, a letter regarding recent actions taken in the Liquidation of HealthyCT (the "March 6th Letter") and enclosed a copy of (i) the Motion to Approve the First Accounting and Status Report of the Liquidation Proceeding and the Acts Reporting Therein (the "Motion"), filed with the Court on February 17, 2017, and (ii) a Brief in Support of the Motion, filed with the Court on March 3, 2017. A copy of the March 6th Letter with enclosures is attached hereto as Exhibit C. Address list:

| | |
|---|---|
| The Honorable Tom Price<br>Department of Health and Human Services<br>Office of the Secretary<br>200 Independence Avenue, SW<br>Washington, DC 20201 | Tom Donohue<br>Jeff Wu<br>Jeff Grant<br>Matt Lynch<br>Centers for Medicare & Medicaid Services<br>7500 Security Blvd<br>Baltimore, MD 21244 |

Serena Orloff
United States Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street, NW  Room 10032
Washington, D.C.  20005

8.     On March 7, 2017, I sent, via email, a copy of the March 6th Letter, the Motion and Brief in Support thereof to the following individuals at CMS and DOJ: Tom Donohue (thomas.donohue@cms.hhs.gov); Jeff Wu (jeff.wu@cms.hhs.gov); Jeff Grant (jeff.grant@cms.hhs.gov); Matt Lynch (matthew.lynch@cms.hhs.gov); and Serena Orloff (serena.m.orloff@usdoj.org).

I have read the preceding statement and to the best of my knowledge, information and belief, it is true.

_Daniel L. Watkins_

Daniel L. Watkins

Subscribed and sworn to me at Hartford, Connecticut, this 7th day of March, 2017.

_Rena C. Wayril_

comm exp. 3/31/2020

# EXHIBIT A



**HEALTHYCT**
YOUR HEALTH – YOUR PLAN.

February 14, 2017

The Honorable Tom Price
Secretary of U.S. Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC

Re: Recent Action in the Liquidation of HealthyCT, Inc.

Dear Secretary Price:

I am the Special Deputy Liquidator of HealthyCT, Inc., in Liquidation ("HCT"), and by this letter I advise you of action the Liquidator has taken on behalf of HCT with respect to obligations owing by and to the United States and its agencies. These obligations are set forth below.

1. Risk Corridors payments are owing to HCT for the 2014 and 2015 plan years in the aggregate amount $16,165,020. Exhibit A attached hereto contains correspondence and materials from the U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS") confirming this amount, toward which CMS has made minimal payments.[1]

2. A Risk Corridors payment is owing to HCT for the 2016 plan year in an amount calculated to be $22,367,329. This amount was determined using 2016 data and an actuarial model developed by a third party pursuant to parameters established by CMS. The model and HCT's methodology for calculating these amounts have been subject to third party review and audit. Exhibit B attached hereto provides a breakdown of this Risk Corridors amount by line of business.

3. A final Transitional Reinsurance payment is owing to HCT for the 2015 plan year in the amount of $655,234. Exhibit C attached hereto contains a payment summary received from CMS in January 2017 confirming this receivable amount.

4. A Transitional Reinsurance payment is owing to HCT for the 2016 plan year in an amount calculated to be $5,618,398. This amount was determined using 2016 incurred, paid and pended claim data as of January 24, 2017, based on the 2016 benefit-year parameters established by CMS.

5. A Risk Adjustment payment is owing by HCT for the 2016 plan year in an amount calculated to be $7,256,549. This amount was determined using an actuarial model developed by a third party pursuant to parameters established by CMS based on paid claims through October 2016. The Risk Adjustment amount will be adjusted as paid claims

---

[1] 12.6% and 1.9% of the Risk Corridors amount for 2014 have been paid by CMS in 2015 and 2016. These partial payments were deducted from the total Risk Corridors amounts in the CMS reports attached as Exhibit A.


through December 2016 are submitted to the CMS EDGE server by HCT and other Connecticut certified health plan carriers.

6. Transitional Reinsurance Fees, Risk Adjustment User Fees and Patient-Centered Outcomes Research Institute fees are owing by HCT for the 2016 plan year in an amount calculated to be $1,167,728. These calculations are based on HCT's enrollment and the per-covered life rates and methodologies established by CMS and the IRS.

7. Advanced Premium Tax Credits ("APTC") and Cost Share Reduction ("CSR") reconciliation amounts are owing by HCT for the 2016 plan year in the amount of $1,515,100. The APTC amount is based on APTC subsidy reports supplied by Access Health CT, inclusive of retroactive adjustments, compared to cumulative amounts funded by CMS. The CSR Reconciliation amount represents CSR advance payments for the months of October, November, and December 2016 pending final reconciliation of the difference between the 2016 advance payments and actual 2016 claim experience.

By this letter, you are hereby advised that the Liquidator has set off items 5, 6 and 7 against items 1 and 2. These setoffs have been effectuated pursuant to the Liquidator's authority under Conn. Gen. Stat. §§ 38a-923(a)(6), 38a-923(b), 38a-932(a), paragraphs 4 through 6 of the Order of Liquidation entered December 9, 2016, and Connecticut common law and equity.

The United States may contend that the amounts set forth in item 1 are not currently due. HCT *disagrees with this position, but such amounts, at a minimum, are undoubtedly owed by the United* States' own admissions. In addition, the U.S. Court of Federal Claims has held in two recent cases that Risk Corridors payments are due and payable by the United States on an annual basis. *See Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757, 776 (Fed. Cl. 2017) (holding that Risk Corridors claims were ripe for adjudication because the United States is required to make annual Risk Corridors payments to eligible qualified health plans); *see also Moda Health Plan, Inc. v. United States*, No. 16-649C, 2017 WL 527588, *1 (Fed. Cl. February 9, 2017) ("The Court finds that the ACA requires annual payments to insurers, and that Congress did not design the risk corridors program to be budget-neutral."). Under Connecticut law, where one of the parties to mutual debts is insolvent, set off may be effectuated even though one or more of the obligations is not yet due. *Sullivan v. Merchants Nat'l Bank*, 144 A. 34 (Conn. 1928). Therefore, items 5, 6 and 7 are considered paid in full, and I have adjusted HCT's records accordingly. Items 3 and 4 should be paid in full by the United States as and when due, based on the balance of the mutual debts of the United States and HCT.[2]

---

[2] The proceeds of the Series A (Start-up) and Series B (Solvency) Loans, issued pursuant to the Loan Agreement dated June 7, 2012, between CMS and HCT (as amended, the "Loan Agreement"), are structured as surplus notes pursuant to the National Association of Insurance Commissioners Statement of Statutory Accounting Principles 41. Given their structure as surplus notes, amounts are not owing by HCT other than with the prior approval of the


**HEALTHYCT**

February 14, 2017
Page 3

The Liquidation Court will be notified of the mutual obligations discussed herein and the set offs effectuated in my next accounting and status report.
Please let me know if you have any questions.

Respectfully yours,

Dan Watkins
Special Deputy Liquidator for
HealthyCT, Inc.

Email ccs: Tom Donahue, CMS Consumer Information and Insurance Oversight (CCIIO),
Thomas.donahue@cms.hhs.gov

Jeff Wu, Acting Director & Acting Marketplace CEO (CMS/CCIIO),
jeff.wu@cms.hhs.gov

Jeff Grant, Director, Payment Policy and Financial Management Group
(CMS/CCIIO), jeff.grant@cms.hhs.gov

Matt Lynch, Director, State Marketplace and Insurance Programs Group
(CMS/CCIIO), matthew.lynch@cms.hhs.gov

Serena Orloff, United States Department of Justice, Civil Division, Commercial
Litigation Branch, serena.m.orloff@usdoj.org

---

Connecticut Insurance Commissioner. *See* Series A and B Promissory Notes, attached to the Loan Agreement as Appendices ("Notwithstanding any conflicting provisions contained in the Loan Agreement, payment shall be on the terms and subject to the conditions set forth in this Surplus Note....This Surplus Note shall be repaid only out of the surplus earnings of Borrower and, as to each payment, only with the prior approval of the Connecticut Insurance Commissioner or his designee."). The surplus notes therefore are not subject to set off as a mutual debt owing by HCT to CMS. CMS's waiver of set off in the Promissory Notes confirms this treatment: "[t]he obligation of Borrower under this Promissory Note may not be offset or be subject to recoupment with respect to any liability or obligation owed to Borrower."

EXHIBIT A

## Department of Health & Human Services

Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201



**Date:** November 19, 2015

**Subject:** Risk Corridors Payment and Charge Amounts for Benefit Year 2014

### Background:

Section 1342 of the Affordable Care Act directs the Secretary of the Department of Health and Human Services (HHS) to establish a temporary risk corridors program that provides issuers of qualified health plans (QHPs) in the individual and small group markets additional protection against uncertainty in claims costs during the first three years of the Marketplace. The program, which was modeled after a similar program implemented as part of the Medicare Part D prescription drug benefit program, encourages issuers to keep their rates stable as they adjust to the new health insurance reforms in the early years of the Marketplaces.

HHS has previously stated that if risk corridors collections for a particular year are insufficient to make full risk corridors payments for that year, risk corridors payments for the year will be reduced pro rata to the extent of any shortfall.[1] On October 1, 2015, HHS announced the payment proration rate for 2014 will be approximately 12.6 percent, reflecting risk corridors charges of $362 million and payments of $2.87 billion requested by issuers.[2] This proration rate was based on the most current risk corridors data submitted by issuers and assumes full collection of charges from issuers.

Today, HHS is releasing issuer-level risk corridors payments and charges based on the most current risk corridors data submitted by issuers and assuming full collection of charges from issuers, by market and state, for the 2014 benefit year. The tables below include the risk corridors payment or charge amounts for the individual and small group markets, respectively, and the prorated risk corridors payment, if applicable. **Risk corridors charges payable to HHS are not prorated, and the full risk corridors charge amounts are noted in the chart below. Only risk corridors payment amounts are prorated.** HHS will begin collection of risk corridors charges in November 2015 and will begin remitting risk corridors payments to issuers starting in December 2015.[3]

---

[1] "Risk Corridors and Budget Neutrality", published April 11, 2014 and posted at
https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf

[2] The exact proration rate for 2014 is 12.6178665287897%.

[3] We note that the risk corridor payment and charge amounts published in this bulletin do not reflect any payment or charge adjustments due to resubmissions after September 15, 2015 or any amount held back for appeals.

Table 1 – Alabama

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | | PRORATED AMOUNT (INDIVIDUAL MARKET) | | PRORATED AMOUNT (SMALL GROUP MARKET) | |
|---|---|---|---|---|---|---|---|---|---|---|
| AL | 44580 | Humana Insurance Company | $ | 947,116.86 | $ | - | $ | 119,505.94 | $ | - |
| AL | 46944 | Blue Cross and Blue Shield of Alabama | $ | 354,762.84 | $ | - | $ | 44,763.50 | $ | - |
| AL | 59809 | UnitedHealthcare Life Insurance Company | $ | - | $ | (4,761.86) | $ | - | $ | (4,761.86) |

Table 2 – Alaska

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | | PRORATED AMOUNT (INDIVIDUAL MARKET) | | PRORATED AMOUNT (SMALL GROUP MARKET) | |
|---|---|---|---|---|---|---|---|---|---|---|
| AK | 38344 | Premera Blue Cross Blue Shield of Alaska | $ | 8,126,435.92 | $ | 122,178.45 | $ | 1,025,382.84 | $ | 15,416.31 |
| AK | 73836 | Moda Health Plan, Inc. | $ | 1,237,418.79 | $ | 448,597.16 | $ | 156,135.85 | $ | 56,603.39 |

Table 3 – Arizona

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | | PRORATED AMOUNT (INDIVIDUAL MARKET) | | PRORATED AMOUNT (SMALL GROUP MARKET) | |
|---|---|---|---|---|---|---|---|---|---|---|
| AZ | 23307 | Humana Health Plan, Inc. | $ | 1,851,728.19 | $ | - | $ | 233,648.59 | $ | - |
| AZ | 51485 | Health Net Life Insurance Company | $ | 38,309,878.15 | $ | 6,528,368.90 | $ | 4,833,889.29 | $ | 823,740.87 |
| AZ | 53901 | Blue Cross Blue Shield of Arizona, Inc. | $ | 11,688,096.55 | $ | (216,623.22) | $ | 1,474,788.42 | $ | (216,623.22) |
| AZ | 60761 | Meritus Health Partners | $ | 3,401,552.97 | $ | 88,126.95 | $ | 429,203.41 | $ | 11,119.74 |

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | | PRORATED AMOUNT (INDIVIDUAL MARKET) | | PRORATED AMOUNT (SMALL GROUP MARKET) | |
|---|---|---|---|---|---|---|---|---|---|---|
| CO | 21032 | Kaiser Foundation Health Plan of Colorado | $ | 14,160,790.95 | $ | - | $ | 1,786,789.70 | $ | - |
| CO | 49375 | Cigna Health and Life Insurance Company | $ | (632,444.16) | $ | - | $ | (632,444.16) | $ | - |
| CO | 63312 | Colorado Choice Health Plans | $ | 5,893,514.24 | $ | 114,299.01 | $ | 743,635.76 | $ | 14,422.10 |
| CO | 66699 | Denver Health Medical Plan, Inc. | $ | 287,542.11 | $ | - | $ | 36,281.68 | $ | - |
| CO | 74320 | Humana Health Plan | $ | 3,183,617.97 | $ | - | $ | 401,704.67 | $ | - |
| CO | 76680 | HMO Colorado, Inc., dba HMO Nevada | $ | 1,479,675.14 | $ | (21,811.05) | $ | 186,703.43 | $ | (21,811.05) |
| CO | 80208 | Rocky Mountain Health Care Options | $ | - | $ | 440,553.54 | $ | - | $ | 55,588.46 |
| CO | 92137 | All Savers Insurance Company | $ | (107,467.82) | $ | - | $ | (107,467.82) | $ | - |
| CO | 97879 | Rocky Mountain HMO | $ | 1,470,136.36 | $ | 578,003.29 | $ | 185,499.84 | $ | 72,931.68 |

**Table 7 – Connecticut**

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | | PRORATED AMOUNT (INDIVIDUAL MARKET) | | PRORATED AMOUNT (SMALL GROUP MARKET) | |
|---|---|---|---|---|---|---|---|---|---|---|
| CT | 49650 | UnitedHealthcare Insurance Company | $ | - | $ | 11,299.51 | $ | - | $ | 1,425.76 |
| CT | 76962 | ConnectiCare Benefits, Inc. | $ | (717,037.34) | $ | - | $ | (717,037.34) | $ | - |
| CT | 86545 | Anthem Health Plans, Inc. (Anthem BCBS) | $ | (863,733.24) | $ | (26,699.38) | $ | (863,733.24) | $ | (26,699.38) |
| CT | 91069 | HealthyCT, Inc. | $ | 1,561,247.18 | $ | 272,638.90 | $ | 196,996.09 | $ | 34,401.21 |

**Department of Health & Human Services**

Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight 200
Independence Avenue SW
Washington, DC 20201



**Date:** November 18, 2016

**Subject:** Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year

**Background:**

Section 1342 of the Affordable Care Act directs the Secretary of the Department of Health and Human Services (HHS) to establish a temporary risk corridors program that provides issuers of qualified health plans (QHPs) in the individual and small group markets additional protection against uncertainty in claims costs during the first three years of the Marketplace.

HHS established a three-year payment framework for the risk corridors program and outlined the details of this payment framework in our April 11, 2014 guidance on *Risk Corridors and Budget Neutrality*.[1] As set forth in that guidance, if risk corridors collections for a particular year are insufficient to make full risk corridors payments for that year, risk corridors payments for the year will be reduced pro rata to the extent of any shortfall. Because risk corridors payments for the 2014 benefit year exceeded risk corridors collections for that benefit year, risk corridors collections for the 2015 benefit year will be used first towards remaining balances on 2014 benefit year risk corridors payments.

On September 9, 2016, HHS published guidance on *Risk Corridors Payments for 2015*, stating that we anticipated that all 2015 benefit year collections would be used toward remaining 2014 benefit year risk corridors payments, and that no funds would be available at this time for 2015 benefit year risk corridors payments.[2] Today, we are confirming that all 2015 benefit year risk corridors collections will be used to pay a portion of balances on 2014 benefit year risk corridors payments.

We are also announcing issuer-level risk corridors payments and charges for the 2015 benefit year. The tables below show risk corridors payments and charges calculated for the 2015 benefit year, by State and issuer, and the additional amount based on anticipated 2015 risk corridors collections that HHS expects to pay towards the calculated 2014 benefit year payments.[3] Pursuant to 45 CFR

---

[1] *Risk Corridors and Budget Neutrality*, available at: https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf

[2] *Risk Corridors Payments for 2015*, available at:
https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/Risk-Corridors-for-2015-FINAL.PDF

[3] Risk corridor payment and charge amounts published in this bulletin do not reflect any payment or charge adjustments due to resubmissions after September 30, 2016 or any amount held back for appeals.

153.510(g), the 2015 benefit year risk corridors amounts listed in this report include the direct adjustment for issuers that reported certified estimates of the cost-sharing reduction portion of advance payments that were lower than the actual CSRs provided for the 2014 benefit year (as calculated under CSR reconciliation for the 2014 benefit year). On November 17, 2016, HHS notified issuers subject to the direct adjustment to 2015 benefit year risk corridors amounts of the calculated adjustment amount, consistent with guidance issued on September 15, 2016.[4]

Risk corridors payments are reduced pro rata based on risk corridors collections received. HHS intends to collect the full 2015 risk corridors charge amounts indicated in the tables below. HHS is collecting 2015 risk corridor charges in November 2016, and will begin remitting risk corridors payments to issuers in December 2016, as collections are received.

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS 2015 RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS 2015 RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | EXPECTED PAYMENT TOWARD 2014 AMOUNTS |
|---|---|---|---|---|---|
| AK | 38344 | Premera Blue Cross Blue Shield of Alaska | $7,479,997.83 | $716,228.92 | $274,005.10 |
| AK | 73836 | Moda Health Plan, Inc. | $28,630,662.11 | $2,900,481.02 | $56,006.61 |
| AL | 44580 | Humana Insurance Company | $2,935,440.73 | $0.00 | $31,461.63 |
| AL | 46944 | Blue Cross and Blue Shield of Alabama | $79,476,154.29 | $10,341,860.76 | $11,784.62 |
| AL | 59809 | UnitedHealthcare Life Insurance Company | $0.00 | $6,577.07 | $0.00 |
| AL | 68259 | UnitedHealthcare of Alabama, Inc. | $8,688,275.81 | $0.00 | N/A |
| AR | 62141 | Celtic Insurance Company | $1,812,823.37 | $0.00 | $0.00 |
| AR | 70525 | QCA Health Plan, Inc. | $476,592.83 | $0.00 | $138,891.20 |
| AR | 75293 | USAble Mutual Insurance Company | $15,919,592.28 | -$7,883.38 | $0.00 |
| AR | 37903 | QualChoice Life & Health Insurance Company, Inc. | $4,524,487.98 | $0.00 | N/A |
| AZ | 23307 | Humana Health Plan, Inc. | $202,481.41 | $0.00 | $61,511.29 |
| AZ | 51485 | Health Net Life Insurance Company | $95,219,226.99 | $17,249,722.49 | $1,489,451.17 |
| AZ | 53901 | Blue Cross and Blue Shield of Arizona, Inc. | $51,990,665.22 | $0.00 | $388,258.91 |
| AZ | 60761 | Meritus Health Partners | $54,694,644.83 | $702,732.99 | $115,921.29 |
| AZ | 70239 | Health Choice Insurance Co. | $4,444,184.06 | $0.00 | $41,795.92 |
| AZ | 84251 | Aetna Life Insurance Company | -$389,753.48 | $0.00 | $1,995.46 |
| AZ | 86830 | Cigna Health and Life Insurance Company | $1,023,204.62 | $0.00 | $5,758.61 |
| AZ | 88925 | University of Arizona Health Plans-University Healthcare, Inc. | $1,213,077.74 | $0.00 | $21,429.04 |
| AZ | 91450 | Health Net of Arizona, Inc. | $38,681,654.46 | $5,438,853.29 | $1,523,528.06 |
| AZ | 92045 | Meritus Mutual Health Partners | $11,438,590.03 | $1,437,229.12 | $62,237.55 |

---

[4] *Reporting of Risk Corridors Amounts Reflecting Certified Estimates of 2014 Cost-Sharing Reduction Amounts in Part 3, Line 1.7 of the Medical Loss Ratio Annual Reporting Form for the 2015 Benefit Year,* available at: https://www.regtap.info/uploads/library/RC_CSRandMLR_091516_v1_5CR_091516.pdf

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS 2015 RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS 2015 RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | EXPECTED PAYMENT TOWARD 2014 AMOUNTS |
|---|---|---|---|---|---|
| AZ | 65441 | Phoenix Health Plans, Inc. | $34,931.14 | $0.00 | N/A |
| AZ | 80863 | Time Insurance Company | $7,624,448.10 | $0.00 | N/A |
| AZ | 98971 | All Savers Insurance Company | $7,002,813.66 | $0.00 | N/A |
| CA | 18126 | MOLINA HEALTHCARE OF CALIFORNIA | $1,784,227.07 | $0.00 | $0.00 |
| CA | 27603 | Blue Cross of California(Anthem BC) | -$808,605.43 | $0.00 | $0.00 |
| CA | 40513 | Kaiser Foundation Health Plan, Inc. | $39,758,493.83 | $47,233,593.74 | $1,226,858.64 |
| CA | 47579 | Chinese Community Health Plan | -$25,303.31 | $0.00 | $23,677.66 |
| CA | 67138 | Health Net of California, Inc | $24,828,036.37 | $0.00 | $0.00 |
| CA | 70285 | CA Physician's Service dba Blue Shield of CA | $29,839,109.20 | -$217,494.36 | $0.00 |
| CA | 84014 | County of Santa Clara | $151,037.85 | $0.00 | $0.00 |
| CA | 92499 | Sharp Health Plan | $0.00 | $31,033.86 | $258.29 |
| CA | 92815 | Local Initiative Health Authority for Los Angeles County | $8,255,198.64 | $0.00 | $450,495.26 |
| CA | 93689 | Western Health Advantage | $0.00 | $171,678.94 | $193.15 |
| CA | 99110 | Health Net Life Insurance Company | $130,379,454.51 | $10,868,970.44 | $168,047.08 |
| CA | 99483 | CONTRA COSTA HEALTH PLAN | $0.00 | $0.00 | $0.00 |
| CO | 11555 | New Health Ventures Inc | $88,645.17 | $0.00 | $3,538.44 |
| CO | 20472 | Colorado Health Insurance Cooperative, Inc. | $97,136,652.48 | $1,558,715.85 | $475,035.47 |
| CO | 21032 | Kaiser Foundation Health Plan of Colo. | $52,928,909.77 | $0.00 | $470,397.66 |
| CO | 49375 | Cigna Health and Life Insurance Company | $2,017,361.36 | $0.00 | $0.00 |
| CO | 63312 | Colorado Choice Health Plans | $1,597,077.24 | $60,789.09 | $199,569.45 |
| CO | 66699 | Denver Health Medical Plan, Inc | $141,372.24 | $0.00 | $9,551.66 |
| CO | 74320 | Humana Health Plan | $2,856,524.81 | $0.00 | $105,754.43 |
| CO | 76680 | HMO Colorado, Inc., dba HMO Nevada | $3,002,631.67 | $38,482.92 | $49,152.32 |
| CO | 80208 | Rocky Mountain Health Care Options | $0.00 | $0.00 | $14,634.44 |
| CO | 92137 | All Savers Insurance Company | $184,407.92 | $0.00 | $0.00 |
| CO | 97879 | Rocky Mountain HMO | $32,345,160.48 | $780,733.56 | $68,035.75 |
| CT | 49650 | UnitedHealthcare Insurance Company | $222,890.06 | $265,020.43 | $375.35 |
| CT | 76962 | ConnectiCare Benefits, Inc. | $0.00 | $0.00 | $0.00 |
| CT | 86545 | Anthem Health Plans Inc(Anthem BCBS) | -$691,198.86 | $0.00 | $0.00 |
| CT | 91069 | HealthyCT, Inc. | $12,859,364.54 | $1,723,783.09 | $60,918.61 |
| DC | 41842 | UnitedHealthcare Insurance Company | $0.00 | $0.00 | $0.00 |
| DC | 73987 | Aetna Health Inc. (a PA corp.) | $0.00 | $220,036.68 | $0.00 |
| DC | 75753 | Optimum Choice, Inc. | $0.00 | -$240,089.45 | $0.00 |
| DC | 77422 | Aetna Life Insurance Company | $42,898.21 | $112,048.45 | $0.00 |

EXHIBIT B

# HEALTHYCT
## 2016 BENEFIT YEAR RISK CORRIDOR CALCULATION

| Risk Corridor Development | IND | SG | LG | IND+SG |
|---|---|---|---|---|
| Premium | $79,080,600 | $55,763,791 | $60,942,815 | $134,844,391 |
| Paid Claims - Less CSR | $0 | $0 | $0 | $0 |
| Reinsurance Recoveries | -$7,865,812 | $0 | -$2,564,627 | -$7,865,812 |
| Reserves | $101,142,988 | $51,910,980 | $64,629,263 | $153,053,968 |
| Total Claims - Less CSR | $93,277,176 | $51,910,980 | $62,064,636 | $145,188,156 |
| Admin Expenses | $16,863,037 | $14,454,572 | $12,450,134 | $31,317,609 |
| Taxes and Fees | $1,993,501 | $1,351,106 | $1,801,038 | $3,344,607 |
| After-tax Premium | $77,087,099 | $54,412,685 | $59,141,777 | $131,499,784 |
| Risk-corridor Profit | $3,854,355 | $2,720,634 | $2,957,089 | $6,574,989 |
| Allowable Admin Expenses | $18,952,663 | $13,321,897 | $14,812,229 | $32,274,559 |
| Target Amount | $60,127,937 | $42,441,894 | $46,130,586 | $102,569,832 |
| Risk Corridor Ratio | 155.13% | 122.31% | 134.54% | 141.55% |

### Risk Corridors

| Factor | Low | High | | | | | |
|---|---|---|---|---|---|---|---|
| -80% | 0% | | 92% | $0 | $0 | $0 | $0 |
| -50% | 92% | | 97% | $0 | $0 | $0 | $0 |
| 0% | 97% | | 100% | $0 | $0 | $0 | $0 |
| 0% | 100% | | 103% | $0 | $0 | $0 | $0 |
| 50% | 103% | | 108% | $1,503,198 | $1,061,047 | $1,153,265 | $2,564,246 |
| 80% | 108% | | 999% | $22,671,203 | $4,858,987 | $9,794,882 | $27,530,190 |
| | | Total Receivable (Payment) | | $24,174,401 | $5,920,035 | | |
| | | Estimated QHP % | | 85.0% | 25.0% | | |
| | | | | $20,548,241 | $1,480,009 | | |

| Risk Corridor Formula Full Year Estimate | Individual | Small Group |
|---|---|---|
| Premium Earned Including Premium Tax Credits | $79,080,600 | $55,763,791 |
| - Taxes and Regulatory Fees | $1,993,501 | $1,351,106 |
| After Tax Premiums Earned | $77,087,099 | $54,412,685 |
| Administration Costs (less taxes and regulatory fees) | $14,869,537 | $13,103,466 |
| + Profits Earned | -$31,059,614 | -$10,601,761 |
| Profit (minimum of 3% of after tax premium) | $2,312,613 | $1,632,381 |
| Admin Costs (2016: 22%) | $16,959,162 | $11,970,791 |
| + Taxes and Regulatory Fees | $1,993,501 | $1,351,106 |
| Allowable Administrative Costs | $18,952,663 | $13,321,897 |
| Claims (less CSR payments) | $0 | $0 |
| + Claim-Related Retention (QI/Health IT) | $0 | $0 |
| + Risk Adjustment Charges | $0 | $0 |
| - Risk Adjustment Receivables | $0 | $0 |
| - Reinsurance Receivables | -$7,865,812 | $0 |
| +Change in reserves | $101,142,988 | $51,910,980 |
| Allowable Costs | $93,277,176 | $51,910,980 |
| Target Amount | $60,127,937 | $42,441,894 |
| Risk Corridor Ratio | 1.55 | 1.22 |
| Risk Corridor Receivable / (Payment) | $24,174,401 | $5,920,035 |
| Risk Corridor Receivable / (Payment) - % QHP + Margin $ | 20,548,241 | $ 1,480,009 |
| % QHP + Margin | 85% | 25% |
| 108% | 0.4020 | 0.1395 |
| 103%-108% | 0.0000 | 0.0000 |
| 92%-97% | 0.0000 | 0.0000 |
| 92% | 0.0000 | 0.0000 |

Left of right table (margin notes): 5.0% / 22%

EXHIBIT C

## 2015 CT. Reinsurance Payment #3 Summary Report

| Issuer ID | Issuer Legal Name | EDGE RI Payment Calculation | Projected Proration Factor | Projected RI Payment Amount | Previous RI Remaining Balance | Prorated Payment Amount 1/23/2017 | New RI Remaining Balance |
|---|---|---|---|---|---|---|---|
| 91089 | Healthy CT. Inc. | $20,743,824.90 | 55.06168% | $ 11,421,888.53 | $1,228,201.27 | $572,966.82 | $655,234.45 |

**EXHIBIT B**

**FedEx.**    Shipping    Tracking    Manage    Learn    FedEx Office ®    **Dan Watkins**

**IMPORTANT!**
**FedEx is closely monitoring the Winter Storm in the Midwest U.S.** Learn More

## FedEx Tracking

---

**778437303333**

Ship date:
**Wed 2/15/2017**

**HEALTHYCT**
Dan Watkins
35 THORPE AVE
WALLINGFORD, CT US 06492
203 949-1602


**Delivered**
Signed for by: L.LATAPIE

Actual delivery:
**Thu 2/16/2017 9:36 am**

**US DEPT OF HEALTH & HUMAN
SERVICES**
TOM PRICE
200 INDEPENDENCE AVENUE, SW
OFFICE OF THE SECRETARY
WASHINGTON, DC US 20201
240 453-2808

---

### Travel History

| ▲ Date/Time | Activity | Location |
|---|---|---|
| ▬ 2/16/2017 - Thursday | | |
| 9:36 am | Delivered | WASHINGTON, DC |
| 8:32 am | On FedEx vehicle for delivery | WASHINGTON, DC |
| 7:41 am | At local FedEx facility | WASHINGTON, DC |
| 5:00 am | At destination sort facility | DULLES, VA |
| 4:14 am | Departed FedEx location | NEWARK, NJ |
| ▬ 2/15/2017 - Wednesday | | |
| 11:54 pm | Arrived at FedEx location | NEWARK, NJ |
| 11:45 pm | Left FedEx origin facility | NORTH HAVEN, CT |
| 4:54 pm | Picked up | NORTH HAVEN, CT |
| 1:51 pm | Shipment information sent to FedEx | |

### Shipment Facts

| | | | | |
|---|---|---|---|---|
| **Tracking number** | 778437303333 | **Service** | | FedEx Priority Overnight |
| **Weight** | 0.5 lbs / 0.23 kgs | **Delivery attempts** | | 1 |
| **Delivered To** | Mailroom | **Total pieces** | | 1 |
| **Total shipment weight** | 0.5 lbs / 0.23 kgs | **Terms** | | Not Available |
| **Shipper reference** | HealthyCT | **Packaging** | | FedEx Envelope |
| **Special handling section** | Deliver Weekday | **Standard transit** | ❓ | 2/16/2017 by 10:30 am |

---

**FedEx**

Search or tracking number

**Customer Focus**
New Customer Center
Small Business Center
Service Guide
Customer Support

**Company Information**
About FedEx
Careers
Investor Relations
Subscribe to FedEx email

**Featured Services**
FedEx Delivery Manager
FedEx SameDay
FedEx Home Delivery
FedEx TechConnect
FedEx HealthCare Solutions
Online Retail Solutions
Packaging Services
Ancillary Clearance Services

**Other Resources**
FedEx Compatible
Developer Resource Center
FedEx Ship Manager Software
FedEx Mobile

**Companies**
FedEx Express
FedEx Ground
FedEx Office
FedEx Freight
FedEx Custom Critical
FedEx Trade Networks
FedEx Cross Border
FedEx Supply Chain

**Follow FedEx**

■■ United States - l

Ask FedEx

# EXHIBIT C



HCT.
**HEALTHYCT**
YOUR HEALTH – YOUR PLAN.

March 6, 2017

The Honorable Tom Price
U.S. Department of Health and Human Services
Office of the Secretary
200 Independence Avenue, SW
Washington, DC 20201

Re: Recent Action in the Liquidation of HealthyCT, Inc.

Dear Secretary Price, et al.:

I am the Special Deputy Liquidator of HealthyCT, Inc., in Liquidation ("HealthyCT"). As you know, by letter dated February 14, 2017, I sent you notice of certain actions taken by the Liquidator on behalf of HealthyCT with respect to obligations owing by and to the United States and its agencies. By this letter, I advise you that the Liquidator filed a Motion to Approve the First Accounting and Status Report of the Liquidation Proceeding and the Acts Reporting Therein (the "Motion") on February 17, 2017, a copy of which is attached hereto as Exhibit A. On March 3, 2017, the Liquidator filed a brief in support of the Motion, a copy of which is attached hereto as Exhibit B.

The Liquidator shall seek a ruling on the Motion on or after April 5, 2017.

Respectfully yours,

Dan Watkins
Special Deputy Liquidator for
HealthyCT, Inc., in Liquidation

Email ccs: Tom Donohue (thomas.donohue@cms.hhs.gov;
Jeff Wu (jeff.wu@cms.hhs.gov);
Jeff Grant (jeff.grant@cms.hhs.gov);
Matt Lynch (matthew.lynch@cms.hhs.gov);
Serena Orloff (serena.m.orlogg@usdoj.org)

# EXHIBIT A

| DOCKET NO. HHD-CV16-6072516-S | : | SUPERIOR COURT |
| --- | --- | --- |
| | : | |
| IN THE MATTER OF HEALTHYCT, | : | JUDICIAL DISTRICT OF |
| INC., IN LIQUIDATION | : | HARTFORD |
| | : | |
| | : | FEBRUARY 17, 2017 |

## MOTION TO APPROVE THE FIRST ACCOUNTING AND STATUS REPORT OF THE LIQUIDATION PROCEEDING AND THE ACTS REPORTED THEREIN

Katharine L. Wade, Insurance Commissioner of the State of Connecticut, in her capacity as Liquidator of HealthyCT, Inc. ("HealthyCT"), respectfully moves this Court for entry of an order (a) accepting and approving the First Accounting and Status Report of Daniel L. Watkins, Special Deputy Liquidator regarding the affairs of HealthyCT in Liquidation (the "First Status Report") annexed hereto, (b) approving, authorizing and ratifying the transactions and other acts of movant that are described in the First Status Report and the Supplemental Filing to the First Status Report, also annexed hereto, including the set off effectuated pertaining to mutual debits and credits with the United States government in accordance with the notice annexed hereto, and (c) approving the Rehabilitator's payment of the necessary expenses and operational costs of HealthyCT as set out in Exhibit A of the First Status Report and documented in the Supplemental Filing. In support of her motion, the Liquidator states and alleges as follows:

## BACKGROUND

1.     This case commenced on November 1, 2016, when the Court entered an Order of Rehabilitation (the "Rehabilitation Order") placing HealthyCT into rehabilitation proceedings pursuant to Conn. Gen. Stat. §§ 38a-903 to 38a-961, inclusive, and

appointed the Insurance Commissioner of the State of Connecticut as rehabilitator (the "Rehabilitator") of HealthyCT.

2.      On November 1, 2016, pursuant to Conn. Gen. Stat. § 38a-916 and the Rehabilitation Order, the Rehabilitator appointed Daniel L. Watkins as her Special Deputy with all the powers and responsibilities of the Rehabilitator. Acting on behalf of the Rehabilitator, the Special Deputy Rehabilitator took possession of the assets of HealthyCT, evaluated HealthyCT's books, records and business operations, and assumed management of HealthyCT with the objective of determining whether its financial condition could be rehabilitated.

3.      In accordance with Conn. Gen. Stat. § 38a-915(b), paragraph 28 of the Rehabilitation Order and the representations of the Rehabilitator to the Court at the November 14, 2016 hearing held in this proceeding, the Rehabilitator filed her First Accounting and Status Report with respect to HealthyCT on November 30, 2016 ("the First Status Report") and received the Court's acceptance and approval of the First Status Report, and its approval, authorization and ratification of the transactions and acts reported therein. The First Status Report reported to the Court that the Rehabilitator would be filing a petition for liquidation and setting a claims bar date as further efforts at rehabilitation were futile due to HealthyCT's insolvency.

4.      Pursuant to Conn. Gen. Stat. § 38a-918 and 38a-919 on December 7, 2016 the Rehabilitator filed a petition for liquidation and received the Court's entry of an Order of Liquidation on December 9, 2016 which set the effective date of liquidation at 11:59 p.m. Eastern Standard Time December 31, 2016 and a claims bar date of July

2

31, 2017. The Liquidation Order named Katharine L. Wade as Liquidator and Daniel L. Watkins Special Deputy Liquidator.

5.    On January 4, 2017, the Liquidator submitted a Second Status Report to the Court regarding the affairs of HealthyCT in Rehabilitation in December 2016 and received the Court's acceptance and approval of the Second Status Report and its approval, authorization and ratification of the transactions and acts reported therein.

## THE FIRST STATUS REPORT OF LIQUIDATION

4.    The First Status Report details the status of the HealthyCT liquidation proceeding including the following:

(a)    the Court's placement of HealthyCT into liquidation effective 11:59 p.m. December 31, 2016, and the appointment of the Insurance Commissioner and Daniel L. Watkins as Liquidator and Special Deputy Liquidator, respectively; and

(b)    the administration of the HealthyCT liquidation estate, including (i) the status of enrollment, (ii) the status of claims, (iii) activation of certain obligations of the Connecticut Life and Health Insurance Guaranty Association ("CLHIGA") and CLHIGA claims payment arrangements, (iv) status of employees, (v) status of broker commissions, (vi) the payment of necessary services, pharmacy claims, operational costs and premium refunds, (vii) the status of its cash at January 1 and February 10, 2017, (viii) the marshaling of assets including collection of commercial reinsurance and pharmacy rebates, and (ix) the effectuation of set off of mutual debts and credits with United States government entities.

3

5.     The Liquidator believes that the First Status Report is true and correct and complies with the Liquidation Order and applicable law.

6.     The Liquidator respectfully requests the Court to enter an order (i) accepting and approving the First Accounting and Status Report, (ii) approving, authorizing and ratifying the  transactions and other acts of the Liquidator and Special Deputy described therein, (iii) approving the set off effectuated by the Special Deputy of the mutual debts and credits to and from United States government entities, (iv) approving the Liquidators payment of the necessary expenses and operational costs of HealthyCT as set out in Exhibit A of the First Accounting and Status Report and (v) approving the December and January fees and expenses of the Special Deputy Rehabilitator and Special Deputy Liquidator.

## CONCLUSION

**WHEREFORE,** for the foregoing reasons the Liquidator respectfully requests that

the Court enter an order in the form annexed hereto.

Dated: February 17, 2017
Hartford, Connecticut

> KATHARINE L. WADE, INSURANCE
> COMMISSIONER OF THE STATE OF
> CONNECTICUT, AS LIQUIDATOR OF
> HEALTHYCT, INC. IN LIQUIDATION
>
> GEORGE JEPSEN
> ATTORNEY GENERAL
>
> BY:      434418
> John A.B. Langmaid
> Assistant Attorney General
> 55 Elm Street
> P.O. Box 120
> Hartford, CT 06141-0120
> Tel: 860 808-5270
>
> Matthew J. Budzik (415629)
> Assistant Attorney General

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Motion to Approve the First

Accounting and Status Report of the Liquidation Proceedings and the Acts Reported

Therein has been sent by first-class mail, postage prepaid this 17TH day of February,

2017 to the following:

Ernest J. Wright, Executive Director
Connecticut Life and Health Insurance Guaranty Association
P.O. Box 1550
Pawcatuck, CT 06379

Cindy Coles Oliver, Esq.
Lewis Roca Rothgerber Christe LLP
1200 Seventeenth Street, Suite 3000
Denver, CO 80202

                                    434418

                                John A.B. Langmaid (434418)
                                Assistant Attorney General
                                55 Elm Street
                                P.O. Box 120
                                Hartford, CT 06141-0120

**EXHIBIT B**

DOCKET NO. HHD-CV16-6072516-S

IN THE MATTER OF HEALTHYCT,
INC., IN LIQUIDATION

SUPERIOR COURT

JUDICIAL DISTRICT OF HARTFORD

March 3, 2017

## LIQUIDATOR'S BRIEF IN SUPPORT OF MOTION TO APPROVE THE FIRST
## ACCOUNTING AND STATUS REPORT OF THE
## LIQUIDATION PROCEEDING AND THE ACTS REPORTED THEREIN

Katherine L. Wade, Insurance Commissioner of the State of Connecticut, in her capacity as Liquidator of HealthyCT, Inc. ("HealthyCT"), through her undersigned counsel, hereby submits this brief in support of the Motion to Approve the First Accounting and Status Report of the Liquidation Proceeding and the Acts Reported Therein (the "Motion"). In the Motion, the Liquidator seeks approval of the actions taken by the Liquidator during the period of the Status Report, including a set off of mutual debts of the United States and its agencies (collectively, the "United States") and HealthyCT. As set forth in the Motion and the First Accounting and Status Report of the Liquidation Proceeding (the "Status Report"), pursuant to the Liquidator's power and authority to marshal assets and collect amounts due and claims belonging to HealthyCT, the Liquidator set off amounts owing by HealthyCT to the United States under certain programs established by the Patient Protection and Affordable Care Act (the "Affordable Care Act") against amounts owed by the United States to HealthyCT under the same and other programs under the Affordable Care Act. Notice of the actions taken by the Liquidator was provided to the United States by letter dated February 14, 2017 (the "Set Off Notice"), which is attached hereto as Exhibit A.

As set forth herein, the set off effectuated by the Liquidator was within her powers and authority under statute, the Liquidation Order entered by the Court on December 9, 2016 (the

"Liquidation Order") and Connecticut common law and equity. Accordingly, and for the reasons set forth below, the Court should grant the Motion.

## BACKGROUND

### I.    The Affordable Care Act

When the Affordable Care Act was signed into law in March 2010, it marked one of the most significant changes to health care law in U.S. history. The Affordable Care Act reshaped the health insurance market through a series of "interlocking reforms" and programs designed to expand coverage in the individual health insurance market. *King v. Burwell*, 135 S. Ct. 2480, 2485 (U.S. 2015). The Affordable Care Act prohibits insurers from denying coverage or setting premiums based on a person's health; generally requires individuals to maintain health insurance coverage or make a payment to the Internal Revenues Service; and provides subsidies to low-income insurance purchasers through refundable tax credits. *Id.* at 2486–87. In conjunction with these reforms, the Affordable Care Act created a network of "Health Benefit Exchanges" on which insurers would offer "Qualified Health Plans" to eligible purchasers. It also created the Consumer Operated and Oriented Plans Program (the "Co-Op Program"), which established non-profit insurers to bring new competition into the insurance market. 42 U.S.C. §§ 18031, 18041, 18042. HealthyCT was a Qualified Health Plan in the Co-Op Program.

The United States Department of Health and Human Services ("HHS") is responsible for overseeing implementation of major provisions of the Affordable Care Act and for administering certain programs thereunder, including the Co-Op Program. *See, e.g.*, 42 U.S.C. §§ 18041(a)(1), 18042(a)(1). HHS delegated many of its responsibilities under the Affordable Care Act to the Centers for Medicare & Medicaid Services ("CMS").

2

## II.  The "3Rs" Program, Premium Subsidies and Other Amounts Payable Under the Affordable Care Act

The changes to the health insurance market brought by the Affordable Care Act created significant uncertainty for health insurers, particularly with respect to setting premium rates. Health insurers could no longer engage in medical underwriting and lacked data regarding millions of new consumers that were entering the health insurance market. To mitigate pricing risk, the Affordable Care Act established three premium stabilization programs, known informally as the "3Rs": a transitional reinsurance program, a temporary risk corridors program, and a permanent risk adjustment program. 42 U.S.C. §§ 18061–18063. In addition, the Affordable Care Act established premium subsidy and cost-sharing programs and imposed various fees (collectively, the "Affordable Care Act Fees") on Qualified Health Plans.[1] The result of these programs is that at any given time, Qualified Health Plans may owe money to the United States under some programs and be owed money by the United States under other programs.

## III.  HealthyCT's Debits and Credits under Affordable Care Act Programs

As a result of its status as a Qualified Health Plan, HealthyCT has amounts owing to and amounts owing from the United States under the 3R Programs, the Advanced Premium Tax Credit and Cost-Sharing Reduction programs, and Affordable Care Act Fees for plan years 2014, 2015 and 2016. Payments under the 3R Programs are calculated annually based on HealthyCT's enrollment and claims data submitted to CMS. The advanced premium credits, cost-sharing reduction amounts and Affordable Care Act Fees are calculated and paid periodically based on HealthyCT's enrollment and other data reported to CMS.

---

[1] Background detail regarding the relevant programs is provided in Exhibit B attached hereto.

The Liquidator set off the amounts owing by HealthyCT to the United States against the amounts owing by the United States to HealthyCT. As set forth in the chart below, prior to effectuating the set off (i) HealthyCT owed $9,939,377, in the aggregate, consisting of Risk Adjustment payments, Advanced Premium Tax Credit and Cost-Sharing Reduction amounts, and Affordable Care Act Fees; and (ii) the United States owed $45,057,994.71, in the aggregate, consisting of Risk Corridors and Transitional Reinsurance payments. As a result of the set off, there is now a net payable by the United States of $35,118,618. Set forth below is a chart summarizing HealthyCT's debits and credits under the Affordable Care Act both before and after effectuating the set off.[2]

|  | Before Set Off | After Set Off |
|---|---|---|
| Transitional Reinsurance | $6,273,632 | $6,273,632 |
| Risk Corridors | $38,784,362.71 | $28,844,985.71 |
| Risk Adjustment | ($7,256,549) | -- |
| Advanced Premium Tax Credit | ($577,336) | -- |
| Cost-Sharing Reduction | ($937,764) | -- |
| Affordable Care Act Fees | ($1,167,728) | -- |

The amounts set forth above cover plan years 2014, 2015 and 2016. The amounts for plan years 2014–2015 are fixed. The inputs for calculating amounts for plan year 2016 (e.g., enrollment, claims and premium revenue) were fixed as of year-end 2016. However, because the calculations depend in part on data to be submitted by Qualified Health Plans through July 2017,

---

[2] Amounts payable to the United States are listed in (parenthesis).

amounts for the 2016 Plan Year are subject to adjustment. The Set Off Notice includes supporting documentation detailing the Risk Corridors and Transitional Reinsurance receivables. *See* Set Off Notice at Exhibits A–C.

## ARGUMENT

## I. The Set Off Effectuated by the Liquidator is Supported by Connecticut Law.

The Liquidator has the power and authority to set off the amounts owing by HealthyCT to the United States against amounts owing by the United States to HealthyCT pursuant to the Liquidation Order, The Insurers Rehabilitation and Liquidation Act, Conn. Gen. Stat. §§ 38a-903 to 38a-961, inclusive (the "Act"), and Connecticut common law and equity. Upon entry of the Liquidation Order, the Liquidator was directed to "immediately take possession of the assets of HealthyCT and to administer them under the general supervision of the Court." Liquidation Order at para. 5. The Liquidation Order also vests the Liquidator with all powers and authority expressed or implied under the Act, and all powers and authority set forth in the Liquidation Order. Liquidation Order at para. 4.

The Act gives the Liquidator the power to "collect all debts and moneys due and claims belonging to the insurer, wherever located, and for this purpose...to do such other acts as are necessary or expedient to collect, conserve or protect its assets or property...." Conn. Gen. Stat. § 38a-923(a)(6). Thus, the Liquidator is charged with gathering and administering the assets of HealthyCT and collecting all debts, monies and claims due and belonging to HealthyCT. The amounts owed by the United States under the Affordable Care Act programs are debts due to HealthyCT and are an asset of the estate. It is the Liquidator's duty to collect those amounts.

The Act also provides the Liquidator with the authority to set off mutual debts or mutual credits between the insurer and another person: "Mutual debts or mutual credits, whether arising

5

out of one or more contracts between the insurer and another person in connection with any action or proceeding under sections 38a-903 to 38a-961 inclusive, shall be set off and the balance only shall be allowed or paid, except as provided in subsection (b) of this section...." Conn. Gen. Stat. § 38a-932(a). In addition, the Act gives the Liquidator the power to do such other acts as are necessary or expedient to collect, conserve or protect the insurer's assets, and to pursue any creditor's remedies, which include common law rights of set off. Conn. Gen. Stat. § 38a-923(a)(6).

The amounts owing by HealthyCT were set off against amounts that the Liquidator maintains are currently due and payable by the United States (the Risk Corridors payments for plan years 2014–2015). The United States has taken the position in cases before the United States Court of Federal Claims that the 2014 and 2015 Risk Corridors payments are due and payable only at the conclusion of the three-year program. *See, e.g., Health Republic Ins. Co v. United States*, 129 Fed. Cl. 757, 770 (Fed. Cl. 2017) (stating that it would be "folly" to argue that the Risk Corridors provisions do not mandate the payment of money to insurers and that the United States instead argues that the amounts are not presently due). The Liquidator believes this position to be without merit. Indeed, the United States has lost this argument in two recent cases in the U.S. Court of Federal Claims, in which the court held that Risk Corridors payments are due and payable by the United States on an annual basis rather than at the conclusion of the three-year program. *See Health Republic*, 129 Fed. Cl. at 776 (holding that the 2014–2015 Risk Corridors payments were ripe for adjudication because the United States is required to make annual Risk Corridors payments to eligible Qualified Health Plans); *see also Moda Health Plan, Inc. v. United States*, No. 16-649C, 2017 WL 527588, *1 (Fed. Cl. February 9, 2017) ("The

6

Court finds that the ACA requires annual payments to insurers, and that Congress did not design the risk corridors program to be budget-neutral.").

In any event, whether the 2014–2015 Risk Corridors payments are presently due and payable does not impact the Liquidator's ability to effectuate the set off. Connecticut courts have long recognized that where one of the parties to mutual debts is insolvent, set off may be effectuated even though one or more of the obligations is not due and payable. *See Sullivan v. Merchants Nat'l Bank*, 144 A. 34 (Conn. 1928). In that case, the Court held that the creditor (a bank) could set off amounts due and payable to an insolvent estate against amounts owing, but not payable, to the creditor under a note from the estate. *Id.* at 34–35. The Court noted that "[w]hen a creditor's debt to the insolvent is not yet payable, while the insolvent's debt to the creditor is payable, the authorities are in practically complete harmony in allowing the set-off of these debts. But where the creditor's debt to the insolvent is due, and the insolvent's debt to him is not due, the authorities are divided; the weight of authority being in favor of allowing set-off." *Id.* at 35.

The *Sullivan* Court determined that principles of equity, out of which the right of set-off grew, supported the allowance of set off where one of the parties was insolvent. These principles support the set off effectuated by the Liquidator in this case. A portion of the amounts owing by HealthyCT is presently due and payable to the United States. The ability to set off amounts due and payable by an insolvent party against amounts that are either owing or presently due and payable to the insolvent party is well settled. *Sullivan*, 144 A. at 35. A portion of the amounts owing by HealthyCT is owing but not yet due and payable. The equities support HealthyCT's set off of these amounts. The set off will benefit the estate and its creditors and allow for more efficient administration of the estate. By effectuating the set off, the Liquidator will prevent the

7

United States from later setting off amounts against the Transitional Reinsurance payment that is owed by the United States. Unlike the Risk Corridors obligation, there is no dispute as to when this obligation will become due and payable by the United States. Thus, by effectuating set off now, the Liquidator has paved the way for timely payment of the Transitional Reinsurance payment from the United States as and when it becomes due in July 2017.[3] It is the Liquidator's duty to marshal estate assets and she has the power to take such actions as are "necessary or expedient to collect, conserve or protect [HealthyCT's] assets...." Conn. Gen. Stat. § 38a-923(a)(6) (emphasis added). The set off effectuated by the Liquidator fulfils this duty and is supported by Connecticut law.

## CONCLUSION

For the reasons set forth above, the Liquidator respectfully requests that the Court enter an order approving the Motion in the form annexed thereto.

Respectfully submitted,

Dated: March 3, 2017          MORGAN, LEWIS & BOCKIUS LLP


By: /s/ Harold S. Horwich
    Harold S. Horwich
    Benjamin J. Cordiano
    MORGAN, LEWIS & BOCKIUS LLP
    One State Street
    Hartford, Connecticut 06103-3178
    Telephone: 860.240.2700

*Attorneys for Katherine L. Wade, Insurance Commissioner of the State of Connecticut, in her capacity as Liquidator of HealthyCT, Inc.*

---

[3] Approximately ten percent of the aggregate Transitional Reinsurance payment is presently due and payable. The remainder is owing and will become due and payable in July of this year.

8

**CERTIFICATE OF SERVICE**

This is to certify that on March 3, 2017, a copy of the foregoing *Liquidator's Brief in Support of Motion to Approve the First Accounting and Status Report of the Liquidation Proceeding and the Acts Reported Therein* has been sent by first class mail, postage prepaid to the following:

John A.B. Langmaid
Office of the Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141

Ernest J. Wright, Executive Director
Connecticut Life and Health Insurance Guaranty Association
P.O. Box 1550
Pawcatuck, CT 06379

Cindy Coles Oliver, Esq.
Lewis Roca Rothgerber Christe LLP
1200 Seventeenth Street, Suite 3000
Denver, CO 80202

/s/ Harold S. Horwich
Harold S. Horwich
Benjamin J. Cordiano
MORGAN, LEWIS & BOCKIUS LLP
One State Street
Hartford, Connecticut 06103-3178
Telephone: 860.240.2700

*Attorneys for Katherine L. Wade, Insurance Commissioner of the State of Connecticut, in her capacity as Liquidator of HealthyCT, Inc.*

# EXHIBIT A

**Setoff Notice**


**HEALTHYCT**
YOUR HEALTH~ YOUR PLAN.

February 14, 2017

The Honorable Tom Price
Secretary of U.S. Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC

Re: Recent Action in the Liquidation of HealthyCT, Inc.

Dear Secretary Price:

I am the Special Deputy Liquidator of HealthyCT, Inc., in Liquidation ("HCT"), and by this letter
I advise you of action the Liquidator has taken on behalf of HCT with respect to obligations owing
by and to the United States and its agencies. These obligations are set forth below.

1. Risk Corridors payments are owing to HCT for the 2014 and 2015 plan years in the
   aggregate amount $16,165,020. Exhibit A attached hereto contains correspondence and
   materials from the U.S. Department of Health and Human Services, Centers for Medicare
   & Medicaid Services ("CMS") confirming this amount, toward which CMS has made
   minimal payments.[1]

2. A Risk Corridors payment is owing to HCT for the 2016 plan year in an amount calculated
   to be $22,367,329. This amount was determined using 2016 data and an actuarial model
   developed by a third party pursuant to parameters established by CMS. The model and
   HCT's methodology for calculating these amounts have been subject to third party review
   and audit. Exhibit B attached hereto provides a breakdown of this Risk Corridors amount
   by line of business.

3. A final Transitional Reinsurance payment is owing to HCT for the 2015 plan year in the
   amount of $655,234. Exhibit C attached hereto contains a payment summary received
   from CMS in January 2017 confirming this receivable amount.

4. A Transitional Reinsurance payment is owing to HCT for the 2016 plan year in an amount
   calculated to be $5,618,398. This amount was determined using 2016 incurred, paid and
   pended claim data as of January 24, 2017, based on the 2016 benefit-year parameters
   established by CMS.

5. A Risk Adjustment payment is owing by HCT for the 2016 plan year in an amount
   calculated to be $7,256,549. This amount was determined using an actuarial model
   developed by a third party pursuant to parameters established by CMS based on paid claims
   through October 2016. The Risk Adjustment amount will be adjusted as paid claims

---

[1] 12.6% and 1.9% of the Risk Corridors amount for 2014 have been paid by CMS in 2015 and 2016. These partial
payments were deducted from the total Risk Corridors amounts in the CMS reports attached as Exhibit A.


through December 2016 are submitted to the CMS EDGE server by HCT and other Connecticut certified health plan carriers.

6. Transitional Reinsurance Fees, Risk Adjustment User Fees and Patient-Centered Outcomes Research Institute fees are owing by HCT for the 2016 plan year in an amount calculated to be $1,167,728. These calculations are based on HCT's enrollment and the per-covered life rates and methodologies established by CMS and the IRS.

7. Advanced Premium Tax Credits ("APTC") and Cost Share Reduction ("CSR") reconciliation amounts are owing by HCT for the 2016 plan year in the amount of $1,515,100. The APTC amount is based on APTC subsidy reports supplied by Access Health CT, inclusive of retroactive adjustments, compared to cumulative amounts funded by CMS. The CSR Reconciliation amount represents CSR advance payments for the months of October, November, and December 2016 pending final reconciliation of the difference between the 2016 advance payments and actual 2016 claim experience.

By this letter, you are hereby advised that the Liquidator has set off items 5, 6 and 7 against items 1 and 2. These setoffs have been effectuated pursuant to the Liquidator's authority under Conn. Gen. Stat. §§ 38a-923(a)(6), 38a-923(b), 38a-932(a), paragraphs 4 through 6 of the Order of Liquidation entered December 9, 2016, and Connecticut common law and equity.

The United States may contend that the amounts set forth in item 1 are not currently due. HCT disagrees with this position, but such amounts, at a minimum, are undoubtedly owed by the United States' own admissions. In addition, the U.S. Court of Federal Claims has held in two recent cases that Risk Corridors payments are due and payable by the United States on an annual basis. *See Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757, 776 (Fed. Cl. 2017) (holding that Risk Corridors claims were ripe for adjudication because the United States is required to make annual Risk Corridors payments to eligible qualified health plans); *see also Moda Health Plan, Inc. v. United States*, No. 16-649C, 2017 WL 527588, *1 (Fed. Cl. February 9, 2017) ("The Court finds that the ACA requires annual payments to insurers, and that Congress did not design the risk corridors program to be budget-neutral."). Under Connecticut law, where one of the parties to mutual debts is insolvent, set off may be effectuated even though one or more of the obligations is not yet due. *Sullivan v. Merchants Nat'l Bank*, 144 A. 34 (Conn. 1928). Therefore, items 5, 6 and 7 are considered paid in full, and I have adjusted HCT's records accordingly. Items 3 and 4 should be paid in full by the United States as and when due, based on the balance of the mutual debts of the United States and HCT.[2]

---

[2] The proceeds of the Series A (Start-up) and Series B (Solvency) Loans, issued pursuant to the Loan Agreement dated June 7, 2012, between CMS and HCT (as amended, the "Loan Agreement"), are structured as surplus notes pursuant to the National Association of Insurance Commissioners Statement of Statutory Accounting Principles 41. Given their structure as surplus notes, amounts are not owing by HCT other than with the prior approval of the


**HEALTHYCT**

February 14, 2017
Page 3

The Liquidation Court will be notified of the mutual obligations discussed herein and the set offs effectuated in my next accounting and status report.
Please let me know if you have any questions.

Respectfully yours,

Dan Watkins
Special Deputy Liquidator for
HealthyCT, Inc.

Email ccs:    Tom Donahue, CMS Consumer Information and Insurance Oversight (CCIIO),
Thomas.donahue@cms.hhs.gov

Jeff Wu, Acting Director & Acting Marketplace CEO (CMS/CCIIO),
jeff.wu@cms.hhs.gov

Jeff Grant, Director, Payment Policy and Financial Management Group
(CMS/CCIIO), jeff.grant@cms.hhs.gov

Matt Lynch, Director, State Marketplace and Insurance Programs Group
(CMS/CCIIO), matthew.lynch@cms.hhs.gov

Serena Orloff, United States Department of Justice, Civil Division, Commercial
Litigation Branch, serena.m.orloff@usdoj.org

---

Connecticut Insurance Commissioner. *See* Series A and B Promissory Notes, attached to the Loan Agreement as Appendices ("Notwithstanding any conflicting provisions contained in the Loan Agreement, payment shall be on the terms and subject to the conditions set forth in this Surplus Note....This Surplus Note shall be repaid only out of the surplus earnings of Borrower and, as to each payment, only with the prior approval of the Connecticut Insurance Commissioner or his designee."). The surplus notes therefore are not subject to set off as a mutual debt owing by HCT to CMS. CMS's waiver of set off in the Promissory Notes confirms this treatment: "[t]he obligation of Borrower under this Promissory Note may not be offset or be subject to recoupment with respect to any liability or obligation owed to Borrower."

EXHIBIT A

## Department of Health & Human Services

Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201



**Date:** November 19, 2015

**Subject:** Risk Corridors Payment and Charge Amounts for Benefit Year 2014

**Background:**

Section 1342 of the Affordable Care Act directs the Secretary of the Department of Health and Human Services (HHS) to establish a temporary risk corridors program that provides issuers of qualified health plans (QHPs) in the individual and small group markets additional protection against uncertainty in claims costs during the first three years of the Marketplace. The program, which was modeled after a similar program implemented as part of the Medicare Part D prescription drug benefit program, encourages issuers to keep their rates stable as they adjust to the new health insurance reforms in the early years of the Marketplaces.

HHS has previously stated that if risk corridors collections for a particular year are insufficient to make full risk corridors payments for that year, risk corridors payments for the year will be reduced pro rata to the extent of any shortfall.[1] On October 1, 2015, HHS announced the payment proration rate for 2014 will be approximately 12.6 percent, reflecting risk corridors charges of $362 million and payments of $2.87 billion requested by issuers.[2] This proration rate was based on the most current risk corridors data submitted by issuers and assumes full collection of charges from issuers.

Today, HHS is releasing issuer-level risk corridors payments and charges based on the most current risk corridors data submitted by issuers and assuming full collection of charges from issuers, by market and state, for the 2014 benefit year. The tables below include the risk corridors payment or charge amounts for the individual and small group markets, respectively, and the prorated risk corridors payment, if applicable. **Risk corridors charges payable to HHS are not prorated, and the full risk corridors charge amounts are noted in the chart below. Only risk corridors payment amounts are prorated.** HHS will begin collection of risk corridors charges in November 2015 and will begin remitting risk corridors payments to issuers starting in December 2015.[3]

---

[1] "Risk Corridors and Budget Neutrality", published April 11, 2014 and posted at
https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf

[2] The exact proration rate for 2014 is 12.6178665287897%.

[3] We note that the risk corridor payment and charge amounts published in this bulletin do not reflect any payment or charge adjustments due to resubmissions after September 15, 2015 or any amount held back for appeals.

**Table 1 – Alabama**

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | PRORATED AMOUNT (INDIVIDUAL MARKET) | PRORATED AMOUNT (SMALL GROUP MARKET) |
|---|---|---|---|---|---|---|
| AL | 44580 | Humana Insurance Company | $ 947,116.86 | $ - | $ 119,505.94 | $ - |
| AL | 46944 | Blue Cross and Blue Shield of Alabama | $ 354,762.84 | $ - | $ 44,763.50 | $ - |
| AL | 59809 | UnitedHealthcare Life Insurance Company | $ - | $ (4,761.86) | $ - | $ (4,761.86) |

**Table 2 – Alaska**

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | PRORATED AMOUNT (INDIVIDUAL MARKET) | PRORATED AMOUNT (SMALL GROUP MARKET) |
|---|---|---|---|---|---|---|
| AK | 38344 | Premera Blue Cross Blue Shield of Alaska | $ 8,126,435.92 | $ 122,178.45 | $ 1,025,382.84 | $ 15,416.31 |
| AK | 73836 | Moda Health Plan, Inc. | $ 1,237,418.79 | $ 448,597.16 | $ 156,135.85 | $ 56,603.39 |

**Table 3 – Arizona**

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | PRORATED AMOUNT (INDIVIDUAL MARKET) | PRORATED AMOUNT (SMALL GROUP MARKET) |
|---|---|---|---|---|---|---|
| AZ | 23307 | Humana Health Plan, Inc. | $ 1,851,728.19 | $ - | $ 233,648.59 | $ - |
| AZ | 51485 | Health Net Life Insurance Company | $ 38,309,878.15 | $ 6,528,368.90 | $ 4,833,889.29 | $ 823,740.87 |
| AZ | 53901 | Blue Cross Blue Shield of Arizona, Inc. | $ 11,688,096.55 | $ (216,623.22) | $ 1,474,788.42 | $ (216,623.22) |
| AZ | 60761 | Meritus Health Partners | $ 3,401,552.97 | $ 88,126.95 | $ 429,203.41 | $ 11,119.74 |

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | PRORATED AMOUNT (INDIVIDUAL MARKET) | PRORATED AMOUNT (SMALL GROUP MARKET) |
|---|---|---|---|---|---|---|
| CO | 21032 | Kaiser Foundation Health Plan of Colorado | $ 14,160,790.95 | $ - | $ 1,786,789.70 | $ - |
| CO | 49375 | Cigna Health and Life Insurance Company | $ (632,444.16) | $ - | $ (632,444.16) | $ - |
| CO | 63312 | Colorado Choice Health Plans | $ 5,893,514.24 | $ 114,299.01 | $ 743,635.76 | $ 14,422.10 |
| CO | 66699 | Denver Health Medical Plan, Inc. | $ 287,542.11 | $ - | $ 36,281.68 | $ - |
| CO | 74320 | Humana Health Plan | $ 3,183,617.97 | $ - | $ 401,704.67 | $ - |
| CO | 76680 | HMO Colorado, Inc., dba HMO Nevada | $ 1,479,675.14 | $ (21,811.05) | $ 186,703.43 | $ (21,811.05) |
| CO | 80208 | Rocky Mountain Health Care Options | $ - | $ 440,553.54 | $ - | $ 55,588.46 |
| CO | 92137 | All Savers Insurance Company | $ (107,467.82) | $ - | $ (107,467.82) | $ - |
| CO | 97879 | Rocky Mountain HMO | $ 1,470,136.36 | $ 578,003.29 | $ 185,499.84 | $ 72,931.68 |

**Table 7 – Connecticut**

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | PRORATED AMOUNT (INDIVIDUAL MARKET) | PRORATED AMOUNT (SMALL GROUP MARKET) |
|---|---|---|---|---|---|---|
| CT | 49650 | UnitedHealthcare Insurance Company | $ - | $ 11,299.51 | $ - | $ 1,425.76 |
| CT | 76962 | ConnectiCare Benefits, Inc. | $ (717,037.34) | $ - | $ (717,037.34) | $ - |
| CT | 86545 | Anthem Health Plans, Inc. (Anthem BCBS) | $ (863,733.24) | $ (26,699.38) | $ (863,733.24) | $ (26,699.38) |
| CT | 91069 | HealthyCT, Inc. | $ 1,561,247.18 | $ 272,638.90 | $ 196,996.09 | $ 34,401.21 |

**Department of Health & Human Services**

Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight 200
Independence Avenue SW
Washington, DC 20201



---

**Date:** November 18, 2016

**Subject:** Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year

**Background:**

Section 1342 of the Affordable Care Act directs the Secretary of the Department of Health and Human Services (HHS) to establish a temporary risk corridors program that provides issuers of qualified health plans (QHPs) in the individual and small group markets additional protection against uncertainty in claims costs during the first three years of the Marketplace.

HHS established a three-year payment framework for the risk corridors program and outlined the details of this payment framework in our April 11, 2014 guidance on *Risk Corridors and Budget Neutrality*.[1] As set forth in that guidance, if risk corridors collections for a particular year are insufficient to make full risk corridors payments for that year, risk corridors payments for the year will be reduced pro rata to the extent of any shortfall. Because risk corridors payments for the 2014 benefit year exceeded risk corridors collections for that benefit year, risk corridors collections for the 2015 benefit year will be used first towards remaining balances on 2014 benefit year risk corridors payments.

On September 9, 2016, HHS published guidance on *Risk Corridors Payments for 2015*, stating that we anticipated that all 2015 benefit year collections would be used toward remaining 2014 benefit year risk corridors payments, and that no funds would be available at this time for 2015 benefit year risk corridors payments.[2] Today, we are confirming that all 2015 benefit year risk corridors collections will be used to pay a portion of balances on 2014 benefit year risk corridors payments.

We are also announcing issuer-level risk corridors payments and charges for the 2015 benefit year. The tables below show risk corridors payments and charges calculated for the 2015 benefit year, by State and issuer, and the additional amount based on anticipated 2015 risk corridors collections that HHS expects to pay towards the calculated 2014 benefit year payments.[3] Pursuant to 45 CFR

---

[1] *Risk Corridors and Budget Neutrality*, available at: https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf
[2] *Risk Corridors Payments for 2015*, available at:
https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/Risk-Corridors-for-2015-FINAL.PDF
[3] Risk corridor payment and charge amounts published in this bulletin do not reflect any payment or charge adjustments due to resubmissions after September 30, 2016 or any amount held back for appeals.

153.510(g), the 2015 benefit year risk corridors amounts listed in this report include the direct adjustment for issuers that reported certified estimates of the cost-sharing reduction portion of advance payments that were lower than the actual CSRs provided for the 2014 benefit year (as calculated under CSR reconciliation for the 2014 benefit year). On November 17, 2016, HHS notified issuers subject to the direct adjustment to 2015 benefit year risk corridors amounts of the calculated adjustment amount, consistent with guidance issued on September 15, 2016.[4]

Risk corridors payments are reduced pro rata based on risk corridors collections received. HHS intends to collect the full 2015 risk corridors charge amounts indicated in the tables below. HHS is collecting 2015 risk corridor charges in November 2016, and will begin remitting risk corridors payments to issuers in December 2016, as collections are received.

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS 2015 RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS 2015 RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | EXPECTED PAYMENT TOWARD 2014 AMOUNTS |
|---|---|---|---|---|---|
| AK | 38344 | Premera Blue Cross Blue Shield of Alaska | $7,479,997.83 | $716,228.92 | $274,005.10 |
| AK | 73836 | Moda Health Plan, Inc. | $28,630,662.11 | $2,900,481.02 | $56,006.61 |
| AL | 44580 | Humana Insurance Company | $2,935,440.73 | $0.00 | $31,461.63 |
| AL | 46944 | Blue Cross and Blue Shield of Alabama | $79,476,154.29 | $10,341,860.76 | $11,784.62 |
| AL | 59809 | UnitedHealthcare Life Insurance Company | $0.00 | $6,577.07 | $0.00 |
| AL | 68259 | UnitedHealthcare of Alabama, Inc. | $8,688,275.81 | $0.00 | N/A |
| AR | 62141 | Celtic Insurance Company | $1,812,823.37 | $0.00 | $0.00 |
| AR | 70525 | QCA Health Plan, Inc. | $476,592.83 | $0.00 | $138,891.20 |
| AR | 75293 | USAble Mutual Insurance Company | $15,919,592.28 | -$7,883.38 | $0.00 |
| AR | 37903 | QualChoice Life & Health Insurance Company, Inc. | $4,524,487.98 | $0.00 | N/A |
| AZ | 23307 | Humana Health Plan, Inc. | $202,481.41 | $0.00 | $61,511.29 |
| AZ | 51485 | Health Net Life Insurance Company | $95,219,226.99 | $17,249,722.49 | $1,489,451.17 |
| AZ | 53901 | Blue Cross and Blue Shield of Arizona, Inc. | $51,990,665.22 | $0.00 | $388,258.91 |
| AZ | 60761 | Meritus Health Partners | $54,694,644.83 | $702,732.99 | $115,921.29 |
| AZ | 70239 | Health Choice Insurance Co. | $4,444,184.06 | $0.00 | $41,795.92 |
| AZ | 84251 | Aetna Life Insurance Company | -$389,753.48 | $0.00 | $1,995.46 |
| AZ | 86830 | Cigna Health and Life Insurance Company | $1,023,204.62 | $0.00 | $5,758.61 |
| AZ | 88925 | University of Arizona Health Plans-University Healthcare, Inc. | $1,213,077.74 | $0.00 | $21,429.04 |
| AZ | 91450 | Health Net of Arizona, Inc. | $38,681,654.46 | $5,438,853.29 | $1,523,528.06 |
| AZ | 92045 | Meritus Mutual Health Partners | $11,438,590.03 | $1,437,229.12 | $62,237.55 |

[4] *Reporting of Risk Corridors Amounts Reflecting Certified Estimates of 2014 Cost-Sharing Reduction Amounts in Part 3, Line 1.7 of the Medical Loss Ratio Annual Reporting Form for the 2015 Benefit Year,* available at: https://www.regtap.info/uploads/library/RC_CSRandMLR_091516_v1_5CR_091516.pdf

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS 2015 RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS 2015 RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | EXPECTED PAYMENT TOWARD 2014 AMOUNTS |
|---|---|---|---|---|---|
| AZ | 65441 | Phoenix Health Plans, Inc. | $34,931.14 | $0.00 | N/A |
| AZ | 80863 | Time Insurance Company | $7,624,448.10 | $0.00 | N/A |
| AZ | 98971 | All Savers Insurance Company | $7,002,813.66 | $0.00 | N/A |
| CA | 18126 | MOLINA HEALTHCARE OF CALIFORNIA | $1,784,227.07 | $0.00 | $0.00 |
| CA | 27603 | Blue Cross of California(Anthem BC) | -$808,605.43 | $0.00 | $0.00 |
| CA | 40513 | Kaiser Foundation Health Plan, Inc. | $39,758,493.83 | $47,233,593.74 | $1,226,858.64 |
| CA | 47579 | Chinese Community Health Plan | -$25,303.31 | $0.00 | $23,677.66 |
| CA | 67138 | Health Net of California, Inc | $24,828,036.37 | $0.00 | $0.00 |
| CA | 70285 | CA Physician's Service dba Blue Shield of CA | $29,839,109.20 | -$217,494.36 | $0.00 |
| CA | 84014 | County of Santa Clara | $151,037.85 | $0.00 | $0.00 |
| CA | 92499 | Sharp Health Plan | $0.00 | -$31,033.86 | $258.29 |
| CA | 92815 | Local Initiative Health Authority for Los Angeles County | $8,255,198.64 | $0.00 | $450,495.26 |
| CA | 93689 | Western Health Advantage | $0.00 | $171,678.94 | $193.15 |
| CA | 99110 | Health Net Life Insurance Company | $130,379,454.51 | $10,868,970.44 | $168,047.08 |
| CA | 99483 | CONTRA COSTA HEALTH PLAN | $0.00 | $0.00 | $0.00 |
| CO | 11555 | New Health Ventures Inc | $88,645.17 | $0.00 | $3,538.44 |
| CO | 20472 | Colorado Health Insurance Cooperative, Inc. | $97,136,652.48 | $1,558,715.85 | $475,035.47 |
| CO | 21032 | Kaiser Foundation Health Plan of Colo. | $52,928,909.77 | $0.00 | $470,397.66 |
| CO | 49375 | Cigna Health and Life Insurance Company | $2,017,361.36 | $0.00 | $0.00 |
| CO | 63312 | Colorado Choice Health Plans | $1,597,077.24 | $60,789.09 | $199,569.45 |
| CO | 66699 | Denver Health Medical Plan, Inc | $141,372.24 | $0.00 | $9,551.66 |
| CO | 74320 | Humana Health Plan | $2,856,524.81 | $0.00 | $105,754.43 |
| CO | 76680 | HMO Colorado, Inc., dba HMO Nevada | $3,002,631.67 | $38,482.92 | $49,152.32 |
| CO | 80208 | Rocky Mountain Health Care Options | $0.00 | $0.00 | $14,634.44 |
| CO | 92137 | All Savers Insurance Company | $184,407.92 | $0.00 | $0.00 |
| CO | 97879 | Rocky Mountain HMO | $32,345,160.48 | $780,733.56 | $68,035.75 |
| CT | 49650 | UnitedHealthcare Insurance Company | $222,890.06 | $265,020.43 | $375.35 |
| CT | 76962 | ConnectiCare Benefits, Inc. | $0.00 | $0.00 | $0.00 |
| CT | 86545 | Anthem Health Plans Inc(Anthem BCBS) | -$691,198.86 | $0.00 | $0.00 |
| CT | 91069 | HealthyCT, Inc. | $12,859,364.54 | $1,723,783.09 | $60,918.61 |
| DC | 41842 | UnitedHealthcare Insurance Company | $0.00 | $0.00 | $0.00 |
| DC | 73987 | Aetna Health Inc. (a PA corp.) | $0.00 | $220,036.68 | $0.00 |
| DC | 75753 | Optimum Choice, Inc. | $0.00 | -$240,089.45 | $0.00 |
| DC | 77422 | Aetna Life Insurance Company | $42,898.21 | $112,048.45 | $0.00 |

EXHIBIT B

# HEALTHYCT
## 2016 BENEFIT YEAR RISK CORRIDOR CALCULATION

| Risk Corridor Development | IND | SG | LG | IND+SG |
|---|---|---|---|---|
| Premium | $79,080,600 | $55,763,791 | $60,942,815 | $134,844,391 |
| Paid Claims – Less CSR | $0 | $0 | $0 | $0 |
| Reinsurance Recoveries | -$7,865,812 | $0 | -$2,564,627 | -$7,865,812 |
| Reserves | $101,142,988 | $51,910,980 | $64,829,283 | $153,053,968 |
| Total Claims – Less CSR | $93,277,176 | $51,910,980 | $62,064,636 | $145,188,156 |
| Admin Expenses | $16,883,037 | $14,454,572 | $12,450,134 | $31,317,609 |
| Taxes and Fees | $1,993,501 | $1,351,106 | $1,801,038 | $3,344,607 |
| After-tax Premium | $77,087,099 | $54,412,685 | $59,141,777 | $131,499,784 |
| Risk-corridor Profit | $3,854,355 | $2,720,634 | $2,957,089 | $6,574,989 |
| Allowable Admin Expenses | $18,952,663 | $13,321,897 | $14,812,229 | $32,274,559 |
| Target Amount | $60,127,937 | $42,441,894 | $46,130,586 | $102,569,832 |
| Risk Corridor Ratio | 155.13% | 122.31% | 134.54% | 141.55% |

### Risk Corridors

| Factor | Low | High | | | | | |
|---|---|---|---|---|---|---|---|
| -80% | 0% | | 92% | $0 | $0 | $0 | $0 |
| -50% | 92% | | 97% | $0 | $0 | $0 | $0 |
| 0% | 97% | | 100% | $0 | $0 | $0 | $0 |
| 0% | 100% | | 103% | $0 | $0 | $0 | $0 |
| 50% | 103% | | 108% | $1,503,198 | $1,061,047 | $1,153,265 | $2,564,246 |
| 80% | 108% | | 999% | $22,671,203 | $4,858,987 | $9,794,882 | $27,530,190 |

| | | |
|---|---|---|
| Total Receivable (Payment) | $24,174,401 | $5,920,035 |
| Estimated QHP % | 85.0% | 25.0% |
| | $20,548,241 | $1,480,009 |

## Risk Corridor Formula
### Full Year Estimate

| | Individual | Small Group |
|---|---|---|
| Premium Earned Including Premium Tax Credits | $79,080,600 | $55,763,791 |
| - Taxes and Regulatory Fees | $1,993,501 | $1,351,106 |
| **After Tax Premiums Earned** | $77,087,099 | $54,412,685 |
| Administration Costs (less taxes and regulatory fees) | $14,869,537 | $13,103,466 |
| + Profits Earned | -$31,059,614 | -$10,601,761 |
| Profit (minimum of 3% of after tax premium) | $2,312,613 | $1,632,381 |
| Admin Costs (2016: 22%) | $16,959,162 | $11,970,791 |
| + Taxes and Regulatory Fees | $1,993,501 | $1,351,106 |
| **Allowable Administrative Costs** | $18,952,663 | $13,321,897 |
| Claims (less CSR payments) | $0 | $0 |
| + Claim-Related Retention (QI/Health IT) | $0 | $0 |
| + Risk Adjustment Charges | $0 | $0 |
| - Risk Adjustment Receivables | $0 | $0 |
| - Reinsurance Receivables | -$7,865,812 | $0 |
| +Change in reserves | $101,142,988 | $51,910,980 |
| **Allowable Costs** | $93,277,176 | $51,910,980 |
| **Target Amount** | $60,127,937 | $42,441,894 |
| **Risk Corridor Ratio** | 1.55 | 1.22 |
| Risk Corridor Receivable / (Payment) | $24,174,401 | $5,920,035 |
| Risk Corridor Receivable / (Payment) - % QHP + Margin | $ 20,548,241 | $ 1,480,009 |
| % QHP + Margin | 85% | 25% |
| 108% | 0.4020 | 0.1395 |
| 103%-108% | 0.0000 | 0.0000 |
| 92%-97% | 0.0000 | 0.0000 |
| 92% | 0.0000 | 0.0000 |

5.0%
22%

EXHIBIT C

## 2015 CT Reinsurance Payment #3 Summary Report

| Issuer ID | Issuer Legal Name | EDGE RI Payment Calculation | Projected Proration Factor | Projected RI Payment Amount | Previous RI Remaining Balance | Prorated Payment Amount 1/23/2017 | New RI Remaining Balance |
|---|---|---|---|---|---|---|---|
| 9f008 | Healthy CT, Inc. | $20,743,824.90 | 55.0816% | $ 11,421,688.53 | $1,228,201.27 | $572,966.82 | $655,234.45 |

## EXHIBIT B

### Affordable Care Act Programs

*Transitional Reinsurance*

The transitional reinsurance program is a three-year program for plan years 2014, 2015 and 2016. It requires insurers to fund a reinsurance entity that makes reinsurance payments to insurers that covered high risk individuals in the individual market for any plan year beginning in the program's three-year period. 42 U.S.C. § 18061.

*Risk Corridors*

The risk corridors program is a three-year program covering policy years 2014, 2015 and 2016. 42 U.S.C. § 18062. Under the risk corridors program, if an insurer's costs are less than a target amount of premium revenues, the insurer is required to pay certain sums to HHS. *Id.* at 18062(b)(2). Conversely, if an insurer's costs exceed a certain percentage of the target amount of premium revenues, HHS must pay certain sums to the insurer. *Id.* at 18062(b)(1).

*Risk Adjustment*

The risk adjustment program is a permanent program under which funds are transferred from plans in the individual and small group markets with low actuarial risk enrollees to plans with high actuarial risk enrollees. 42 U.S.C. § 18063. Under the statute, plans whose enrollees' actuarial risk is below the state average of all enrollees in those plans are assessed. 42 U.S.C. § 18063(a)(1). Those assessments are transferred to plans whose enrollees' actuarial risk is higher than the state average of all enrollees in those plans. *Id.* at 18063(a)(2). The Affordable Care Act required HHS to establish the methodology for calculating risk adjustment payments. *Id.* at 18063(b).

*Advanced Premium Tax Credits*

The Advanced Premium Tax Credit program allows qualifying individuals to access tax credits prior to year-end and apply those credits to subsidize their monthly premium. The amount of the advanced credit is estimated based on information provided by the policyholder. The advanced credit is paid by CMS to the Qualified Health Plan on a monthly basis. Those payments are reconciled on a monthly basis based on enrollment and premium reports.

*Cost-Sharing Reduction*

The Cost-Sharing Reduction program allows qualifying individuals to lower the amount they pay in deductibles, coinsurance and copayments. The amount of the reduction is paid by CMS to the Qualified Health Plan on a monthly basis. The Cost-Sharing Reduction payments are reconciled on a monthly basis, based on enrollment and premium reports, and also reconciled annually based on the difference between the payments and actual claims experience.

*Patient-Centered Outcomes Research Institute Fee*

The Affordable Care Act imposes a fee on Qualified Health Plans to fund the Patient-Centered Outcomes Research Institute (the "PCORI Fee"). The PCORI Fee is based on enrollment and the per-covered life rates and methodologies established by CMS and the Internal Revenue Service.

*Other User Fees*

In addition, the Affordable Care Act requires Qualified Health Plans to pay transitional reinsurance fees and risk adjustment user fees. These fees are calculated based on enrollment and the per-covered life rates and methodologies established by CMS and the Internal Revenue Service.

2

# EXHIBIT E

## Order Approving First Accounting and Status Report and the Acts Reported Therein

DOCKET NO. HHD-CV16-6072516-S : SUPERIOR COURT
:
IN THE MATTER OF HEALTHYCT, INC., : JUDICIAL DISTRICT OF
IN LIQUIDATION : HARTFORD
:
: FEBRUARY 17, 2017

## PROPOSED ORDER APPROVING FIRST ACCOUNTING AND STATUS REPORT OF THE LIQUIDATION PROCEEDINGS AND THE ACTS REPORTED THEREIN AND APPROVING CERTAIN COSTS AND EXPENSES OF HEALTHYCT, INC.

Upon the Motion to Approve The First Accounting And Status Report Of The Liquidation Proceedings And The Acts Reported Therein, and no objection having been filed thereto or all such objections having been heard and overruled, and good and sufficient cause appearing therefor, it is hereby **ORDERED**:

1.     The First Accounting and Status Report of Daniel L. Watkins, Special Deputy Liquidator regarding the affairs of HealthyCT in Liquidation (the "First Status Report") is hereby accepted for filing, and the transactions and acts of the Rehabilitator and Special Deputy reported therein are hereby authorized, approved and ratified, including the set off effectuated by the Special Deputy with respect to the mutual debts and credits to and from entities of the United States government;

2.     The Rehabilitator's payment of the necessary expenses and operational costs of HealthyCT as set out in Exhibit A of the First Status Report and documented in the Supplemental Filing including the Special Deputy's December 2016 and January 2017 fees and expenses are approved pursuant to the Court's general supervision of the Liquidator's administration of HealthyCT's assets pursuant to the Liquidation Order.

**APPROVED AND ORDERED** this _____ day of February 2017.


_____
Judge of the Superior Court

DOCKET NO: HHDCV166072516S

KATHARINE L. WADE, INSURANCE
COMM'R OF THE STATE
  V.
HEALTHYCT, INC.

SUPERIOR COURT

JUDICIAL DISTRICT OF HARTFORD
   AT HARTFORD

5/17/2017

<u>ORDER</u>

ORDER REGARDING:
02/17/2017 123.00 PROPOSED ORDER

The foregoing, having been considered by the Court, is hereby:

ORDER: APPROVED

Short Calendar Results Automated Mailing (SCRAM) Notice was sent on the underlying motion.

415596
_____

Judge: ROBERT B SHAPIRO